ORIGINAL  #9998-3034257

## IN THE UNITED STATES COURT OF FEDERAL CLAIMS

FILED
OCT 23 2015
U.S. COURT OD
FEDERAL CLAIMS

ESTATE OF ERNEST GOTTDIENER,
ESTATE OF JUDIT GOTTDIENER,
ERVIN TAUSKY, AND SUAN INVESTMENTS,
on their own behalf and on behalf of a class
of all others similarly situated,
                       Plaintiffs,
       v.
THE UNITED STATES OF AMERICA,
                       Defendant

No. 15-1245 C

### CLASS ACTION COMPLAINT

Plaintiffs (the "Gottdieners"), individually and on behalf of a class of all others similarly situated (the "Victims"), allege for their complaint with knowledge as to their own acts and status and events taking place in their presence, and on information and belief as to all other matters:

### JURISDICTION

1.     This court has jurisdiction pursuant to 28 U.S.C. § 1491(a). No pending actions in any other forum affect this jurisdiction on account of 28 U.S.C. § 1500.

### CONSTITUTIONAL PROVISION

2.     Plaintiffs' claim is governed by the Fifth Amendment to the United States Constitution, which states in pertinent part that no person shall "be deprived of…property, without due process of law; nor shall private property be taken for public use, without just compensation."

### STATUTORY PROVISION

3.     That property which Plaintiffs' complain was compensably taken from them (or, in the alternative, illegally exacted from them) is a cause of action created by 18 U.S.C. § 3771.

**SUMMARY**

4. For decades the federal district courts of the Second Circuit have led the nation in the number of completely hidden, covert criminal prosecutions they've conducted and kept secret. Almost all of this occurs in the Southern and Eastern Districts, most of even that in the latter.

5. Whenever one of these cases pops up, invariably the secrecy is justified as, "We had to do it to protect the cooperator, no wait, we had to do it to recruit cooperators, no wait, we had to do it to protect national security, no wait, we had to do it to protect ongoing investigations."

6. And with cold inevitability, if a case stays entirely hidden the victims stay entirely in the dark and thus never are given any restitution, even though in most such cases it's mandatory, and importantly, never are afforded their right to sue to get it even though the statute providing it mandates that the government tell the victims of it and the judge make sure that they do.

7. Suppose that somehow, somewhere, either (1) the government has the authority to implement a *de facto* override of victims' rights statutes by the voluntary use of such secrecy; or (2) a court has the authority to do the same thing by ordering such secrecy; (or both).

8. In that case, it would be an authorized taking (by concealment in the face of a duty to disclose) of property (a chose in action) for a public purpose (fighting crime, national security).

9. Then the government must <u>pay</u> for it; even if it's unauthorized, they still have to pay for it as an illegal exaction. <u>They have to pay the victims what they let the criminal keep</u>.

10. Here, all the victims of Felix Sater, who has become the poster boy for the evasion of mandatory restitution as a favor to special cooperators, sue the government to compel it to (1) admit that this evasion was done on authority and then write them all a very big check; (2) admit that this evasion was done without authority and then write them all a very big check; or (3) admit that this evasion was done *ultra vires* in violation of law for no cognizable public purpose and so be forced by public disgrace to consider proper retributive actions to take against those responsible.

**PARTIES**

11. Plaintiffs Ernest and Judit Gottdiener are deceased naturalized citizens, husband and wife, who appear through their estates.

12. Plaintiff Ervin Tausky is an Israeli citizen and is Judit's surviving brother.

13. Plaintiff Suan Investments is a foreign entity serving as a family investment vehicle.

14. Plaintiffs' commonality of interest in recovering in respect of their losses justifies treating them collectively as "the Gottdieners."

15. Defendant United States of America includes the Department of Justice, the United States Judiciary, and all their agents acting at their direction (collectively, "the government").

**ALLEGATIONS**

THE SECRET CONVICTIONS

16. In November and December 1998, in closed federal courtrooms in the Eastern District of New York, three individuals, Felix Sater, Salvatore Lauria, and Gennady Klotsman, secretly pled guilty to racketeering charges for their roles as ringleaders of an organized crime penny stock fraud ("White Rock") which bilked its victims, collectively, of at least $40,000,000.

