# IN THE UNITED STATES COURT OF FEDERAL CLAIMS

ESTATE OF ERNEST GOTTDIENER,
ESTATE OF JUDIT GOTTDIENER,
ERVIN TAUSKY, AND SUAN INVESTMENTS,
on their own behalf and on behalf of a class of all others
similarly situated,

Plaintiffs,

v.

THE UNITED STATES OF AMERICA,

Defendant

No. 55-01245 (CIVIL)

FIRST AMENDED
CLASS ACTION
COMPLAINT

Plaintiffs ( the "Gottdieners"), individually and for the class of all others similarly situated (the "Victims"), allege with knowledge as to their own acts, their own status, and events which took place in their presence, and on information and belief as to everything else:

## JURISDICTION

1   This court has jurisdiction pursuant to 28 U.S.C. § 1491(a). No pending actions in any other forum affect this jurisdiction on account of 28 U.S.C. § 1500.

## CONSTITUTIONAL PROVISION

2   Plaintiffs' claim is governed by the Fifth Amendment, which states  no person shall "…nor shall private property be taken for public use, without just compensation."

## STATUTORY PROVISION

3   The property which Plaintiffs' complain was compensably taken from them (or was illegally exacted from them) is a chose in action created by 18 U.S.C. § 3771.

## SUMMARY

### PLAINTIFFS SEEK JUST COMPENSATION FOR CHOSES IN ACTION WHICH THE GOVERNMENT TOOK FROM THEM

4      In *Kelo v. City of New London*[i], the Supreme Court allowed a city to condemn the homes of Kelo and other petitioners for transfer to a private developer in return for just compensation. We presume none would argue that if one of those homes had had an option to buy outstanding the Court would have upheld condemnation of that option as well, as an option to buy property is property for takings purposes.

5      An option to buy property may be worth a great deal, depending on its terms, and though its present value is dependent upon future events, the math used to compute it has been well understood for a long time. For example, if a stock is worth $80, an option to buy it for $90 exercisable a year from now may be worth $2 today, even though we can't know with certainty how much it will be worth in a year.

6      This case raises similar issues. Here, plaintiffs complain that their rights to sue, their *choses in action*, were taken by the government for public use so they deserve compensation for the value of those rights at the time of taking.

7      In *Shangai Power*[ii], this court found that a chose in action was property for takings purposes, so this is not new. What is new is the perspective with which we present our claims, *viz*. one of *real option theory*. We consider the property taken from plaintiffs, their choses in action, to be options. In the stock example, the right, but not the obligation, to pay a future $90 (the exercise price) for the stock was property worth $2 (the premium); with a chose in action, plaintiffs' rights, but not their obligations, to pay future legal fees (the exercise price) for potential recoveries was also property then worth a readily determinable premium, for which they seek compensation.

PLAINTIFFS ARE VICTIMS OF FEDERAL CRIMES. THE
CHOSES IN ACTION WHICH THE GOVERNMENT TOOK
FROM THEM ARE THEIR RIGHTS TO SUE THE COURTS
TO COMPEL THEM TO RESENTENCE THE CRIMINALS.

**Federal sentencing laws make the imposition of an order of restitution mandatory and give crime victims the right to sue the court to enforce it.**

8       The years 1996 and 2004 witnessed a sea change in federal sentencing laws. Before 1996, federal district courts could impose an order of restitution as part of a criminal sentence, but it was entirely discretionary with the sentencing judge.

9       In 1996, on the effective date of the Mandatory Victim Restitution Act ("MVRA")[iii], imposition of a sentencing order of restitution became mandatory, but for a few exceptions, for many crimes, though an aggrieved victim who failed to receive the benefit of such an order was dependent on the government to vindicate her rights to it.

10      Then, in 2004, on the effective date of the Crime Victims Rights Act ("CVRA")[iv], victims were given a plethora of enumerated rights, such as rights (1) to reasonable, accurate, and timely notice of public court proceeding involving the crime; (2) not to be excluded from any such proceeding; (3) to be reasonably heard at any public proceeding involving sentencing; and (4) to full and timely restitution as provided in law. The last provision is significant, for it incorporated into the CVRA rights the right to any sentencing order of restitution the MVRA provided.

11      And, the CVRA gave victims the right to sue to enforce those enumerated rights, first by petition in the district court handling the crime and, if the victim was not satisfied with the resolution, then by mandamus in the appropriate appellate court.

12      Obviously, then, such a right to sue was intended as a right to sue the government or the courts to force them to provide those rights, not to sue the criminal himself.