17. The courtroom closures and related secrecy had been put in place because these three persons had agreed to cooperate against other members of the criminal scheme. Naturally, each had signed cooperation agreements.

18. A little over a year later, in March 2000, then United States Attorney, Eastern District of New York (and current Attorney General of the United States) Loretta Lynch held a press conference and distributed a press release announcing the arrest of 19 persons for their roles in the White Rock racketeering.

19. That press release, a copy of which is attached as Exhibit A and deemed incorporated

herein, generally described the White Rock organized criminal enterprise, named the 19 persons arrested, and, importantly, stated – by name – that Sater, Lauria, and Klotsman had already pled guilty for their roles in the scheme. See Fn.2 therein.

**THE SECRET DOCKETS**

20.     Despite that public disclosure of their felony pleas and convictions, all of Sater, Lauria, and Klotsman's federal criminal dockets stayed hidden from the public. Incredibly, they would stay hidden for 11 years, until 2009 (Lauria); 14 years, until 2012 (Sater), even for 16 years, until 2014 (Klotsman). This was no accident, and both the government and at least one of these three convicted RICO felons were quick to take advantage of the concealment.

21.     In 2002, Sater, for example – while still cooperating – insinuated himself into a New York real estate firm, Bayrock Group, which was then a start-up real estate developer, and by 2003 had become its second-in-command with substantial equity ownership that within a few years would make him by far the firm's largest owner, in early 2007 his interests potentially worth, at least in his own estimate (and the firm's), some $100,000,000 – or even more.

**THE BILLION DOLLAR BANK FRAUD**

22.     That explosion in value happened because, under Sater's purposeful and calculated control and direction, Bayrock affiliated itself with Donald Trump and the Trump Organization and partnered with them on several development projects, then used that Trump connection to fraudulently induce banks (and, to a lesser degree, others) to lend the firm some $1,000,000,000 to finance those Trump (and one or two other) projects, all of which turned out to be disastrous.

23.     Why *disastrous*? The cumulative losses on those loans are into the hundreds of millions.

24.     Why *fraudulently induce*? Unfortunately for the banks (and others like CBRE, which lost tens of millions it had lent, no doubt client money entrusted to it for investment in other than mob-

infested businesses like Bayrock), Sater only disclosed his RICO conviction to a few at Bayrock, including its chairman, Tevfik Arif, and CEO and General Counsel, Julius Schwarz.

25. In short, when all the Bayrock loan applications went in, to GMAC (soon bankrupt, Bayrock losses a factor); to Corus (soon bankrupt, Bayrock losses a factor); to Merrill Lynch (soon insolvent, Bayrock losses a factor)…they all shared one thing in common:

26. Not a one of them disclosed Sater's ownership and control of Bayrock and not a one of them disclosed that he was a secretly convicted RICO felon.

27. Sater knew that without concealing his conviction as a mobster and fraudfeasor no one would have lent a dime. He admitted this at his (long-delayed) sentencing, on October 23, 2009: His sentencing transcript contains his confession – and be aware that this is in open court (at least the government and the presiding judge (Glasser, J.) have so represented in court papers, including those filed by the Solicitor General before the Supreme Court) – that he knew the banks wouldn't have lent if they had known of his conviction. Exhibit B is a copy of that transcript. See pages 17-18.

28. By collective and imputed knowledge, what Sater knew, not to mention what Arif and Schwarz knew, is imputed to Bayrock.

29. Of course by the time of his sentencing, the United States knew too, as the transcript shows him admitting these crimes in open court in front of four FBI agents, two Assistant United States Attorneys, one presiding federal judge – and his own defense counsel, Leslie Caldwell, who (according to Sater's sworn testimony) a few months later advised him not to testify about the concealment of his conviction at Bayrock as he could face criminal prosecution for it, and who is now the current Assistant Attorney General of the United States, Criminal Division, so presumably even then knew what she was talking about *re* federal bank and wire fraud laws.