13      This is of great import in the case of the right to restitution. The statutory scheme clearly contemplated that in the case of a sentencing in open court the victim would be (1) told of it in advance; (2) allowed to be heard at it; and (3) if not satisfied with the order of restitution imposed, allowed to sue to have the criminal resentenced.

14      However, the CVRA also provided that a victim could not sue to re-open a sentence unless (1) the victim first asserted her right to be heard during the sentencing; and (2) the victim petitioned the court of appeals for a writ of mandamus within 10 days.

15      In sum, as of 2004 the government not only was required to seek a sentencing order of restitution, and the court not only was required to impose one, but the victim who would benefit from one was able to sue to get one and sue the court to force it to impose one, provided that she first exercised rights to appear and be heard at the sentencing, as noted, the government and courts had an obligation to provide. ¶ 10.

**Plaintiffs and the class they would represent, are crime victims whose rights to bring such suit under the CVRA to obtain restitution were taken from them by the government for a public purpose.**

16      Clearly, if the government and the court intentionally fail to inform the victims of the sentencing to reward a criminal for cooperating by allowing him to be sentenced without an order of restitution and be free of the risk that the victim would sue to obtain one, these victims' rights to sue are taken from them and rendered worthless.

17      And if they do so *lawfully* to benefit law enforcement because rewarding the criminal helps them recruit new cooperators, the taking is compensable. That is the gravamen of this case, where individual and class plaintiffs whose CVRA choses in action for restitution were taken from them for such claimed public good sue for compensation.

## MISCELLANEOUS CONSIDERATIONS ABOUT THE "EMBEDDED OPTIONALITY" CHARACTERIZATION OF THE CHOSE IN ACTION TAKEN BY THE GOVERNMENT

18      Except in a degenerate case, such as the conditional right to buy something in a year if at that time 2+2=5, there is always a value to optionality because there is always an intrinsic value to having the right to do something in the future that you would otherwise not have but for the option. Anyone who has ever played Monopoly knows that, for example, there is some value to a "Get out of jail free" card.

19      Therefore, the existence of a positive valuation of the right to sue, considered as an embedded option in sentencing law, or more properly as an embedded optionality, cannot be disputed.

20      And though this optionality, the victims' chose in action, is not an option on an asset for which there is a liquid, complete market (conditions which, for reasons far beyond the scope of this document, make option valuation relatively straightforward), in fact, such valuations are made routinely, for example in malpractice cases, where a "trial within a trial" determines the value of a wrongfully forfeited claim.

21      Indeed, the modern American legal marketplace is rife with vendors who will either buy or finance litigation with recourse only to any recovery, testament to the clear ability to value the right to sue and thus to value the compensation due for taking it.

## PLAINTIFFS ASK FURTHER RELIEF (COMPLETE REMEDY)

22      To the extent the court finds appropriate and within its jurisdiction as set forth in 28 U.S.C. § 1491(a)(2), as an incident of and collateral to any judgment, plaintiffs ask that it issue orders to officials of the Department of Justice and the United States Judiciary directing the correction of records of victim status.

## PARTIES

23    Plaintiffs Ernest and Judit Gottdiener are deceased naturalized citizens, husband and wife, who appear through their estates.

24    Plaintiff Ervin Tausky is an Israeli citizen and is Judit's surviving brother.

25    Plaintiff Suan Investments is a foreign entity serving as a family investment vehicle.

26    Plaintiffs' commonality of interest in recovering in respect of their losses justifies treating them collectively as "the Gottdieners."

27    Defendant United States of America includes the Department of Justice, the United States Judiciary, and all agents at their direction (collectively, "the government").

## ALLEGATIONS AS TO NAMED PLAINTIFFS

### THE WHITE ROCK (STATE STREET) RACKETEERING

**The history and operation of the criminal enterprise.**

28    During the 1990's Italian and Russian organized crime infiltrated Wall Street and by defrauded countless investors of, collectively, hundreds of millions of dollars.

29    One of the most notorious was the "White Rock" or "State Street" scheme, which ran a "pump-and-dump" fraud at its own brokerage and recruited other brokers such as A.E. Baron and D.H. Blair, to participate. Victim losses exceeded $40,000,000.

30    Among the ringleaders, or "control persons," of the "White Rock" conspiracy were Felix Sater, Salvatore Lauria, and Gennady Klotsman.