30. But the United States knew long before that. In a PSR (pre-sentence investigation

report) written five years earlier, in 2004, when Sater was first due to be sentenced, his probation officer admits not only knowing that Sater was hiding his conviction from the firm and his partners there but further admits – not just knowing of, but even willingly joining an "arrangement" between the government and the court meant to ensure that Sater could keep on concealing his conviction.

**THE WHITEY BULGER OF WHITE COLLAR CRIME**

31. Yes, Sater committed all those criminal frauds through his operation of Bayrock.

32. Yes, all those crimes are RICO predicates, which means that throughout that period, 2002-2008 or so, Sater was actually operating yet another racketeering enterprise under the nose of and with the facilitation of the government and the courts.

33. Yes, his cooperation agreement, prohibited him from committing crime while awaiting sentencing as a cooperator, so should have been declared void and Sater thrown in jail long ago.

34. Yes, all those persons defrauded by his Bayrock crimes no doubt have various claims against the persons involved, to the extent they're not cloaked in (that is, hiding behind) immunity.

35. Yes, that means that the government and the courts facilitated the operation and cover-up of this billion dollar racketeering, the cover-up seen especially in its five-year-long efforts since 2010 to keep it quiet by, for example, threatening to prosecute anyone who knew and told anyone for, among other things, criminal contempt for the violation of non-existent orders and for the use of public information to tell a story the courts and the government didn't want told.

36. (But take time to read that again, for it's true that a sitting federal judge ordered a criminal investigation into whether American citizens could be tried and sent to prison for using public information to tell a story that he and other judges and the government just didn't want told.)

37. Yes, it means that the half billion dollars of condominiums at New York's Trump SoHo, a Bayrock-Trump collaboration, were not only built on bank fraud for the corrupt way the

developers obtained the financing but were, every offer, whether or not closed, criminal violations of New York's Martin Act because the condominium disclosure documents "neglected" to tell the buyers about Sater's ownership of co-developer Bayrock and his racketeering conviction.

38. Yes, it means that even where federal judges were explicitly and directly informed of these ongoing frauds that could only be committed by using the secrecy of Sater's criminal case, their response was not only to decline to allow all those who knew to reveal them to the ongoing victims, but to further order all those who knew not to tell anyone, *even including Congress*.

39. In short, yes, it means in size and duration – and now in its implication in a presidential election (because it raises the question what, if anything, did Trump know about his development partner, and when did he know it) – *Felix Sater is the Whitey Bulger of White Collar Crime*.

40. But that's not the gravamen of the case here.

**THE VICTIMS AND THE TAKING
OR ILLEGAL EXACTION**

41. Nor is the gravamen the United States' potential liability *vel non* in tort to those banks, lenders, investors, partners, etc. for emboldening Sater's crimes. Nor is it whether any misconduct justifies investigation, sanction, impeachment, or prosecution.

42. No, it's about the fact that this collaborative effort across the executive and judiciary branches to conceal Sater's conviction carried with it the "necessity" – at least in the government's and court's minds – that it *had* to be concealed, for public purposes, not only from those he was currently defrauding in the 2000s, *post*-White Rock conviction, while running Bayrock, but also from those he had previously defrauded in the 1990s, *at* White Rock.

43. It's about the White Rock Victims and the taking (or in the alternative, the illegal exaction) of property from them which the government did for what it has insisted was necessary to

facilitate the fight against crime, in this case by securing Sater's cooperation.

44. And that, by definition, is a public purpose for Fifth Amendment takings purposes.

45. What property was taken (or exacted) from these Victims?

46. Their Congressionally created choses in action to sue for victims' rights, especially their rights to sue in the district court which sentenced Sater to force him to be sentenced to pay it and their right to sue the district court itself, by mandamus, in the appellate court if it refused.