31    Exhibit C is a copy of the indictment in the White Rock case which now-Attorney General Loretta Lynch announced in March 2, 2000 when she was the United States Attorney for the Eastern District of New York. It describes the methods and means of its operation, and Sater's role. Plaintiffs incorporate it herein in its entirety.

32    Exhibit D is a copy of the information to which Sater pled guilty. It describes the methods and means by which he operated the "White Rock" criminal enterprise, and is consistent with the indictment, though the indictment is much more thorough and names many more names. Plaintiffs incorporate the information in its entirety.

33    These documents and the guilty pleas that followed confirm that (1) Sater was one of the ringleaders of the scheme; and that (2) the scheme involved the use of corrupt brokers not only at White Rock but also at other firms, among the corrupt brokers one Alfred Palagonia and among these firms D. H. Blair, where Palagonia worked while facilitating Sater's White Rock crimes.

### Named plaintiffs the Gottdieners' victimization by Palagonia.

34     As set forth in Exhibit C, Palagonia was a top broker at D. H. Blair who made his
       money in large part by stuffing worthless stocks onto his unsuspecting clients with-
       out bothering to tell them first that (1) he'd been bribed by Sater and others to do so
       as part of the "White Rock" pump-and-dump market manipulation scheme and that
       (2) he would refuse to let them sell until he and his cronies, including Sater, cashed
       out their undisclosed holdings for huge gains, which not surprisingly removed the
       artificial price support and left his clients with little or nothing.

35     The Gottdieners were defrauded of some $7,000,000 by Palagonia, their broker at
       D. H. Blair, as part of his role in the "White Rock" scheme.

36     Palagonia admitted his role at his sentencing in 2002 and in particular admitted that
       he understood that while he was pleading guilty to securities fraud conspiracy, the
       paragraphs in that White Rock indictment he was admitting to made his admission
       inclusive of his role in the participation and operation of the White Rock racketeering
       enterprise run by Sater and others. Exhibit E is a copy of this sentencing transcript.
       He was sentenced to incarceration and to a $20,000,000 restitution order in favor of
       the general class of all victims.

37     Then, years later in or about 2009, after he'd been resentenced, including to that
       order of restitution, because he'd violated his supervised release from prison by not
       paying down the $20,000,000 upon his release, Palagonia admitted under oath in
       depositions conducted in a suit brought by the Gottdieners that they had been among
       his victims. Exhibit F is a copy of that deposition.

38     The Gottdieners then filed a CVRA action before the judge (Glasser, J., EDNY) who
       had presided over that 19-defendant White Rock case, which had been captioned

*U.S. v. Coppa et al.*, and who had sentenced Palagonia both times, asking that they be formally recognized as federally protected crime victims of the scheme and asking for an order directing that they be reimbursed from funds Palagonia had paid into court pursuant to that restitution order. To be clear, they did not ask for and did not receive a resentencing of Palagonia, who had already been sentenced to pay $20,000,000 into a victims' fund, rather they asked for and received declaratory judgment that they were victims of the scheme and so could be paid out of the fund.

39      On November 6, 2012, and again on December 11, 2012 with the consent of the government, Judge Glasser so ordered, finding the Gottdieners to be federally protected crime victims of the scheme and ordering that they receive $1,300,000 in restitution. Exhibit G is a copy of that order.

40      So it is settled that the Gottdieners were causally injured by Palagonia's crimes, and his crimes were committed in the scope, and furtherance, of Sater's racketeering.

## SATER'S SECRET 1998 CONVICTION BY PLEA

41      In November and December 1998, in closed courtrooms in the Eastern District of New York, Felix Sater, Salvatore Lauria, and Gennady Klotsman secretly pled guilty to racketeering charges for their roles as ringleaders of the "White Rock" scheme.

42      The courtroom closures and related secrecy, including the concealment of their dockets, had been put in place because they had agreed to cooperate against other members of the criminal scheme. Naturally, each signed cooperation agreements.

43      A little over a year later, in March 2000, then United States Attorney, Eastern District of New York (and current Attorney General of the United States) Loretta Lynch

held a press conference and distributed a press release announcing the arrest of 19 persons for their roles in the White Rock racketeering.

44     That press release, a copy of which is attached as Exhibit A and deemed incorporated herein, generally described the White Rock organized criminal enterprise, named the 19 persons arrested, and, importantly, stated – by name – that Sater, Lauria, and Klotsman had already pled guilty for their roles in the scheme. See n.2 therein.