47. What was its value?

48. The aleatory, or statistical expectation value, of the long-overdue restitution judgment of $40,000,000 accreting at interest they should have had, with which they could have obtained a lien against all Sater's property nationwide, which as noted was worth vastly into the millions by 2007, both with what he was allowed to skim, nearly a million dollars a year in cash, and the astonishing sum his interests in the Bayrock partnerships with Trump became worth. In sum, whatever his earning power and assets were worth for decades.

49. What was its authority?

50. Authority is not to be confused with illegality. Plaintiffs have to argue, in the first alternative, that the government's and court's concerted actions for public purpose were authorized, but not that they were authorized legally, and they do argue, alleging that the authority came from either or both (1) employees of the Department of Justice, whose identity will be found in disclosure; or (2) the judge presiding, (Glasser, J. EDNY) and any other judge whose orders authorized it.

51. In the second alternative, if the person or persons who purported to authorize this taking lacked the authority to do so, or didn't exist to begin with, and it was illegal, but still within the proper scope, then it was an illegal exaction and compensable on that basis.

**THE WHITE ROCK (STATE STREET) RACKETEERING**

52. Exhibit C is a copy of the indictment in the White Rock case now-Attorney General Lynch announced back in March 2000. Plaintiffs incorporate it in this pleading in its entirety as if stated herein. It describes the methods and means of its operation, and Sater's role.

53. Exhibit D is a copy of the information to which Sater pled guilty. Plaintiffs incorporate it as well in this pleading in its entirety as if stated in full herein. It describes the methods and means by which Sater operated the White Rock criminal enterprise.

54. Both the information and indictment are completely consistent, though the indictment is much more thorough and names many more names.

55. These documents and the guilty pleas that followed confirm that (1) Sater was one of the ringleaders of the criminal scheme; and that (2) the scheme involved the use of corrupt brokers not only at White Rock but also at other firms, among the corrupt brokers one Alfred Palagonia and among these firms D. H. Blair, where Palagonia worked while facilitating Sater's White Rock crimes.

**THE GOTTDIENERS' VICTIMIZATION BY PALAGONIA**

56. As set forth in Exhibit C, Palagonia was a top broker at D. H. Blair who made his money in large part by stuffing worthless stocks onto his unsuspecting clients without bothering to tell them first that (1) he'd been bribed by Sater and others to do so as part of the White Rock pump-and-dump market manipulation scheme and that (2) he would refuse to let them sell until he and his cronies, including Sater, cashed out their undisclosed holdings for huge gains, which not surprisingly removed the artificial price support and left his clients with little or nothing.

57. The Gottdieners were defrauded of some $7,000,000 by Palagonia, their broker at D. H. Blair, as part of his role in the scheme.

58. Palagonia admitted his role at his sentencing in 2002 and in particular admitted that

he understood that while he technically was pleading guilty to securities fraud conspiracy, the paragraphs in that White Rock indictment he was admitting to made his admission inclusive of his role in the participation and operation of the White Rock racketeering enterprise run by Sater and others. Exhibit E is a copy of this sentencing transcript.

59. Then, years later in or about 2009, after he'd been resentenced because he'd violated his supervised release from prison by not paying down the $20,000,000 restitution he'd been ordered to pay upon his release, Palagonia admitted under oath in depositions conducted in a suit brought by the Gottdieners that they had been among his victims. Exhibit F is a copy of that deposition.

60. The Gottdieners then filed a CVRA action before the judge (Glasser, J., EDNY) who had presided over that 19-defendant White Rock case, which had been captioned *U.S. v. Coppa et al.*, and who had sentenced Palagonia both times, asking that they be formally recognized as federally protected crime victims of the scheme and asking for an order of restitution.[1]

61. On November 6, 2012, and again on December 11, 2012 with the consent of the government, Judge Glasser so ordered, finding the Gottdieners to be federally protected crime victims and ordering that they receive $1,300,000 in restitution. Exhibit F is a copy of that order.

62. Thus it is settled that the Gottdieners were causally injured by Palagonia's crimes, and that Palagonia's crimes were committed in the scope, and furtherance, of Sater's racketeering.