## HIS DOCKET IS KEPT SECRET FOR 14 YEARS

45     Despite that public disclosure of their felony pleas and convictions, Sater, Lauria, and Klotsman's federal criminal dockets stayed hidden from the public. Incredibly, they would stay hidden for 11 years, until 2009 (Lauria); 14 years, until 2012 (Sater), even for 16 years, until 2014 (Klotsman).

46     This was no accident, and both the government and at least one of these three convicted RICO felons were quick to take advantage of the concealment.

47     In 2002, Sater, for example – while still cooperating – insinuated himself into a New York real estate firm, Bayrock Group, which was then a start-up real estate developer, and by 2003 had become its second-in-command with substantial equity ownership that within a few years would make him by far the firm's largest owner, in early 2007 his interests potentially worth, at least in his own estimate (and the firm's), some $100,000,000 – or even more.

## SATER'S BILLION DOLLAR BANK FRAUD

48     That explosion in value happened because, under Sater's purposeful and calculated control and direction, Bayrock affiliated itself with Donald Trump and the Trump Organization and partnered with them on several development projects, then used

that Trump connection to fraudulently induce banks (and, to a lesser degree, others) to lend the firm some $1,000,000,000 to finance those Trump (and one or two other) projects, all of which turned out to be disastrous.

49    The cumulative losses on those loans are into the hundreds of millions.

50    Unfortunately for the banks (and others like CBRE, which lost tens of millions it had lent, no doubt client money entrusted to it for investment in other than mob-infested businesses like Bayrock), Sater only disclosed his conviction to a few at Bayrock, including its chairman, Tevfik Arif, and CEO and General Counsel, Julius Schwarz.

51    In sum, when the Bayrock loan applications went in, to GMAC (soon bankrupt, Bayrock losses a factor); Corus (soon bankrupt, Bayrock losses a factor); Merrill Lynch (soon insolvent, Bayrock losses a factor), they all shared two things in common:

52    Not a one of them disclosed Sater's ownership and control of Bayrock and not a one of them disclosed that he was a secretly convicted RICO felon.

53    Victims of similar Sater concealment frauds at Bayrock include its partners, its other investors, its employees, and its customers, most especially those at Trump SoHo, who bought condominiums offered for sale through fouled condominium documents which omitted any mention of Sater's ownership or conviction.

54    Space does not permit a full description of all of the criminality at Bayrock; however, Exhibit I, a complaint filed in the SDNY, does well describe it.

55    But in sum, Sater knew that without concealing his conviction as a RICO felon and fraudfeasor no one would have joined the firm, invested in it, or bought from it.

56    That he knew this is obvious because he admitted it at his (long-delayed) sentencing.

SATER'S OCTOBER 23, 2009 SENTENCING

57     His sentencing transcript contains his confession that he knew the banks wouldn't have lent if they had known of his conviction .[1] Exhibit B is a copy. *See* pp. 17-18.

58     More to the point, the government now insists this sentencing was in open court.

59     Yet despite that, and despite the mandates of the CVRA, not one victim of State Street was ever told of Sater's conviction or his sentencing.

60     And as the transcript shows, the court never asked if any victims were present or otherwise wanted to be heard, never sentenced Sater to any restitution, and the government never asked him to.

61     And as noted, ¶ 58, despite the fact that this sentencing was in open court, all public record of it, such as his federal court criminal docket, was kept hidden from the public for another three years, until 2012.

62     Yet it is settled sentencing law that insofar as Sater was a ringleader in the "White Rock" criminal enterprise (for that matter even if he was a mere co-participant), as a matter of restitution law (the MVRA), Sater is responsible for all the losses of all the victims, jointly and severally (unless found otherwise by the sentencing judge by reason of lesser responsibility or lesser ability to pay).

---

[1] Of course by the time of his sentencing, the United States knew too, as the transcript shows him admitting these crimes in front of four FBI agents, two Assistant United States Attorneys, one presiding federal judge – and his own defense counsel, Leslie Caldwell, who (according to Sater's sworn testimony) a few months later advised him not to testify about the concealment of his conviction at Bayrock as he could face criminal prosecution for it, and who is now the current Assistant Attorney General of the United States, Criminal Division, so presumably even then knew what she was talking about re federal bank and wire fraud laws.

The United States knew long before that. In a PSR (pre-sentence investigation report) written five years earlier, in 2004, when Sater was first due to be sentenced, his probation officer admits knowing Sater was hiding his conviction from the firm and his partners there but further admits not just knowing of, but even willingly joining an "arrangement" between the government and the court meant to ensure that Sater could keep on concealing his conviction.