---

[1] Briefly, restitution for victims of certain crimes in the full amount of their causal injury became a mandatory part of a federal sentencing order with the 1996 effective date of the Mandatory Victim Restitution Act ("MVRA"), 18 U.S.C. § 3663A. It applies to all the crimes relevant here.

Then, with the 2004 effective date of the Crime Victims Rights Act ("CVRA"), 18 U.S.C. § 3771, victims were given the enforceable right to be informed of, inter alia, all open court sentencing proceedings in the case and, in particular point, the right to sue if they disagreed with the judge's sentencing order by moving in the district court for a sentencing order providing such restitution as they felt mandated and moreover to sue the district court itself if it denied their motion by seeking a writ of mandamus from the appellate court.

The statute also requires the district judge to ensure the government meets its duties thereunder.

**THE GOTTDIENERS' VICTIMIZATION BY SATER**

63. Thus it is also settled that insofar as Sater was a ringleader in the criminal enterprise (for that matter even if he was a mere co-participant), as a matter of restitution law, not substantive RICO law, i.e. the MVRA, Sater is responsible for all of their losses as well, jointly and severally (unless found otherwise by the sentencing judge by reason of lesser responsibility or lesser ability to pay. And by definition if they are entitled to such an order of restitution from him they are also his crime victims.

64. Judge Glasser, who also sentenced Sater in 2009, knows this and agrees:

65. On August 12, 2015, Judge Glasser conducted a hearing in a related case, *U.S. v. Berkun*. It concerned the proper method of ordering restitution in a scheme or enterprise crime, and both Judge Glasser and the government are seen to concur that the law requires that all victims be awarded restitution in full and that where, as in White Rock, the crimes were committed during or in furtherance of a scheme, at the very least the ringleaders (so the government admitted) but actually all co-participants (as Judge Glasser quite correctly opined) are jointly and severally liable for all losses suffered by all victims so must each receive sentencing orders of restitution in the full amount thereof, unless the court orders apportionment. Exhibit G is a copy of that transcript. See *passim*.

66. But, again as Judge Glasser noted, the only bases on which there can be an adjudication of such is upon findings of either or both lesser responsibility or lesser ability to pay.

67. Once again, as to joint and several restitution liability, they were and are correct and the law does require joint and several sentencing orders against each defendant sentenced for crimes committed during or in furtherance of a criminal scheme or enterprise absent findings of diminished responsibility or financial ability, and has required so for decades.

**THE GOTTDIENERS' VICTIMIZATION BY THE UNITED STATES**

68. Yet Sater's sentencing transcript, Exhibit B, confirms that no mention was made there of his victims. There was no discussion of, let alone entry of an order and findings of, any reason by which he as an admitted ringleader should not have been ordered to pay $40,000,000 in restitution, accreted at interest to perhaps $100,000,000 during the period from his stock frauds and bribery and money laundering in the 1990s to his sentencing almost 15 years later.

69. This is particularly strange considering that one of the Assistant United States Attorneys present was Marshall Miller, at the time the Victims' Rights Compliance Officer for the Eastern District and so one would expect him to have noticed the gap. (Mr. Miller now serves as chief deputy or assistant to Ms. Caldwell in her role as Assistant Attorney General, Criminal Division.)

70. As well, Sater's 2004 PSR – and by the time it was written, in June 2004, every single one of the 19 *Coppa* defendants had pled guilty and been sentenced, most to million dollar plus orders of restitution, and if this is not literally so, only a handful were left – admits that the government had (after all those years) failed to provide probation with a list of victims and losses or similar information.

71. And along with all those sentencings on the *Coppa* docket are letter after letter written by Assistant United States Attorneys from the EDNY (at least one signed in behalf of Loretta Lynch) to Judge Glasser for use in sentencing all those 19 persons, or almost all, to massive restitution orders.

72. Included among them are lists of victims, account records, losses, and the like.

73. And none of this is surprising, because as the director of the then-new testified before Congress in 2000, the loss determinations had been performed by the Criminal Prosecution Assistance Group of the NASD (now FINRA), reconstructed from trading blue sheets.