63        By definition, anyone entitled to an order of restitution from him is a crime victim.

64        Judge Glasser, who also sentenced Sater in 2009, knows this and agrees: On August 12, 2015, Judge Glasser conducted a hearing in a related case, *U.S. v. Berkun*. It concerned the proper method of ordering restitution in a scheme or enterprise crime, and both Judge Glasser and the government concur that the law requires that all victims be awarded restitution in full and that where, as in White Rock, the crimes were committed during or in furtherance of a scheme, at the least the ringleaders (so the government admitted) but actually all co-participants (as Judge Glasser quite correctly opined) are jointly and severally liable for all losses suffered by all victims so must each receive sentencing orders of restitution in the full amount thereof, unless the court orders apportionment. Exhibit H is a copy of that transcript. See *passim*.

65        They were and are correct and the law does require joint and several sentencing orders against each defendant sentenced for crimes committed during or in furtherance of a criminal scheme or enterprise absent findings of diminished responsibility or financial ability, and has required so for decades.

66        Yet, again, Sater's sentencing transcript confirms that no mention was made of his victims. There was no discussion of, let alone findings of, any reason by which he as an admitted ringleader should not have been ordered to pay $40,000,000 in restitution, accreted at interest to $100,000,000 during the period from his stock frauds and bribery and money laundering in the 1990s to that sentencing 15 years later.

67        This is particularly strange considering that one of the Assistant United States Attorneys present was Marshall Miller, then the Victims' Rights Compliance Officer for the Eastern District so one who should have noticed the gap. (Mr. Miller now is chief deputy or to Ms. Caldwell, Assistant Attorney General, Criminal Division.)

68      As well, Sater's 2004 PSR – and by the time it was written, in June 2004, every one of the 19 *Coppa* defendants had pled guilty and been sentenced, most to million dollar plus orders of restitution, and if not literally so, only a handful were left – admits that the government had failed to provide a list of victims and losses.

69      Yet along with all those sentencings on the *Coppa* docket are letter after letter written by Assistant United States Attorneys from the EDNY (at least one signed in behalf of Loretta Lynch) to Judge Glasser for use in sentencing those 19 persons, or almost all, to massive restitution orders. Included among them are lists of victims, account records, losses, and the like.

70      None of this is surprising, because as the director of the then-new Criminal Prosecution Assistance Group of the NASD now FINRA) testified before Congress in 2000, his department had made loss determinations from trading blue sheets.

71      So it's not surprising that, as one of the ringleaders, Gennady Klotsman (one of the early cooperators who secretly pled guilty in 1998), ¶ 58, who ceased cooperating, was sentenced in 2002 to pay the entire $40,000,000 restitution.

72      So how does one explain why, at Sater's 2009 sentencing, given the above and what must by then have been millions of dollars of restitution received by the government in respect of all those other White Rock defendants who'd been ordered to pay it years before, no consideration of restitution liability occurred in Sater's sentencing?

73      Because, plaintiffs allege, the government, with the imprimatur of the court, planned to, and then took all possible steps to, never reveal Sater's sentencing to the public, and accordingly never reveal it to the hundreds of White Rock victims, which again includes the victims of all its participants at Blair and Baron. And that was a taking.

## THE TAKING

74       As noted, as of (and for some years before) Sater's 2009 sentencing, the White Rock victims were vested with the right to be told of it (since again the government and the court insist it was in open court and the transcript shows Sater's real name was used) and in particular the right to sue to force a (re)sentencing order of restitution.

75       Of course those rights are meaningless and worthless if in contravention of those rules the government and court (or "the government," in the collective sense that it includes all three branches) hides everything, the entire case, from the victims.

76       And it did. Besides the question how there can be an open court sentencing that is completely hidden there are dozens of documents filed in related court actions since 2010 in which the government and the court insist up down and sideways that "no member of the public" ever knew about the conviction (and thus the whole case).

77       Just as interestingly, the government has filed papers here insisting that the government never at all intended to hide his conviction, citing the press release as proof.

78       But the government has never said there weren't any victims of Sater (which would be unlikely, considering that he pled guilty to running a stock fraud that bilked its victims out of some $40,000,000 and his cooperation and 2004 PSR note that he faced a massive restitution liability).

79       And it never said that it ever notified any of them (again, the probation officer said, indeed, that the Department of Justice had not done so as far as he knew). ¶ 68.

80       Thus plaintiffs well allege that neither they nor other victims of Sater (which, again, should be the set of all of the White Rock victims), were ever told of his sentencing.