74. So it's not surprising that, as one of the ringleaders, Gennady Klotsman (recall he was one of the early cooperators who secretly pled guilty in 1998) was sentenced in 2002 to pay exactly full freight, in other words, to pay the entire $40,000,000 restitution.

75. Unfortunately, it wasn't because that was what the law required. Oh, it was what the law required alright, but that wasn't why it was imposed. No, it was imposed to punish him for being a bad cooperator. (From what's understood in the public meme, Sater, Lauria, and Klotsman had promised to reclaim Stinger missiles from Afghanistan with the help of the Russian Mafia, specifically the Mogelivich syndicate in which Sater's father was a crime boss, in return for making their convictions "disappear" plus a fee to them of $200,000 per missile but Klotsman reneged and asked for more so was punished. No missiles were ever recovered anyway that anyone knows of.

76. So it's hard to understand how, in 2009, given all the above and what must by then have been millions of dollars of restitution received by the government in respect of all those other White Rock defendants who'd been ordered to pay it years before, absolutely no consideration of restitution liability occurred in or about Sater's sentencing, or in it, or after it.

77. Hard, but not impossible.

78. For, plaintiffs allege, the government, with the imprimatur of the court, planned to, decided to, meant to, and then took all possible steps to, never reveal Sater's conviction or sentencing to the public, and accordingly never to reveal it to the hundreds of White Rock victims, which again includes the victims of all its participants at Blair and Baron. And that led to a taking.

**THE TAKING**

79. As noted, as of (and for some years before) Sater's 2009 sentencing, the White Rock victims were vested with the right to be told of it (since again the government and the court insist it was in open court and the transcript shows Sater's real name was used) and in particular the right to sue to force a sentencing order of restitution.

80. Of course those rights would become meaningless and worthless if in contravention of those rules the government and the court (or "the government," in the collective sense that it

includes all three branches) hid everything, the entire case, from the victims.

81. And it did. Besides the question how there can be an open court sentencing that is completely hidden without someone misrepresenting something, there are dozens of documents filed in related court actions since 2010 in which the government and the court insist up down and sideways that "no member of the public" ever knew about the conviction (and thus the whole case).

82. There are only four possibilities: (1) the government had the authority to do this, to keep it hidden by its own determination, notwithstanding the statute; (2) the court had the authority to do this, to keep it hidden by its own determination, notwithstanding the statute, by issuance of orders to that effect; or (3) no one had the authority, but they did it anyway but sufficiently within the proper scope of their functions that it was not *ultra vires*; or (4) no one had the authority and it was so far outside their proper function that it was *ultra vires* and if not criminal, then certainly tortious (and also an express ticket out of absolute immunity as by definition it would be impossible to argue that they were acting officially to do something that they had no possible right or authority to do officially).

83. Thus, insofar as the concealment destroyed, thus took, the choses in action, and knowledge thereof, from their owners the victims, and such have long been recognized as property for purposes of the takings clause (and due process clause), there are only three possibilities: (1) there was a compensable taking for public purpose, and the victims are owed money (and a lot of it); (2) there was a compensable illegal exaction, and the victims are owed money (and a lot of it); or (3) there was complete *ultra vires* illegality and a whole lot of people need to be investigated for it.

84. For the avoidance of ambiguity, the "triggering event" is asserted to be that date of sentencing, October 23, 2009.

85. However, insofar as no victim could have been expected to know of any of this before August 2012 when the court officially unsealed Sater's criminal docket, substantial tolling would apply in any event.

**CLASS ALLEGATIONS**

68. Pursuant to Rule 23, the Gottdieners brings this action on behalf of all those persons who are, should be, or should have been either or both (1) victims of, or (2) beneficiaries of, any order of restitution against, any defendant in *U.S. v. Coppa* or other related case where such persons suffered causal injury mandatorily compensable by restitution under the MVRA or CVRA caused by crimes committed during the White Rock scheme or in facilitation thereof.

69. The requirements of Rule 23(a) are satisfied.

70. Members of the Class are so numerous that joinder is impracticable. Public victim lists show that there are hundreds of class members. The exact number of Class members is unknown to the Gottdieners at this time and can only be ascertained from books and records maintained by the government or its agents.