81    And they could not have found it on their own, with any degree of diligence, insofar as his entire criminal docket was concealed and the press release, although in the Congressional Record and so a matter of public fact, was out of sight insofar as one would have to know it was there to find it (until 2010, when the volume of the Congressional Record holding it went online and it became readily "findable").

82    There are only four possibilities: (1) the government had the authority to do this, to keep it hidden by its own determination, notwithstanding the statute; (2) the court had the authority to do this, to keep it hidden by its own determination, notwithstanding the statute, by issuance of orders to that effect; or (3) no one had the authority, but they did it anyway but sufficiently within the proper scope of their functions that it was not *ultra vires*; or (4) no one had the authority and it was so outside their proper function that it was *ultra vires* and if not criminal, then certainly tortious.

83    For this pleading, plaintiffs allege that one or more of (1), (2), or (3) were true, but that (4) was not true, and the choses in action were property for takings purposes.

84    They allege that as the concealment destroyed the value of the choses in action to sue for a (re)sentencing of restitution because they were prevented from asking to be heard at the sentencing and from petitioning for a writ, this took the choses in action, and knowledge thereof, from them and the other victims.

85    Finally, plaintiffs allege that, although they disagree with this ultimate fact, nevertheless they expect to introduce evidence that will cause this court to find that this concealment was done to aid in the recruitment of cooperators and in furtherance of the government's claimed dependence upon them to effectuate law enforcement.

86    Thus they allege that (1) there was a compensable taking for public purpose; or (2) there was a compensable illegal exaction.

87    For the avoidance of ambiguity, the "triggering event" is asserted to be that date of sentencing, October 23, 2009. However, insofar as no victim could have been expected to know of any of this before August 2012 when the court officially unsealed Sater's criminal docket, substantial tolling would apply in any event.

88    Importantly, plaintiffs freely concede that they have made allegations in other fora that the actions of the government and the courts in concealing these things was far from lawful, indeed was tortious and illegal. They still believe that. However, no court has ever addressed, let alone conceded the point. They are entitled to pursue alternate legal theories which appear to be in complete contradiction. Suffice it to say that, therefore, plaintiffs' allegations herein are to be understood as their belief, as set forth by undersigned counsel, that there is a reasonable likelihood that the evidence as already possessed by plaintiffs and as may be obtained during this proceeding will produce a determination that the actions of the government were legal and thus a taking theory is appropriate. The fact that they believe the better argument if not far better argument is exactly the opposite does not preclude them from developing this case as it may develop, for again no court has ever ruled on these issues.

89    More simply, plaintiffs are in the position of a creditor of a contract for the forward purchase of commodities some decades ago. In those days, courts often dismissed breach of contract suits on the ground that such contracts were gambling contracts and not enforceable. The fact that plaintiffs agreed with that theory and believed their contract to be unenforceable does not mean that they were precluded from introducing evidence as to its legality *vel non* and letting the court decide.

90    Alternatively, plaintiffs are in the situation of persons aggrieved pursuing one of two alternate and mutually exclusive theories of liability: either the taking was unlawful, in which case they may recover from those responsible personally if there was no

immunity, or the taking was lawful, in which case they may recover from the government. No known theory of jurisprudence prevents the pursuit of both claims, even though in separate fora and at separate times, even if plaintiffs personally believe one is far more likely so than the other.

91    To do so despite their belief is, in sum, their *option*.

## CLASS ALLEGATIONS

68.    Pursuant to Rule 23, the Gottdieners bring this action on behalf of all those persons who are, should be, or should have been either or both (1) victims of, or (2) beneficiaries of, any order of restitution against, any defendant in *U.S. v. Coppa*" (the main White Rock case) other related case where such persons suffered causal injury mandatorily compensable by restitution under the MVRA or CVRA caused by crimes committed during the White Rock scheme or in facilitation thereof.

69.    The requirements of Rule 23(a) are satisfied.

70.    Members of the Class are so numerous that joinder is impracticable. Public victim lists show that there are hundreds of class members. The exact number of Class members is unknown to the Gottdieners at this time and can only be ascertained from books and records maintained by the government or its agents.

71.    Common questions of law and fact exist as to all Class members. These dominate any questions unique to any individual and include, without limitation, (1) whether the government had a legal basis to appropriate Class members' property; and (2) whether the government appropriated Class members' property without just compensation in violation of the United States Constitution.