71. Common questions of law and fact exist as to all Class members. These questions predominate over any questions unique to any individual and include, without limitation, (1) whether the government had any legal basis to appropriate Class members' property; and (2) whether the government appropriated Class members' property without just compensation in violation of the United States Constitution.

72. The Gottdieners' claims are typical of those of other class members. The government's actions alleged have impacted the members equally because such actions have been directed at them as a whole. Accordingly, the Gottdieners' claims against the government based on the conduct alleged would be identical to the claims of other members.

73. The Gottdieners will fairly and adequately protect the interests of Class members. During the time of the conduct at issue, the Gottdieners were one of the two or three largest victims measured in terms of dollars lost and in addition is represented by counsel(s) uniquely well aware of the history of the concealments in this case.

74. Accordingly, the Gottdieners are committed to prosecuting this action to a final resolution and, in furtherance thereof, has retained experienced and competent class counsel.

75. The Gottdieners seek class certification under Rule 23(b)(3) because as described above, common questions of fact and law predominate over any individual issues and a class action is superior to other methods of adjudicating the controversy.

## PRAYER FOR RELIEF

76. Plaintiff incorporates by reference and realleges each allegation set forth above.

77. The government[2] destroyed the rights of Felix Sater's White Rock victims, the Gottdieners and the Victims to sue for restitution.

78. Those rights are private property, rights of action given to the victims by act of Congress, rights which the government was tasked to preserve and protect and inform of, not destroy even if for public purpose.

79. The Government is required, in taking private property, to adhere to due process of law and to respect the legal rights of affected parties.

80. The Government violated the statutory and constitutional rights of the Gottdieners and the Victims in taking from them this right of action, at one time worth perhaps $100,000,000, and certainly worth a great deal even if not that much, as will be determined at trial.

81. Even where property is taken under authority, and certainly where it is illegally exacted, by the Government to serve public purposes, the Constitution requires payment of just compensation.

82. The Government did not pay just compensation.

---

[2] As used throughout, "government" means, where not clearly referring only to the executive branch, the United States, whether the result be a claim of legislative, executive, or judicial.

83. The Taking Clauses of the United States Constitution protects the Gottdieners and the Victims from suffering such an uncompensated deprivation of property.

84. As a result of the Government's violations of the United States Constitution, the Gottdieners and the Victims suffered harm, including monetary damage, directly and proximately caused by the Government's taking or illegal exaction,

85. WHEREFORE, the Gottdieners demand judgment in their favor, and in favor of the Victims, against Defendant United States of America as follows:

A. Determining that this action may be maintained as a class action;

B. Certifying a class of all those persons who are, should be, or should have been either or both (1) victims of, or (2) beneficiaries of, any order of restitution against, any defendant in *U.S. v. Coppa* or other related case where such persons suffered causal injury mandatorily compensable by restitution under the MVRA or CVRA caused by crimes committed during the White Rock scheme or in facilitation thereof.

C. Finding that the Gottdieners have met the requirements of a class representative and may maintain this action in that capacity.

D. Finding that the Defendant United States of America has taken or illegally exacted the property of the Gottdieners and the Victims in violation of the Takings Clause of the United States Constitution.

E. Awarding damages to the Gottdieners and the Victims in a sum to be determined at trial, estimated at $100,000,000 for the compensable loss they sustained as a result of the taking or illegal exaction.

F. Awarding as well pre-judgment and post-judgment interest, together with any and all further costs, disbursements and reasonable attorney's and expert fees; and

G. Granting such other relief, as this Court may deem just and proper.

                                            Dated:   Montauk, N.Y.
                                                       October 23, 2015

By:   /s/ Frederick M. Oberlander
       **THE LAW OFFICE OF FREDERICK M. OBERLANDER, P.C.**
       28 Sycamore Lane (PO Box 1870)
       Montauk, NY 11954
       212.826.0357  Tel.
       212.202.7624  Fax.
       fred55@aol.com