72.    The Gottdieners' claims are typical of those of other class members. The government's actions alleged have impacted the members equally because such actions have been directed

at them as a whole.  Accordingly, the Gottdieners' claims against the government based on the conduct alleged would be identical to the claims of other members.

73.     The Gottdieners will fairly and adequately protect the interests of Class members. During the time of the conduct at issue, the Gottdieners were among the largest victims measured in dollars lost and in addition are represented by counsel(s) uniquely aware of the history of this case.

74.     The Gottdieners are committed to prosecuting this action to a final resolution and, in furtherance thereof, has retained experienced and competent class counsel.

75.     The Gottdieners seek class certification under Rule 23(b)(3) because as described above, common questions of fact and law predominate over any individual issues and a class action is superior to other methods of adjudicating the controversy.

## PRAYER FOR RELIEF I

**GEDANKENEXPERIMENT (German: "thought experiment"), term used by German-born physicist Albert Einstein to describe his unique approach of using conceptual rather than actual experiments in creating the theory of relativity.**

92    To best understand the gravamen of this complaint, imagine for a moment that it is October 23, 2009 and one of the named plaintiffs somehow learns that Felix Sater is being sentenced "in open court" and goes to attend.

93    Would he be admitted or would the court have suddenly found reason to close the proceeding? If admitted, if he objected to the sentencing as not including restitution, what would the court have done? If the court had ignored him and he timely sought a writ of mandamus from the Second Circuit, what would that court have done?

94    That's what this trial is going to help us all find out.

95    Importantly, this court *is not* being asked to overrule Judge Glasser or second-guess his sentencing order (technically, the Judgement and Commitment order) or review the merits of what he ordered.

96    This court *is* being asked to recognize that (1) plaintiffs had the right to seek to overrule it; (2) that right was exercisable by petition for mandamus, thus by exercise of a chose in action; (3) that right was taken from plaintiffs; and (4) whatever the value of that right was, it was non-zero, since it cannot be that as a matter of law one must assume Judge Glasser would not have changed his mind or been reversed; just as one cannot say that the negligent deprivation of the right to appeal has no value.

97    Nor is this court being asked to review the merits of any sealing decision, only to review the liability for any taking that resulted from such. If this court is bound to

presume that the decision to conceal the sentencing from the victims and thus conceal their choses of action from them, it may do so and so award judgment.

98     We repeat, if only because the government repeated so often in its motion to dismiss now rendered moot by this filing, that this court is simply being asked to determine what is the value of the right, or option, that plaintiffs had to "walk into that courtroom and ask for restitution and sue the court in writ to get it."

99     The SDNY never determined that the Gottdieners were not crime victims of Sater for purposes of the CVRA. That issue was never before it, nor could it have been. The issue before the SDNY was whether, in a civil suit by the Gottdieners against Sater in RICO, could the Gottdieners come under the "conviction exception" of the PSLRA amendment to RICO which allows civil RICO suits only upon a criminal conviction for a related crime. The SDNY held that because the Gottdieners had not been named as victims in the information to which Sater had pled they could not qualify for the PSLRA conviction exception. This is not remotely the standard for determining whether someone is a victim under the CVRA, and in any event there can be no preclusion from the SDNY case as the counterparty to the exercise of the chose in action option taken from plaintiffs would not have been Sater but would have been the government, thus there is no identity of party.

100    As noted, there is no question that a chose in action is property for takings purposes. The question of what is and is not property is generally a matter of state law, and the argument that because the CVRA says it does not create a cause of action is pointless because the Fifth Amendment created it the moment the chose of action came into being; Congress cannot create a property interest and at the same time then say it is not subject to taking. Congress can create a revocable license instead of an irrevocable property interest but it cannot create an irrevocable property interest and then

say that there can be no takings liability. Arguably Congress could remove Tucker Act jurisdiction from this court for such a taking, but it did not do so and implied repeals are highly disfavored.

101    Similarly, prosecutorial discretion cannot extend to obviate a taking. The executive branch cannot be said to have the discretion to take property without compensation.

102    We repeat one final time that there is no claim here that there was a right to restitution, and that that was taken, rather that there was a right to sue to get it which was taken. That is a huge difference. With all seriousness, the question is not whether there was a right to $1,000,000, but whether there was a right to attempt a freethrow in an NBA playoff and if successful then win the $1,000,000.

*****

103    Plaintiff incorporates by reference and realleges each allegation set forth above.

104    The government[2] destroyed the rights of Sater's White Rock victims, the Gottdieners and the Victims to sue for restitution, and did so for public purpose.

105    Those rights are private property, rights of action belonging to the victims.

106    The Government is required, in taking private property, to adhere to due process of law and to respect the legal rights of affected parties. The Government violated the constitutional rights of the Gottdieners and the Victims in taking from them this right of action, worth such amount as will be determined at trial, without payment.

---

[2] As used throughout, "government" means, where not clearly referring only to the executive branch, the United States, whether the result be a claim of legislative, executive, or judicial.

FIRST AMENDED CLASS ACTION COMPLAINT                                    22 | P a g e

say that there can be no takings liability. Arguably Congress could remove Tucker Act jurisdiction from this court for such a taking, but it did not do so and implied repeals are highly disfavored.

101    Similarly, prosecutorial discretion cannot extend to obviate a taking. The executive branch cannot be said to have the discretion to take property without compensation.

102    We repeat one final time that there is no claim here that there was a right to restitution, and that that was taken, rather that there was a right to sue to get it which was taken. That is a huge difference. With all seriousness, the question is not whether there was a right to $1,000,000, but whether there was a right to attempt a freethrow in an NBA playoff and if successful then win the $1,000,000.

*****

103    Plaintiff incorporates by reference and realleges each allegation set forth above.

104    The government[2] destroyed the rights of Sater's White Rock victims, the Gottdieners and the Victims to sue for restitution, and did so for public purpose.

105    Those rights are private property, rights of action belonging to the victims.

106    The Government is required, in taking private property, to adhere to due process of law and to respect the legal rights of affected parties. The Government violated the constitutional rights of the Gottdieners and the Victims in taking from them this right of action, worth such amount as will be determined at trial, without payment.

---

[2] As used throughout, "government" means, where not clearly referring only to the executive branch, the United States, whether the result be a claim of legislative, executive, or judicial.

107     Where property is taken under authority, and where it is illegally exacted, by the Government to serve public purposes, the Constitution requires just compensation.

108     The Government did not pay just compensation.

109     The taking clauses of the United States Constitution protects the Gottdieners and the Victims from suffering such an uncompensated deprivation of property.

110     As a result of the Government's violations of the United States Constitution, the Gottdieners and the Victims suffered harm, including monetary damage, directly and proximately caused by the Government's taking or illegal exaction.

111     WHEREFORE, the Gottdieners demand judgment in their favor, and in favor of the Victims, against Defendant United States of America as follows:

   A.     Determining that this action may be maintained as a class action;

   B.     Certifying a class of all those persons who are, should be, or should have been either or both (1) victims of, or (2) beneficiaries of, any order of restitution against, any defendant in *U.S. v. Coppa* or other related case where such persons suffered causal injury mandatorily compensable by restitution under the MVRA or CVRA caused by crimes committed during the White Rock scheme or in facilitation thereof.

   C.      Finding that the Gottdieners have met the requirements of a class representative and may maintain this action in that capacity.

   D.     Finding that the Defendant United States of America has taken or illegally exacted the property of the Gottdieners and the Victims in violation of the Takings Clause of the United States Constitution.

E.      Awarding damages to the Gottdieners and the Victims in a sum to be deter-
mined at trial, estimated at $100,000,000 for the compensable loss they sus-
tained as a result of the taking or illegal exaction.

F.      Awarding pre-judgment and post-judgment interest, with any and all further
costs, disbursements and reasonable attorney's and expert fees; and

G.      Granting such other relief, as this Court may deem just and proper. In par-
ticular, and without limitation, this shall include, to the extent the court finds
appropriate and within its jurisdiction as set forth in 28 U.S.C. § 1491, as an
incident of and collateral to such judgment as prayed for above, issue orders
to appropriate officials of the Department of Justice and the United States
Judiciary directing the correction of applicable records of victim status.

*****

Dated:  Montauk, N.Y.
June 8, 2016

By:      /s/ Frederick M. Oberlander

**THE LAW OFFICE OF FREDERICK M. OBERLANDER, P.C.**
28 Sycamore Lane (PO Box 1870)
Montauk, NY 11954
212.826.0357  Tel.
212.202.7624  Fax.
fred55@aol.com

---

[i] *Kelo v. City of New London*, 545 U.S. 469 (2005).

[ii] *Shanghai Power Co. v. United States*, 4 Cl. Ct. 237 (1983), aff'd, 765 F.2d 159 (Fed. Cir. 1985).

[iii] 18 U.S.C. § 3663A.

[iv] 18 U.S.C. § 3771.

[v]