Case 1:00-cr-00196-JMW Document 14-312 Filed 06/08/162 Page 1 of 80 #: 160

J2:JSS:jss
F. #1998R01996
WHITEROCK.IND

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - -X

UNITED STATES OF AMERICA

    - against -

FRANK COPPA, SR.,
ERNEST MONTEVECCHI,
    also known as "Butch,"
DANIEL PERSICO,
JACK BASILE,
ROCCO BASILE,
LARRY BERMAN,
JOHN CIOFFOLETTI,
JOHN DOUKAS,
WALTER DURCHALTER,
    also known as "Dutch,"
EDWARD GARAFOLA,
DANIEL LEV,
EUGENE LOMBARDO,
EDMOND NAGEL,
ALFRED PALAGONIA,
ALEKS PAUL,
JOSEPH POLITO, SR.,
LAWRENCE RAY,
ABRAHAM SALAMAN and
GIUSEPPE TEMPERINO,
    also known as "Joseph
    Temperino,"

           Defendants.

- - - - - - - - - - - - - - - -X

I N D I C T M E N T

Cr. No. _____
(T. 15, U.S.C., §§
78j(b) and 78ff;
T. 18, U.S.C., §§ 371,
1951, 1956(a)(1)(A)(i),
1956(a)(1)(B)(i), 1956(h),
1962(c), 1962(d), 1963,
982, 2 and 3551 et seq.)

Received

OCT 27 2011

Hacker & _____, LLP

THE GRAND JURY CHARGES:

    At all times relevant to this Indictment, unless

otherwise indicated:

I.   THE BROKERAGE FIRMS

    A.   White Rock and State Street

        1.   White Rock Partners & Co., Inc. ("White Rock") was

a broker-dealer of securities, registered by the National

Association of Securities Dealers ("NASD"). White Rock bought an existing broker-dealer in or about September 1993 and commenced brokerage operations in or about February 1994, with an office at 17 State Street, New York, New York.

2. White Rock was originally a partnership owned and operated by the defendant WALTER DURCHALTER, also known as "Dutch," and unindicted co-conspirators Gennady Klotsman, Salvatore Lauria and Felix Sater. In or about July 1995, the defendant JOHN DOUKAS acquired the partnership interest of DURCHALTER, who left the firm. DOUKAS then owned and operated White Rock along with Klotsman, Lauria and Sater. DOUKAS, DURCHALTER, Klotsman, Lauria and Sater are sometimes referred to herein as the "White Rock Partners."

3. In or about September 1995, the White Rock Partners renamed White Rock as State Street Capital Markets Corporation ("State Street"). State Street continued the trading of securities that had been conducted at White Rock. In or about June 1996, State Street moved its office to 1 World Trade Center, New York, New York. State Street was a partnership owned and operated by the defendant JOHN DOUKAS, Gennady Klotsman, Salvatore Lauria and Felix Sater (sometimes referred to herein as the "State Street Partners" and collectively with the White Rock Partners as the "White Rock and State Street Partners"). State Street ceased operation in or about September 1996.

4. The business of White Rock and State Street consisted primarily of the sale of stock and warrants in small

3

and start-up companies. White Rock and State Street frequently underwrote initial public offerings ("IPOs"), by which stock and warrants in formerly privately owned companies were first sold to the public. White Rock and State Street also participated extensively in the trading of securities after they were first sold to the public (referred to herein as the "aftermarket" or "aftermarket trading"). White Rock and State Street also took part in offerings to the public of stock and warrants subsequent to an IPO, commonly known as "secondary offerings" of securities.

5. White Rock and State Street held themselves out as legitimate brokerage firms, although they were in fact operated for the primary purpose of earning money through fraud involving the manipulation of the price of securities. Among the securities fraudulently sold by the White Rock and State Street Partners to the public were stock of Country World Casinos, Inc. ("Country World"), and stock and warrants of Holly Products, Inc. ("Holly"), U.S. Bridge of New York, Inc. ("USBNY"), Cable & Co. Worldwide, Inc. ("Cable") and Fun Tyme Concepts, Inc. ("Fun Tyme"). Country World securities were traded on the Over-the-Counter Bulletin Board (the "OTC Bulletin Board"), an electronic price quotation service. Holly, USBNY, Cable and Fun Tyme securities were traded by means of the National Association of Securities Dealers Automated Quotation System ("NASDAQ"), in which trades are executed through the use of computers and the transmission of data via interstate communications lines

throughout the United States, including the Eastern District of New York.

    B.   Other Brokerage Firms

    6.   The White Rock and State Street Partners entered into agreements with brokers at numerous other brokerage firms in furtherance of the fraudulent sale of securities.  These other brokerage firms included J.W. Barclay & Co., Inc. ("Barclay") A.R. Baron & Co., Inc. ("Baron"), and D.H. Blair & Co., Inc. ("Blair").

    7.   Barclay was a registered broker-dealer of securities, licensed by the NASD, with an office at 25 Broadway, New York, New York.  Barclay commenced operations in or about March 1989 and is still in operation.  The defendant JOHN CIOFFOLETTI was a registered representative of Barclay from in or about October 1991 through February 1998.

    8.   Baron was a registered broker-dealer of securities, licensed by the NASD, with its principal office at 153 East 53rd Street, New York, New York.  Baron commenced operations in or about April 1992 and ceased doing business in or about October 1996.  Unindicted co-conspirator Andrew Bressman was a principal and registered representative of Baron and owned the firm together with others.

    9.   Blair was a registered broker-dealer of securities, licensed by the NASD, with an office at 44 Wall Street, New York, New York.  Blair commenced operations in or about April 1975 and ceased doing business in or about August

1998.  The defendant ALFRED PALAGONIA was a registered representative of Blair from approximately January 1990 to February 1998.

## II.  THE ENTERPRISE

10.  Between approximately March 1993 and October 1996, the defendants FRANK COPPA, SR., ERNEST MONTEVECCHI, DANIEL PERSICO, JACK BASILE, ROCCO BASILE, LARRY BERMAN, JOHN CIOFFOLETTI, JOHN DOUKAS, WALTER DURCHALTER, also known as "Dutch," DANIEL LEV, EUGENE LOMBARDO, EDMOND NAGEL, ALFRED PALAGONIA, ALEKS PAUL, JOSEPH POLITO, SR., ABRAHAM SALAMAN and GIUSEPPE TEMPERINO, also known as "Joseph Temperino," together with Gennady Klotsman, Salvatore Lauria, Felix Sater, Andrew Bressman and others, constituted an enterprise as defined in Title 18, United States Code, Section 1961(4), that is, a group of individuals associated in fact (hereafter, the "Enterprise").

11.  The Enterprise operated in the Eastern District of New York and elsewhere in the United States as well as abroad. The Enterprise engaged in, and its activities affected, interstate and foreign commerce.

12.  The chief purpose of the Enterprise was to obtain money for its members and associates by acquiring secret control over large blocks of stock and warrants, and then artificially inflating and maintaining the price of these securities by means of material misrepresentations and omissions and manipulative sales practices.  After inflating the price of the stock and warrants, individuals employed by and associated with the

Enterprise sold their secretly controlled securities to the
public, generating millions of dollars in illicit profits.  These
profits were then laundered through numerous off-shore and other
nominee accounts.

13.   The Enterprise furthered its unlawful purposes by
means of various criminal activities, including securities fraud,
mail and wire fraud, money laundering and conspiracy to commit
these offenses.

14.   The Enterprise was led by the defendants JOHN
DOUKAS and WALTER DURCHALTER, together with Gennady Klotsman,
Salvatore Lauria and Felix Sater, who collectively controlled
White Rock and State Street during the periods set forth in
paragraphs 1 through 3 above.  The defendants JACK BASILE, ROCCO
BASILE and JOSEPH TEMPERINO were brokers at White Rock who
fraudulently sold stock to investors.  The defendant JOHN
CIOFFOLETTI was allotted blocks of stock which were fraudulently
sold to clients of Barclay.  The defendant ALFRED PALAGONIA,
together with Andrew Bressman, were allotted blocks of stock
which were fraudulently sold to clients of Blair and Baron.  The
defendants ABRAHAM SALAMAN, LARRY BERMAN and JOSEPH POLITO, SR.,
through their affiliations with Country World, Holly and USBNY,
respectively, provided "product," that is, securities, for White
Rock, State Street, Barclay, Baron, Blair and other brokerage
firms to sell to the public fraudulently.  The defendants DANIEL
LEV and EDMOND NAGEL acted as nominees by whom the White Rock
Partners and others concealed their ownership of and interest in

USBNY securities, which were fraudulently sold to the public.
The defendant ALEKS PAUL laundered the proceeds of fraudulent
securities sales through, among other means, the transfer of
funds to off-shore bank accounts. The defendant LARRY RAY
conducted certain secret transactions which furthered the
fraudulent sale of USBNY securities.

15. The defendants FRANK COPPA, SR., ERNEST
MONTEVECCHI, also known as "Butch," DANIEL PERSICO and EUGENE
LOMBARDO furthered the Enterprise by virtue of their various
affiliations with Organized Crime Families of La Cosa Nostra
("LCN Families"). COPPA was a captain in the Bonanno Organized
Crime Family (the "Bonanno Family"); MONTEVECCHI was a soldier in
the Genovese Organized Crime Family (the "Genovese Family");
PERSICO was an associate of the Colombo Organized Crime Family
(the "Colombo Family"); and LOMBARDO was an associate of the
Bonanno Family. COPPA, MONTEVECCHI, PERSICO, and LOMBARDO, among
other things, resolved, and attempted to resolve, disputes
relating to the hiring and retention of brokers, the extortion
and attempted extortion of members or associates of the
Enterprise, and concerted efforts to reduce the price of
securities underwritten by White Rock and State Street through
such techniques as "short selling." In return for this
assistance, members of the Enterprise paid COPPA, MONTEVECCHI,
PERSICO and LOMBARDO compensation in the form of securities and
cash proceeds of the fraudulent sale of securities.

III. THE MANIPULATED STOCKS

16. Country World, based in Colorado, came into existence in or about August 1993 after the defendant ABRAHAM SALAMAN, a stock promoter, and others arranged for Monolite Industries ("Monolite") to change its name to Country World and go into the business of developing a casino in Black Hawk, Colorado. Previously, Monolite had purportedly been in the business of manufacturing panels for semi-truck trailers.

17. Holly, based in Moorestown, New Jersey, was in the business of manufacturing tables and cabinets for the gaming industry and custom-built equipment for hospitals and long-term care facilities. The defendant LARRY BERMAN was Holly's chairman and chief executive officer and a substantial shareholder of Holly.

18. USBNY, a construction company located in Queens, New York, was a subcontractor on public infrastructure projects in the greater New York area. The defendant JOSEPH POLITO, SR., was the president and principal shareholder of the company. POLITO was an associate of the Gambino Organized Crime Family (the "Gambino Family").

19. Cable, with offices in New York and New Jersey, designed and imported men's footwear, which the company marketed to department and specialty stores in the United States.

IV. THE UNLAWFUL SCHEMES

     20.  From in or about March 1993 to October 1996, the
White Rock and State Street Partners, together with the
defendants FRANK COPPA, SR., ERNEST MONTEVECCHI, DANIEL PERSICO,
JACK BASILE, ROCCO BASILE, LARRY BERMAN, JOHN CIOFFOLETTI, JOHN
DOUKAS, WALTER DURCHALTER, DANIEL LEV, EUGENE LOMBARDO, EDMOND
NAGEL, ALFRED PALAGONIA, ALEKS PAUL, JOSEPH POLITO, SR., LAWRENCE
RAY, ABRAHAM SALAMAN and JOSEPH TEMPERINO, also known as "Joseph
Temperino," and others, devised, implemented and oversaw
fraudulent schemes to manipulate the price of securities of
Country World, Holly, USBNY and Cable and fraudulently induce
investors to buy and hold these securities. Each of the
fraudulent schemes followed a similar pattern.

     21.  The White Rock and State Street Partners, together
with JOHN CIOFFOLETTI, ALFRED PALAGONIA and others, secretly
acquired ownership and control of substantial blocks of common
stock and warrants of Country World, Holly, USBNY and Cable.
These individuals secured such ownership and control through
various methods, including the private sale of securities to off-
shore and domestic nominees prior to public offerings, and, in
the case of Country World, the fraudulent issuance of securities
to off-shore nominees pursuant to Regulation S of the rules and
regulations of the Securities and Exchange Commission ("SEC").
These individuals then concealed their ownership and control by,
among other means, depositing the securities in brokerage
accounts at White Rock, State Street and other brokerage firms

that had been opened in the name of nominees, including off-shore
shell companies created to serve this purpose.

22. In furtherance of their efforts to gain control
over large blocks of securities, the White Rock and State Street
Partners entered into undisclosed agreements with certain
individuals associated with companies which had issued securities
pursuant to Regulation S (Country World) or in offerings
underwritten by White Rock and State Street (Holly Products,
USBNY and Cable). Pursuant to these agreements, the White Rock
and State Street Partners secretly agreed to compensate such
individuals, including company officers, by allocating to them a
portion of the profits from the fraudulent sale of stock and
warrants. The defendants ABRAHAM SALAMAN, LARRY BERMAN and
JOSEPH POLITO, SR., among others, entered into such unlawful
agreements.

23. After they gained secret control over the stock
and warrants of Country World, Holly, USBNY and Cable, the White
Rock and State Street Partners, together with others, created
artificial market demand for the securities. One of the
techniques used to create such artificial demand was the payment
of substantial undisclosed commissions, in the form of cash,
securities and other items of value, to induce brokers to
recommend and sell securities to investors. These commissions,
which were often as much as 50 percent of the price of the
securities, induced brokers to tout aggressively the securities
of Country World, Holly, USBNY and Cable. Among the brokers at

White Rock who received undisclosed payments were JACK BASILE, ROCCO BASILE and GIUSEPPE TEMPERINO. Among the individuals at other firms who received such payments were JOHN CIOFFOLETTI at Barclay and ALFRED PALAGONIA at Blair. These payments, and the resulting creation of artificial market demand, were not disclosed to the public.

24. When the price of Country World, Holly, USBNY and Cable securities rose as a result of the artificially created demand, the White Rock and State Street Partners, together with JOHN CIOFFOLETTI, ALFRED PALAGONIA and others, sold their secretly held stock and warrants to unwitting customers of White Rock, State State, Barclay, Baron, Blair and other brokerage firms. The White Rock and State Street Partners, together with others, obtained tens of millions of dollars in proceeds through these schemes.

25. The White Rock and State Street Partners, together with JOHN CIOFFOLETTI, ALFRED PALAGONIA, Andrew Bressman and others, sought to maintain the artificially high price of the securities of Country World, Holly, USBNY and Cable, among other companies, so that (a) they could continue to sell the stock and warrants they secretly controlled at these inflated prices, (b) their unlawful schemes would go undetected, and (c) a large number of investors at White Rock, State Street, Barclay, Baron, Blair, and other brokerage firms could be tapped for future sales of artificially inflated securities. The White Rock and State Street Partners, together with CIOFFOLETTI, PALAGONIA and others,

12

artificially maintained the inflated price of securities by
various techniques designed to insulate the securities from
regular market forces, which would ordinarily cause the price of
the stock and warrants to collapse due to the lack of genuine
demand.  These techniques included (a) false and misleading
statements to persuade investors not to sell the securities; (b)
purposely failing to take and execute customer orders to sell the
securities; and (c) executing a sale of the securities only if
the sale could be matched, or "crossed," with a corresponding
purchase of the same securities by another investor.  None of
these techniques was disclosed to investors.

   26. When the White Rock and State Street Partners,
together with JOHN CIOFFOLETTI, ALFRED PALAGONIA, Andrew Bressman
and others, sold their Country World, Holly, USBNY and Cable
securities at artificially inflated prices, their profits were
laundered through various domestic and off-shore bank accounts.
The proceeds were typically electronically transferred from
domestic brokerage accounts to various off-shore nominee bank
accounts, and in turn transferred to other off-shore bank
accounts designated and controlled by the defendant ALEKS PAUL.
In return, PAUL provided a corresponding amount of cash, less a
money laundering fee, to the White Rock and State Street
Partners, a portion of which was used to make undisclosed
payments to brokers who sold Country World, Holly, USBNY, Cable
and other securities.  By means of these off-shore companies and
accounts, the White Rock and State Street Partners, together with

CIOFFOLETTI, PALAGONIA, PAUL, Bressman and others, concealed and
promoted fraudulent securities transactions.

      27.  In furtherance of their fraudulent schemes, the
White Rock and State Street Partners, and others, entered into
undisclosed arrangements with members and associates of LCN
Families.  Pursuant to these arrangements, the defendants FRANK
COPPA, SR., ERNEST MONTEVECCHI, DANIEL PERSICO and EUGENE
LOMBARDO provided protection for individuals and resolved
disputes relating to the fraudulent sale of stock and warrants.
These activities included the following:

      (a) In or about and between June 1994 and September
1994, sales of large blocks of Country World stock that the White
Rock Partners did not control made it difficult and costly for
them to maintain the stock's artificially inflated price.  COPPA
caused these uncontrolled sales to cease, thereby facilitating
the White Rock Partners' efforts to maintain the stock's inflated
market price;

      (b) In or about and between December 1994 and February
1995, the White Rock Partners learned that the defendant ROCCO
BASILE was being extorted by LCN associates to repay money
purportedly owed to the owners of another brokerage firm.
MONTEVECCHI and PERSICO negotiated with other members and
associates of LCN Families so as to enable the White Rock
Partners to retain the defendant ROCCO BASILE and others with
whom he worked, including the defendants JACK BASILE and GIUSEPPE
TEMPERINO, as White Rock brokers and cold callers;

14

(c) In or about and between August 1995 and September
1995, a dispute arose concerning a substantial cash payment made
in order for USBNY to obtain bonding in connection with future
construction projects. When the bonding being sought was not
given, the defendants EDWARD GARAFOLA, a soldier in the Gambino
Family, and JOSEPH POLITO, SR., sought to extort Felix Sater and
others in an effort to recoup this cash payment. MONTEVECCHI
intervened in this dispute on Sater's behalf, causing the demands
for money from Sater to cease; and

(d) In or about and between December 1995 and January
1996, the State Street Partners learned that certain individuals
were seeking to extort Andrew Bressman. PERSICO intervened in
the extortion efforts on behalf of the State Street Partners and
Bressman, causing the demand for money from Bressman to cease.

## COUNT ONE
(Racketeering)

28. The allegations contained in paragraphs 1 through
27 are realleged and incorporated as if fully set forth herein.

29. In or about and between March 1993 and October
1996, both dates being approximate and inclusive, within the
Eastern District of New York and elsewhere, the defendants FRANK
COPPA, SR., LARRY BERMAN, JOHN CIOFFOLETTI, JOHN DOUKAS, WALTER
DURCHALTER, also known as "Dutch," DANIEL LEV, EUGENE LOMBARDO,
EDMOND NAGEL, ALFRED PALAGONIA, ALEKS PAUL, and JOSEPH POLITO,
SR., together with others, being persons employed by and
associated with the Enterprise, knowingly and intentionally

conducted and participated, directly and indirectly, in the
conduct of the affairs of the Enterprise, which engaged in, and
the activities of which affected, interstate and foreign
commerce, through a pattern of racketeering activity as defined
in Title 18, United States Code, Sections 1961(1) and 1961(5).
The defendants participated in the affairs of the Enterprise
through the commission of multiple racketeering acts, as set
forth below.

## PATTERN OF RACKETEERING ACTIVITY

30.    The pattern of racketeering activity, as defined
in Title 18, United States Code, Sections 1961(1) and 1961(5),
consisted of the following acts.

### Racketeering Act One
### (Country World Securities Fraud)

31.    The defendants named herein committed the
following acts, either one of which alone constitutes the
commission of Racketeering Act One.

A.    Securities Fraud Conspiracy

32.    In or about and between July 1993 and October
1995, both dates being approximate and inclusive, within the
Eastern District of New York and elsewhere, the defendants FRANK
COPPA, SR., LARRY BERMAN, JOHN CIOFFOLETTI, WALTER DURCHALTER,
also known as "Dutch," EUGENE LOMBARDO, ALFRED PALAGONIA and
ALEKS PAUL, together with others, did knowingly and willfully
conspire, directly and indirectly, to use and employ manipulative
and deceptive devices and contrivances in violation of Rule 10b-5

of the Rules and Regulations of the SEC (Title 17, Code of
Federal Regulations, Section 240.10b-5), in that the defendants,
together with others, did knowingly and willfully conspire
directly and indirectly, to (a) employ devices, schemes and
artifices to defraud; (b) make untrue statements of material
facts and omit to state material facts necessary in order to make
the statements made, in light of the circumstances under which
they were made, not misleading; and (c) engage in acts, practices
and courses of business which would and did operate as a fraud
and deceit upon members of the investing public, in connection
with purchases and sales of Country World common stock, and by
use of means and instrumentalities of interstate commerce and the
mails, in violation of Title 15, United States Code, Sections
78j(b) and 78ff, all in violation of Title 18, United States
Code, Section 371.

      33.  It was part of the conspiracy that, in or about
August 1993, the defendant ABRAHAM SALAMAN and others arranged
for the White Rock Partners to acquire large blocks of Country
World stock pursuant to Regulation S in the name of five off-
shore companies secretly controlled by the White Rock Partners:
Sure Steps Corporation, N.V. ("Sure Steps"), Grace Note
Corporation, N.V. ("Grace Note"), Profinco Holdings S.A.
("Profinco"), Corporation Ceiba ("Ceiba") and Inversiones Santa
Catalina, N.V. ("Santa Catalina").  In return for his
participation in the Country World scheme, SALAMAN retained a

large amount of Country World stock which he later would and did
cause to be sold at artificially inflated prices.

34. It was further part of the conspiracy that,
beginning in or about October 1993, the White Rock Partners and
others caused Country World stock to be sold to the public by,
among other means, pre-arranged sales of large blocks of stock to
brokers at other brokerage firms, including the defendant JOHN
CIOFFOLETTI at Barclay and the defendant ALFRED PALAGONIA at
Blair. In return for selling Country World stock to their
customers, CIOFFOLETTI and PALAGONIA received undisclosed cash
payments from the White Rock Partners. Because of certain
trading restrictions at Blair, PALAGONIA, in association with
Andrew Bressman, executed many of his sales through accounts at
Baron.

35. It was further part of the conspiracy that,
beginning in or about January 1995, the White Rock Partners and
others took steps designed to raise the price of the Country
World stock, including (a) arranging for another company whose
stock they were fraudulently selling -- Holly -- to lend $600,000
to Country World and enter into a "letter of intent" to buy a
controlling interest in Country World, and (b) seeking to replace
Country World's directors with individuals associated with the
White Rock Partners.

36. In furtherance of the conspiracy, and to effect
the objects thereof, within the Eastern District of New York and
elsewhere, the defendants named herein, together with others,

· 18

committed and caused to be committed, among others, the
following:

### OVERT ACTS

a.    In or about August 1993, the defendant ABRAHAM
SALAMAN, and others, caused Country World common stock and
warrants to be issued pursuant to Regulation S to Sure Steps,
Grace Note, Profinco, Ceiba and Santa Catalina.

b.    In or about December 1993, one or more
coconspirators caused $64,122.44 to be wired from a Santa
Catalina bank account in Curacao, Netherlands Antilles to a
Chemical Bank account maintained in Brooklyn, New York.

c.    In or about December 1993, one or more
coconspirators caused 210,000 shares of Country World stock held
in the name of Abraham Chanuka to be sold to the public.

d.    In or about and between December 1993 and January
1994, one or more coconspirators caused $285,000 to be wired from
a bank account in the name of Santa Catalina in Curacao,
Netherlands Antilles to the bank account of an attorney in Salt
Lake City, Utah.

e.    In or about and between March 1994 and May 1994,
one or more coconspirators caused 300,000 shares of Country World
stock held in the name of Sure Steps to be sold to investors.

f.    On or about April 12, 1994, the defendant JOHN
CIOFFOLETTI and others caused 47,000 shares of Country World
stock held in the name of Sure Steps to be sold to Barclay.

g.   In or about and between May 1994 and June 1994, one or more coconspirators caused 300,000 shares of Country World stock held in the name of Ceiba to be sold to investors.

h.   In or about and between August 1994 and October 1994, one or more coconspirators caused 264,900 shares of Country World stock held in the name of Profinco to be sold to investors.

i.   On or about October 21, 1994, the defendant JOHN CIOFFOLETTI and others caused approximately 56,400 shares of Country World stock held in the name of Profinco to be sold to Barclay.

j.   In or about January 1995, the defendant LARRY BERMAN and others caused Holly to lend $600,000 to Country World.

k.   In or about January 1995, the defendant LARRY BERMAN and others caused Holly to enter into a letter of intent to acquire 52 percent of the outstanding shares of Country World.

l.   On or about April 24, 1995, the defendant LARRY BERMAN and others caused Holly to issue a press release concerning Holly's agreement to acquire a majority interest in Country World.

3.   **Securities Fraud**

37.   The allegations contained in paragraphs 33 through 36 are realleged and incorporated as if fully set forth herein.

38.   In or about and between July 1993 and October 1995, both dates being approximate and inclusive, within the Eastern District of New York and elsewhere, the defendants FRANK COPPA, SR., LARRY BERMAN, JOHN CIOFFOLETTI, WALTER DURCHALTER,

also known as "Dutch," EUGENE LOMBARDO, ALFRED PALAGONIA and ALEKS PAUL, together with others, did knowingly and willfully use and employ manipulative and deceptive devices and contrivances in violation of Rule 10b-5 of the Rules and Regulations of the SEC (Title 17, Code of Federal Regulations, Section 240.10b-5), in that the defendants and others did (a) employ devices, schemes and artifices to defraud; (b) make untrue statements of material facts and omit to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and (c) engage in acts, practices and courses of business which would and did operate as a fraud and deceit upon members of the investing public, in connection with purchases and sales of Country World common stock, and by use of means and instrumentalities of interstate commerce and the mails, in violation of Title 15, United States Code, Sections 78j(b) and 78ff.

### Racketeering Act Two
### (Country World Money Laundering)

39. The defendants named herein committed the following acts, either one of which alone constitutes the commission of Racketeering Act Two.

40. The allegations contained in paragraphs 33 through 36 are realleged and incorporated as if fully set forth herein.

A. Money Laundering Conspiracy

41. In or about and between July 1993 and November 1994, both dates being approximate and inclusive, within the

Eastern District of New York and elsewhere, the defendants WALTER DURCHALTER, also known as "Dutch," and ALEKS PAUL, together with others, knowing that the property involved in financial transactions represented the proceeds of some form of unlawful activity, did knowingly and intentionally conspire to conduct such financial transactions affecting interstate and foreign commerce, which transactions in fact involved the proceeds of a specified unlawful activity, to wit: securities fraud in connection with purchases and sales of Country World common stock, in violation of Title 15, United States Code, Sections 78j(b) and 78ff, (a) with the intent to promote the carrying on of said specified unlawful activity, and (b) knowing that the transactions were designed in whole and in part to conceal and disguise the nature, location, source, ownership and control of the proceeds of said specified unlawful activity, all in violation of Title 18, United States Code, Section 1956(h).

42. It was part of the conspiracy that, in order to conceal the White Rock Partners' control over Country World stock and the proceeds therefrom, the defendant WALTER DURCHALTER and others caused the issuance and sale of Country World stock to off-shore and other nominees of the White Rock Partners.

43. It was further part of the conspiracy that, in order to promote the fraudulent sale of Country World stock and conceal their control over the proceeds therefrom, the White Rock Partners and others caused proceeds from the sale of their secretly held Country World stock to be wired to off-shore

accounts designated by the defendant ALEKS PAUL. In turn, PAUL
provided the White Rock Partners with substantial sums of cash, a
portion of which was paid to the defendants JOHN CIOFFOLETTI and
ALFRED PALAGONIA, and others.

B.    Money Laundering

        44.    The allegations contained in paragraphs 42 and 43
are realleged and incorporated as if fully set forth herein.

        45.    In or about and between July 1993 and November
1994, both dates being approximate and inclusive, within the
Eastern District of New York and elsewhere, the defendants WALTER
DURCHALTER, also known as "Dutch," and ALEKS PAUL, together with
others, knowing that the property involved in financial
transactions represented the proceeds of some form of unlawful
activity, did knowingly and intentionally conduct and attempt to
conduct such financial transactions, in and affecting interstate
and foreign commerce, which in fact involved the proceeds of a
specified unlawful activity, to wit: securities fraud in
connection with purchases and sales of Country World common
stock, in violation of Title 15, United States Code, Sections
78j(b) and 78ff, (a) with the intent to promote the carrying on
of said specified unlawful activity, and (b) knowing that the
transactions were designed in whole or in part to conceal and
disguise the nature, location, source, ownership and control of
the proceeds of said specified unlawful activity, in violation of
Title 18, United States Code, Sections 1956(a)(1)(A)(i) and
1956(a)(1)(B)(i).

Racketeering Act Three
(Securities Fraud -- Holly Offerings)

46.   The defendants named herein committed the
following acts, either one of which alone constitutes the
commission of Racketeering Act Three.

A.   Securities Fraud Conspiracy

47.   In or about and between October 1993 and October
1996, both dates being approximate and inclusive, within the
Eastern District of New York and elsewhere, the defendants LARRY
BERMAN, JOHN CIOFFOLETTI, WALTER DURCHALTER, also known as
"Dutch," ALFRED PALAGONIA and ALEKS PAUL, together with others,
did knowingly and willfully conspire, directly and indirectly, to
use and employ manipulative and deceptive devices and
contrivances in violation of Rule 10b-5 of the Rules and
Regulations of the SEC (Title 17, Code of Federal Regulations,
Section 240.10b-5), in that the defendants, together with others,
did knowingly and willfully conspire directly and indirectly, to
(a) employ devices, schemes and artifices to defraud; (b) make
untrue statements of material facts and omit to state material
facts necessary in order to make the statements made, in light of
the circumstances under which they were made, not misleading; and
(c) engage in acts, practices and courses of business which would
and did operate as a fraud and deceit upon members of the
investing public, in connection with purchases and sales of Holly
Preferred Stock, common stock and warrants, and by use of means
and instrumentalities of interstate commerce and the mails, in

violation of Title 15, United States Code, Sections 78j(b) and
78ff, all in violation of Title 18, United States Code, Section
371.

48.  It was part of the conspiracy that, in or about
November 1993, the White Rock Partners arranged with the
defendant JOHN CIOFFOLETTI for Barclay to underwrite an IPO of
Holly securities.

49.  It was further part of the conspiracy that, in or
about November 1994, White Rock underwrote a secondary offering
of Holly securities (the "November 1994 Offering").  Pursuant to
this offering, Holly sold 350,000 shares of Series D Convertible
Preferred Stock (the "Holly Preferred Stock").  As compensation
to White Rock for agreeing to underwrite this secondary offering,
the defendant LARRY BERMAN and others caused 4,000,000 Holly
warrants to be sold in a private placement to nominees of the
White Rock Partners, the defendant JOHN CIOFFOLETTI and others.

50.  It was further part of the conspiracy that, as a
part of the November 1994 Offering, the 4,000,000 Holly warrants
that were secretly controlled by the White Rock Partners, the
defendant JOHN CIOFFOLETTI and others in the name of off-shore
and other nominees -- Sure Steps, Ceiba, China Gaming N.V.
("China Gaming"), J.P. Downey, Ernest Ferrante and Paul
Signoracci -- were registered for offer and sale to the public.

51.  It was further part of the conspiracy that,
beginning in or about November 1994, the White Rock Partners, the
defendant JOHN CIOFFOLETTI and others caused these 4,000,000

Holly warrants to be fraudulently sold to the public. The defendants ROCCO BASILE, JACK BASILE and GIUSEPPE TEMPERINO, together with others, sold Holly warrants to their customers at White Rock. The defendant JOHN CIOFFOLETTI arranged for Holly warrants to be sold to customers at Barclay, and the defendant ALFRED PALAGONIA arranged for Holly warrants to be sold to customers at Blair, though many of these sales were executed through accounts at Baron. These defendants received substantial undisclosed cash payments from the White Rock Partners in return for selling the Holly warrants to customers.

52. It was further part of the conspiracy that, on or about January 13, 1995, the defendant LARRY BERMAN, and others, sold in excess of 1,000,000 shares of Holly common stock to off-shore entities that were secret nominees of the White Rock Partners.

53. It was further part of the conspiracy that, on or about January 24, 1995, Holly filed a registration statement with the SEC by which certain "Selling Stockholders" offered 2,230,000 shares of Holly common stock to the public, which included the more than 1,000,000 shares that were secretly owned by the White Rock Partners in the name of nominees (the "January 1995 Offering").

54. It was further part of the conspiracy that the defendants ROCCO BASILE, JACK BASILE and GIUSEPPE TEMPERINO, together with others, sold Holly common stock pursuant to the January 1995 Offering to their customers at White Rock. The

Holly warrants to be fraudulently sold to the public. The
defendants ROCCO BASILE, JACK BASILE and GIUSEPPE TEMPERINO,
together with others, sold Holly warrants to their customers at
White Rock. The defendant JOHN CIOFFOLETTI arranged for Holly
warrants to be sold to customers at Barclay, and the defendant
ALFRED PALAGONIA arranged for Holly warrants to be sold to
customers at Blair, though many of these sales were executed
through accounts at Baron. These defendants received substantial
undisclosed cash payments from the White Rock Partners in return
for selling the Holly warrants to customers.

52. It was further part of the conspiracy that, on or
about January 13, 1995, the defendant LARRY BERMAN, and others,
sold in excess of 1,000,000 shares of Holly common stock to off-
shore entities that were secret nominees of the White Rock
Partners.

53. It was further part of the conspiracy that, on or
about January 24, 1995, Holly filed a registration statement with
the SEC by which certain "Selling Stockholders" offered 2,230,000
shares of Holly common stock to the public, which included the
more than 1,000,000 shares that were secretly owned by the White
Rock Partners in the name of nominees (the "January 1995
Offering").

54. It was further part of the conspiracy that the
defendants ROCCO BASILE, JACK BASILE and GIUSEPPE TEMPERINO,
together with others, sold Holly common stock pursuant to the
January 1995 Offering to their customers at White Rock. The

defendant JOHN CIOFFOLETTI sold Holly common stock to customers at Barclay, and the defendant ALFRED PALAGONIA sold Holly common stock to customers at Blair, though many of these sales were executed through accounts at Baron.  These brokers received undisclosed cash payments from the White Rock Partners in return for selling the Holly common stock to customers.

55.  In furtherance of the conspiracy, and to effect the objects thereof, within the Eastern District of New York and elsewhere, the defendants named herein, together with others, committed and caused to be committed, among others, the following:

### OVERT ACTS

a.  In or about May 1994, the defendant LARRY BERMAN and others caused 4,000,000 Holly warrants to be sold in a private placement to the following entities and individuals: Sure Steps, Ceiba, China Gaming, J.P. Downey, Ernest Ferrante and Paul Signoracci.

b.  In or about and between December 1994 and February 1995, one or more coconspirators caused approximately 600,000 Holly warrants held in the name of China Gaming to be sold to investors.

c.  In or about and between November 1994 and May 1995, one or more coconspirators caused approximately 1,594,000 Holly warrants held in the name of Sure Steps to be sold to investors.

d.   In or about and between November 1994 and May 1995, one or more coconspirators caused 1,100,000 Holly warrants held in the name of Ceiba to be sold to investors.

e.   On or about December 15, 1994, the defendant JOHN CIOFFOLETTI and others caused 30,000 Holly warrants held in the name of Paul Signoracci to be sold to Barclay.

f.   On or about December 15, 1994, one or more coconspirators caused White Rock's clearing firm, Oppenheimer & Co., Inc. ("Oppenheimer"), to send a confirmation slip to a customer in Staten Island, New York in connection with the purchase of 5,000 Holly warrants.

g.   On or about December 15, 1994, one or more coconspirators caused Oppenheimer to send a confirmation slip to Paul Signoracci in Bellmore, New York in connection with the sale of 30,000 Holly warrants.

h.   On or about December 22, 1994, one or more coconspirators caused Oppenheimer to send a confirmation slip to a customer in Brooklyn, New York in connection with the purchase of 1,125 shares of Holly Preferred Stock.

i.   In or about January 1995, the defendant JOHN CIOFFOLETTI and others caused the sale of 500,000 Holly warrants held in the name of Ernest Ferrante to Ceiba.

j.   On or about January 13, 1995, the defendant LARRY BERMAN and others caused the sale of 240,000 shares of Holly common stock held in the name of Sunrise Group, Inc. ("Sunrise")

to Offington Import/Export Limited ("Offington") and Mallable
Limited ("Mallable").

      k.   On or about January 13, 1995, the defendant LARRY
BERMAN and others caused the sale of 720,000 shares of Holly
common stock held in the name of Norlar, Inc. ("Norlar") to
Polyvest Limited ("Polyvest"), Salin Investments Limited
("Salin"), Canova Finance, Inc. ("Canova") and Pataro Group
Limited ("Pataro").

      l.   On or about January 13, 1995, the defendant LARRY
BERMAN and others caused the sale of 240,000 shares of Holly
common stock held in the name of Samanda, Inc. ("Samanda") to
Wagner Resources, S.A. ("Wagner") and Etilon Trading Limited
("Etilon").

      m.   On or about January 13, 1995, the defendant LARRY
BERMAN and others caused Holly to enter into promissory notes
with Sure Steps, Almondvale Corporation ("Almondvale") and Ora
Toledano pursuant to which Holly promised to repay loans totaling
$1,000,000 and to issue to Sure Steps, Almondvale and Toledano
150,000 restricted shares of Holly common stock in lieu of
interest payments on the loans.

      n.   On or about January 18, 1995, the defendant JOHN
CIOFFOLETTI and others caused 15,000 Holly warrants held in the
name of Paul Signoracci to be sold to Barclay.

      o.   On or about January 24, 1995, the defendant LARRY
BERMAN and others caused the registration of 2,230,000 shares of
Holly common stock, including the shares of common stock

described in over acts j through l above, for offer and sale to the public.

p.   In or about February 1995, the defendant JOHN CIOFFOLETTI and others caused 500,000 Holly warrants held in the name of Ernest Ferrante to be registered in the name of Ceiba.

q.   On or about February 15, 1995, the defendant JOHN CIOFFOLETTI and others caused $250,000 to be wired from a Ceiba bank account maintained in Curacao, Netherlands Antilles to an account in the names of Ernest and Camille Ferrante maintained at the Staten Island Savings Bank in Staten Island, New York.

r.   In or about April 1995, the defendant ALFRED PALAGONIA and others caused 115,000 shares of Holly common stock held in a Mallable account at Blair to be sold to investors.

s.   In or about and between April 1995 and June 1995, the defendant ALFRED PALAGONIA and others caused 110,000 shares of Holly common stock held in a Wagner account at Blair to be sold to investors.

t.   On or about May 3, 1995, the defendant LARRY BERMAN and others caused Ceiba to wire $400,000 from a bank in Curacao, Netherlands Antilles to a Norlar bank account maintained at Corestates Bank in Bala Cynwyd, Pennsylvania (the "Norlar Account").

u.   In or about June 1995, the defendant ALFRED PALAGONIA and others caused 170,000 shares of Holly common stock held in a Pataro account at Blair to be sold to investors.

v.   In or about and between June 1995 and July 1995, the defendant ALFRED PALAGONIA and others caused 166,000 shares of Holly common stock held in a Canova account at Blair to be sold to investors.

w.   On or about June 5, 1995, the defendant ALFRED PALAGONIA and others caused approximately $352,000 in the Mallable account at Blair to be wired to a Barclays Bank account.

x.   On or about June 21, 1995, the defendant LARRY BERMAN and others caused Mallable to wire $161,000 from a Barclays Bank account to the Norlar Account.

y.   On or about June 28, 1995, the defendant LARRY BERMAN and others caused Polyvest to wire $339,000 to the Norlar Account.

z.   In or about and between July 1995 and August 1995, the defendant LARRY BERMAN and others caused approximately 63,500 shares of Holly common stock held in a Norlar account at Northeast Securities, Inc., Westbury, New York ("Northeast"), to be sold to investors.

aa.  On or about July 19, 1995, the defendant ALFRED PALAGONIA and others caused $480,000 in the Canova account at Blair to be wired to an ABN AMRO Bank account.

bb.  On or about August 4, 1995, the defendant ALFRED PALAGONIA and others caused approximately $481,000 in the Pataro account at Blair to be wired to an ABN AMRO Bank account.

31

## B.   Securities Fraud

56.   The allegations contained in paragraphs 48 through 55 are realleged and incorporated as if fully set forth herein.

57.   In or about and between October 1993 and October 1996, both dates being approximate and inclusive, within the Eastern District of New York and elsewhere, the defendants LARRY BERMAN, JOHN CIOFFOLETTI, WALTER DURCHALTER, also known as "Dutch,", ALFRED PALAGONIA and ALEKS PAUL, together with others, did knowingly and willfully use and employ manipulative and deceptive devices and contrivances in violation of Rule 10b-5 of the Rules and Regulations of the SEC (Title 17, Code of Federal Regulations, Section 240.10b-5), in that the defendants and others did (a) employ devices, schemes and artifices to defraud; (b) make untrue statements of material facts and omit to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and (c) engage in acts, practices and courses of business which would and did operate as a fraud and deceit upon members of the investing public, in connection with purchases and sales of Holly Preferred Stock, common stock and warrants, and by use of means and instrumentalities of interstate commerce and the mails, in violation of Title 15, United States Code, Sections 78j(b) and 78ff.

## Racketeering Act Four
### (Money Laundering -- Holly Offerings)

58.   The defendants named herein committed the
following acts, either one of which alone constitutes the
commission of Racketeering Act Four.

59.   The allegations contained in paragraphs 48 through
55 are realleged and incorporated as if fully set forth herein.

A.   Money Laundering Conspiracy

60.   In or about and between May 1994 and October 1995,
both dates being approximate and inclusive, within the Eastern
District of New York and elsewhere, the defendants LARRY BERMAN,
WALTER DURCHALTER, also known as "Dutch," ALFRED PALAGONIA and
ALEKS PAUL, together with others, knowing that the property
involved in financial transactions represented the proceeds of
some form of unlawful activity, did knowingly and intentionally
conspire to conduct such financial transactions affecting
interstate and foreign commerce, which transactions in fact
involved the proceeds of a specified unlawful activity, to wit:
securities fraud in connection with purchases and sales of Holly
common stock, preferred stock and warrants, in violation of Title
15,  United States Code, Sections 78j(b) and 78ff, (a) with the
intent to promote the carrying on of said specified unlawful
activity, and (b) knowing that the transactions were designed in
whole and in part to conceal and disguise the nature, location,
source, ownership and control of the proceeds of said specified

unlawful activity, all in violation of Title 18, United States
Code, Section 1956(h).

61.  It was part of the conspiracy that, in order to
conceal the White Rock Partners' control over Holly common stock
and warrants and the proceeds therefrom, the defendants LARRY
BERMAN, WALTER DURCHALTER and others caused the issuance and sale
of Holly common stock and warrants to off-shore and other
nominees of the White Rock Partners and others.

62.  It was further part of the conspiracy that, in
order to promote the fraudulent sale of Holly common stock and
warrants and conceal their control over the proceeds therefrom,
the White Rock Partners and others caused proceeds from the sale
of their secretly held Holly stock and warrants to be wired to
off-shore accounts designated by the defendant ALEKS PAUL.  In
turn, PAUL provided the White Rock Partners with substantial sums
of cash, a portion of which was paid to the defendants JACK
BASILE, ROCCO BASILE, JOHN CIOFFOLETTI, ALFRED PALAGONIA,
GIUSEPPE TEMPERINO, and others.

B.  Money Laundering

63.  The allegations contained in paragraphs 61 and 62
are realleged and incorporated as if fully set forth herein.

64.  In or about and between May 1994 and October 1995,
both dates being approximate and inclusive, within the Eastern
District of New York and elsewhere, the defendants LARRY BERMAN,
WALTER DURCHALTER, also known as "Dutch," ALFRED PALAGONIA and
ALEKS PAUL, together with others, knowing that the property

34

involved in financial transactions represented the proceeds of
some form of unlawful activity, did knowingly and intentionally
conduct and attempt to conduct such financial transactions, in
and affecting interstate and foreign commerce, which in fact
involved the proceeds of a specified unlawful activity, to wit:
securities fraud in connection with purchases and sales of Holly
common stock, preferred stock and warrants, in violation of Title
15,  United States Code, Sections 78j(b) and 78ff, (a) with the
intent to promote the carrying on of said specified unlawful
activity, and (b) knowing that the transactions were designed in
whole or in part to conceal and disguise the nature, location,
source, ownership and control of the proceeds of said specified
unlawful activity, in violation of Title 18, United States Code,
Sections 1956(a)(1)(A)(i) and 1956(a)(1)(B)(i).

### Racketeering Act Five
### (USBNY Securities Fraud)

65.  The defendants named herein committed the
following acts, either one of which alone constitutes the
commission of Racketeering Act Five.

A.  Securities Fraud Conspiracy

66.  In or about and between December 1994 and October
1996, both dates being approximate and inclusive, within the
Eastern District of New York and elsewhere, the defendants JOHN
CIOFFOLETTI, JOHN DOUKAS, WALTER DURCHALTER, also known as
"Dutch," DANIEL LEV, EUGENE LOMBARDO, EDMOND NAGEL, ALFRED
PALAGONIA and JOSEPH POLITO, SR., together with others, did

knowingly and willfully conspire, directly and indirectly, to use and employ manipulative and deceptive devices and contrivances in violation of Rule 10b-5 of the Rules and Regulations of the SEC (Title 17, Code of Federal Regulations, Section 240.10b-5), in that the defendants, together with others, did knowingly and willfully conspire directly and indirectly, to (a) employ devices, schemes and artifices to defraud; (b) make untrue statements of material facts and omit to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and (c) engage in acts, practices and courses of business which would and did operate as a fraud and deceit upon members of the investing public, in connection with purchases and sales of USBNY common stock and warrants, and by use of means and instrumentalities of interstate commerce and the mails, in violation of Title 15, United States Code, Sections 78j(b) and 78ff, all in violation of Title 18, United States Code, Section 371.

67. It was part of the conspiracy that, in or about December 1994, the defendant JOSEPH POLITO, SR., agreed with the White Rock Partners that White Rock would underwrite an IPO of USBNY common stock and warrants in exchange for a secret allotment of USBNY warrants, which the White Rock Partners would acquire in the name of nominees and then sell to the public. POLITO and the White Rock Partners also agreed that POLITO would get several hundred thousand dollars that would be derived from

the eventual sale of the securities that the White Rock Partners
would secretly acquire.

68.  It was further part of the conspiracy that, in or
about January 1995, the defendant JOSEPH POLITO, SR., and the
White Rock Partners executed a secret agreement under which the
defendant DANIEL LEV provided a $252,000 loan to USBNY in return
for 10 USBNY "units," each of which consisted of a promissory
note to LEV from USBNY for $25,200 and 300,000 USBNY warrants.
As a result of the agreement, LEV obtained a total of 3,000,000
USBNY warrants.

69.  It was further part of the conspiracy that the
defendant DANIEL LEV agreed to be a nominee for the White Rock
Partners.  Although the 3,000,000 warrants were in LEV's name,
the White Rock Partners controlled the warrants and made all
decisions concerning the purchase and sale of the warrants.  In
return for acting as a nominee, LEV was promised a substantial
profit on the sum he lent to USBNY in January 1995.

70.  It was further part of the conspiracy that, prior
to USBNY's IPO, the defendants JOSEPH POLITO, SR., and EUGENE
LOMBARDO, and others, took steps to make it appear as if USBNY
would use the IPO proceeds to obtain bonding that would enable
USBNY to act as a general contractor on large-scale construction
projects.  The White Rock Partners agreed with POLITO, LOMBARDO,
the defendant LAWRENCE RAY and others that RAY would secretly pay
$100,000 to an executive of a bond brokerage firm to facilitate
the issuance of bonding after the IPO.

71. It was further part of the conspiracy that, on or
about August 9, 1995, White Rock underwrote the USBNY IPO (the
"August 1995 IPO"). Pursuant to the IPO, 860,000 shares of
common stock and 3,430,000 warrants were offered to the public at
$5.00 per share of common stock and 10 cents per warrant. In the
IPO, USBNY sold 700,000 shares of common stock and 430,000
warrants. The remaining 160,000 shares of common stock and
3,000,000 warrants were sold in the IPO by certain "Selling
Security Holders" listed in the IPO prospectus. The defendant
DANIEL LEV was identified as the seller of the 3,000,000
warrants, but the White Rock Partners were not identified, as
they should have been, as the actual owners who were in control
of LEV's warrants.

72. It was further part of the conspiracy that, in
order to control the supply of USBNY warrants in the aftermarket
trading and allocate profits to their associates, the White Rock
Partners arranged for the sale of the defendant DANIEL LEV's
3,000,000 USBNY warrants to off-shore nominees and other persons
and entities specifically chosen by the White Rock Partners.

73. It was further part of the conspiracy that among
the individuals allotted warrants for sale in the aftermarket was
the defendant JOSEPH POLITO, SR., for whom warrants were
purchased and deposited in a brokerage account opened in the name
of Jasminville Corp. ("Jasminville"), an off-shore entity made
available to POLITO by the defendant EDMOND NAGEL. These
warrants were then sold to the public on or about August 15,

38

1995, generating approximately $380,000 of proceeds, which were subsequently wire transferred to other accounts and eventually divided by POLITO and NAGEL.

74. It was further part of the conspiracy that the White Rock Partners allotted warrants for sale in the aftermarket to the defendants ERNEST MONTEVECCHI, DANIEL PERSICO and FRANK COPPA, SR. These warrants were sold to the public on or about and between August 15, 1995 and August 16, 1995, generating profits for MONTEVECCHI of approximately $97,000, for PERSICO of approximately $58,000, and for COPPA of about $9,500.

75. It was further part of the conspiracy that, in or about and between August 1995 and December 1995, the 3,000,000 warrants secretly controlled by the White Rock and State Street Partners were fraudulently sold to the public through brokers at White Rock, State Street and other firms. The defendant JOHN CIOFFOLETTI arranged for USBNY warrants to be sold to customers at Barclay, and the defendant ALFRED PALAGONIA arranged for USBNY warrants to be sold to customers of Blair, though he executed many of his sales through accounts at Baron. These defendants received undisclosed cash payments in return for selling the USBNY warrants to customers.

76. In furtherance of the conspiracy, and to effect the objects thereof, within the Eastern District of New York and elsewhere, the defendants named herein, together with others, committed and caused to be committed, among others, the following:

<u>OVERT ACTS</u>

a.  In or about and between December 1994 and January 1995, the defendants EDMOND NAGEL and JOSEPH POLITO, SR., and others discussed the terms of the USBNY IPO.

b.  In or about January 1995, the defendants EDMOND NAGEL and JOSEPH POLITO, SR., and others caused USBNY to issue 3,000,000 USBNY warrants to the defendant DANIEL LEV in return for LEV's $282,000 loan to USBNY.

c.  In or about and between June 1995 and July 1995, the defendants EUGENE LOMBARDO, JOSEPH POLITO, SR., and LAWRENCE RAY, and others, caused an employee of a bond brokerage company to send a letter, dated July 11, 1995, to USBNY in Queens, New York.

d.  In or about August 1995, one or more coconspirators caused the 3,000,000 USBNY warrants held in the name of the defendant DANIEL LEV to be sold in connection with the August 1995 IPO to nominees of the White Rock Partners and others.

e.  On or about August 14, 1995, the defendants JOSEPH POLITO, SR., and EDMOND NAGEL, and others, caused 100,000 USBNY warrants to be purchased in the name of Jasminville.

f.  On or about August 14, 1995, the defendant JOSEPH POLITO, SR., and others caused a check for $269,312.60, payable to the defendant DANIEL LEV, to be drawn on a USBNY account maintained at a Chase Manhattan Bank branch in Queens, New York (the "USBNY Account").

40

g.   On or about August 15, 1995, the defendants JOSEPH POLITO, SR., and EDMOND NAGEL, and others, caused 100,000 USBNY warrants held in a Jasminville brokerage account at White Rock (the "Jasminville Brokerage Account") to be sold to investors.

h.   On or about August 30, 1995, the defendants EDMOND NAGEL and JOSEPH POLITO, SR., and others, caused $44,158 to be wired from the Jasminville Brokerage Account to a Jasminville account maintained at Nationsbank of Texas in Houston, Texas (the "Jasminville Bank Account").

i.   On or about September 13, 1995, the defendants EDMOND NAGEL and JOSEPH POLITO, SR., and others, caused $200,000 to be wired from the Jasminville Brokerage Account to the Jasminville Bank Account.

j.   On or about September 19, 1995, the defendant EUGENE LOMBARDO and others caused $167,000 to be wired from a bank in the Channel Islands to a bank account for Mint Check Cashing in New Jersey.

k.   On or about September 21, 1995, the defendants EUGENE LOMBARDO and JOSEPH POLITO, JR. and others caused a check for $100,000, payable to N & A Promotional Services, Inc., to be drawn on the USBNY Account.

l.   On or about November 1, 1995, one or more coconspirators caused Oppenheimer to send a confirmation slip to a customer in Roslyn Heights, New York, in connection with the purchase of 1,250 USBNY warrants.

m. On or about November 2, 1995, the defendant JOSEPH
POLITO, SR., and others caused a check for $20,000, payable to
Equitable Funding, Inc., to be drawn on the USBNY account.

n. On or about November 2, 1995, one or more
coconspirators caused Oppenheimer to send a confirmation slip to
a customer in Brooklyn, New York, in connection with the purchase
of 1,000 USBNY warrants.

B. Securities Fraud

77. The allegations contained in paragraphs 67 through
76 are realleged and incorporated as if fully set forth herein.

78. In or about and between December 1994 and October
1996, both dates being approximate and inclusive, within the
Eastern District of New York and elsewhere, the defendants JOHN
CIOFFOLETTI, JOHN DOUKAS, WALTER DURCHALTER, also known as
"Dutch," DANIEL LEV, EUGENE LOMBARDO, EDMOND NAGEL, ALFRED
PALAGONIA and JOSEPH POLITO, SR., together with others, did
knowingly and willfully use and employ manipulative and deceptive
devices and contrivances in violation of Rule 10b-5 of the Rules
and Regulations of the SEC (Title 17, Code of Federal
Regulations, Section 240.10b-5), in that the defendants and
others did (a) employ devices, schemes and artifices to defraud;
(b) make untrue statements of material facts and omit to state
material facts necessary in order to make the statements made, in
light of the circumstances under which they were made, not
misleading; and (c) engage in acts, practices and courses of
business which would and did operate as a fraud and deceit upon

members of the investing public, in connection with purchases and
sales of USBNY common stock and warrants, and by use of means and
instrumentalities of interstate commerce and the mails, in
violation of Title 15, United States Code, Sections 78j(b) and
78ff.

Racketeering Act Six<br>(USBNY Money Laundering)

79.   The defendants named herein committed the
following acts, either one of which alone constitutes the
commission of Racketeering Act Six.

80.   The allegations contained in paragraphs 67 through
76 are realleged and incorporated as if fully set forth herein.

A.    Money Laundering Conspiracy

81.   In or about and between January 1995 and February
1996, both dates being approximate and inclusive, within the
Eastern District of New York and elsewhere, the defendants JOHN
DOUKAS, DANIEL LEV, EUGENE LOMBARDO, EDMOND NAGEL, ALEKS PAUL and
JOSEPH POLITO, SR., together with others, knowing that the
property involved in financial transactions represented the
proceeds of some form of unlawful activity, did knowingly and
intentionally conspire to conduct such financial transactions
affecting interstate and foreign commerce, which transactions in
fact involved the proceeds of a specified unlawful activity, to
wit: securities fraud in connection with purchases and sales of
USBNY common stock and warrants, in violation of Title 15, United
States Code, Sections 78j(b) and 78ff, (a) with the intent to

promote the carrying on of said specified unlawful activity, and
(b) knowing that the transactions were designed in whole and in
part to conceal and disguise the nature, location, source,
ownership and control of the proceeds of said specified unlawful
activity, all in violation of Title 18, United States Code,
Section 1956(h).

82. It was part of the conspiracy that, in order to
conceal the White Rock Partners' control over USBNY stock and
warrants and the proceeds therefrom, the defendants DANIEL LEV,
EDMUND NAGEL, JOSEPH POLITO, SR., and others caused the issuance
and sale of USBNY warrants to LEV and subsequently to off-shore
and other nominees of the White Rock Partners and others.

83. It was further part of the conspiracy that, in
order to promote the fraudulent sale of USBNY stock and warrants
and conceal their control of the proceeds therefrom, the White
Rock and State Street Partners and others caused proceeds from
the sale of their secretly held USBNY stock and warrants to be
wired to off-shore accounts designated by the defendant ALEKS
PAUL. In turn, PAUL provided the White Rock and State Street
Partners with substantial sums of cash, a portion of which was
paid to the defendants JOHN CIOFFOLETTI and ALFRED PALAGONIA, and
others.

· 44

B.   Money Laundering

84.   The allegations contained in paragraphs 82 and 83 are realleged and incorporated as if fully set forth herein.

85.   In or about and between January 1995 and February 1996, both dates being approximate and inclusive, within the Eastern District of New York and elsewhere, the defendants JOHN DOUKAS, DANIEL LEV, EUGENE LOMBARDO, EDMOND NAGEL, ALEKS PAUL and JOSEPH POLITO, SR., together with others, knowing that the property involved in a financial transaction represented the proceeds of some form of unlawful activity, did knowingly and intentionally conduct and attempt to conduct financial transactions, in and affecting interstate and foreign commerce, which in fact involved the proceeds of a specified unlawful activity, to wit: securities fraud in connection with purchases and sales of USBNY common stock and warrants, in violation of Title 15,  United States Code, Sections 78j(b) and 78ff, (a) with the intent to promote the carrying on of said specified unlawful activity, and (b) knowing that the transactions were designed in whole or in part to conceal and disguise the nature, location, source, ownership and control of the proceeds of said specified unlawful activity, in violation of Title 18, United States Code, Sections 1956(a)(1)(A)(i) and 1956(a)(1)(B)(i).

Racketeering Act Seven
(Money Laundering)

86.   The defendant named herein committed the following acts, either one of which alone constitutes the commission of Racketeering Act Seven.

87.   The allegations contained in paragraphs 67 through 76 are realleged and incorporated as if fully set forth herein.

A.   Money Laundering Conspiracy

88.   On or about and between August 10, 1995 and August 31, 1995, both dates being approximate and inclusive, within the Eastern District of New York and elsewhere, the defendant FRANK COPPA, SR., together with others, knowing that the property involved in financial transactions represented the proceeds of some form of unlawful activity, did knowingly and intentionally conspire to conduct such financial transactions affecting interstate and foreign commerce, which transactions in fact involved the proceeds of a specified unlawful activity, to wit: securities fraud, in violation of Title 15, United States Code, Sections 78j(b) and 78ff, with the intent to promote the carrying on of said specified unlawful activity by the Enterprise, all in violation of Title 18, United States Code, Section 1956(h).

89.   It was part of the conspiracy that, beginning on or about August 10, 1995, the White Rock Partners and the defendant FRANK COPPA, SR., and others arranged for USBNY warrants to be purchased and deposited in White Rock brokerage

46

accounts for the benefit of COPPA and shortly thereafter sold for a substantial profit.

B.    Money Laundering

90.    The allegations contained in paragraph 89 are realleged and incorporated as if fully set forth herein.

91.    On or about and between August 10, 1995 and August 31, 1995, both dates being approximate and inclusive, within the Eastern District of New York and elsewhere, the defendant FRANK COPPA, SR., together with others, knowing that the property involved in financial transactions represented the proceeds of some form of unlawful activity, did knowingly and intentionally conduct and attempt to conduct such financial transactions, in and affecting interstate and foreign commerce, which in fact involved the proceeds of a specified unlawful activity, to wit: securities fraud, in violation of Title 15,  United States Code, Sections 78j(b) and 78ff, with the intent to promote the carrying on of said specified unlawful activity by the Enterprise, in violation of Title 18, United States Code, Section 1956(a)(1)(A)(i).

Racketeering Act Eight
(Cable Securities Fraud)

92.    The defendants named herein committed the following acts, either one of which alone constitutes the commission of Racketeering Act Eight.

A.   Securities Fraud Conspiracy

93.   In or about and between December 1995 and October
1996, both dates being approximate and inclusive, within the
Eastern District of New York and elsewhere, the defendants FRANK
COPPA, SR., JOHN CIOFFOLETTI, JOHN DOUKAS and ALFRED PALAGONIA,
together with others, did knowingly and willfully conspire,
directly and indirectly, to use and employ manipulative and
deceptive devices and contrivances in violation of Rule 10b-5 of
the Rules and Regulations of the SEC (Title 17, Code of Federal
Regulations, Section 240.10b-5), in that the defendants, together
with others, did knowingly and willfully conspire directly and
indirectly, to (a) employ devices, schemes and artifices to
defraud; (b) make untrue statements of material facts and omit to
state material facts necessary in order to make the statements
made, in light of the circumstances under which they were made,
not misleading; and (c) engage in acts, practices and courses of
business which would and did operate as a fraud and deceit upon
members of the investing public, in connection with purchases and
sales of Cable common stock and warrants, and by use of means and
instrumentalities of interstate commerce and the mails, in
violation of Title 15, United States Code, Sections 78j(b) and
78ff, all in violation of Title 18, United States Code, Section
371.

94.   It was part of the conspiracy that, in or about
and between November 1995 and December 1995, the State Street
Partners agreed to make substantial undisclosed payments to the

48

defendant FRANK COPPA, SR., in order to gain COPPA's assistance in inflating and maintaining the price of Cable securities in the aftermarket.

95. It was further part of the conspiracy that, in or about and between November 1995 and June 1996, the State Street Partners agreed with "John Doe #1," a director of Cable, whose identity is known to the grand jury, that State Street would underwrite Cable's IPO on the condition that the State Street Partners would receive a secret allotment of Cable securities which would be held in the name of an off-shore nominee and then sold to the public in aftermarket trading.

96. It was further part of the conspiracy that, on or about January 26, 1996, Cable entered into a bogus consulting agreement with an off-shore entity, U.K. Hyde Park Consultants, Ltd. ("Hyde Park"), under which Hyde Park would receive 400,000 shares of Cable stock and warrants to purchase an additional 450,000 shares of Cable stock. Hyde Park, which was actually a nominee controlled by the State Street Partners, subsequently transferred these shares of stock and warrants to U.K. Midland Group Ltd. ("Midland"), another off-shore entity controlled by the State Street Partners. The Cable stock and warrants held in the name of Midland are sometimes referred to herein as the "Midland Securities."

97. It was further part of the conspiracy that, on or about June 5, 1996, State Street, together with First Metropolitan Securities, Inc. ("First Metropolitan"), a brokerage

firm in which Gennady Klotsman, Salvatore Lauria and Felix Sater
had an undisclosed interest, underwrote the Cable IPO (the "June
1996 IPO"). Pursuant to the June 1996 IPO, Cable and certain
"Selling Security Holders," as described in the Cable IPO
prospectus, registered and offered for sale shares of Cable
common stock and warrants. Included in the offering were the
Midland Securities.

98. It was further part of the conspiracy that, in or
about and between June 1996 and August 1996, the Cable stock and
warrants held in the name of Midland were fraudulently sold to
the public by brokers at Barclay, Blair and two other licensed
brokerage firms: Marlowe & Co., located in Hauppauge, New York
("Marlowe"); and Prudential Securities, Inc., located in Denver,
Colorado ("Prudential").

99. In furtherance of the conspiracy, and to effect
the objects thereof, within the Eastern District of New York and
elsewhere, the defendants named herein, together with others,
committed and caused to be committed, among others, the
following:

### OVERT ACTS

a. In or about January 1996, the defendant JOHN
DOUKAS and others caused the issuance to Hyde Park of 400,000
shares of Cable common stock and warrants to purchase an
additional 450,000 shares of Cable common stock.

b. In or about and between January 1996 and June
1996, the defendant JOHN DOUKAS and others caused Hyde Park to

transfer the stock and warrants described in overt act a above to Midland.

c.   On or about June 5, 1996, the defendant JOHN DOUKAS and others caused State Street and First Metropolitan to offer and sell 1,130,000 shares of common stock and warrants pursuant to the Cable IPO.

d.   On or about June 5, 1996, in a concurrent offering described in the Cable IPO prospectus, the defendants JOHN DOUKAS and others caused Cable to register for sale to the public an additional 882,547 shares of Cable common stock and 630,000 warrants held by certain Selling Security Holders, including the Midland Securities.

e.   On or about June 6, 1996, the defendant JOHN DOUKAS and others caused State Street to waive a restriction which would otherwise have prevented Midland from selling its stock and warrants for a period of 25 months from June 5, 1996.

f.   In or about June 1996, the defendant JOHN DOUKAS and others caused the Midland Securities to be deposited into Midland brokerage accounts at Barclay, Blair, Marlowe and Prudential.

g.   In or about and between June 1996 and August 1996, the defendants JOHN CIOFFOLETTI, JOHN DOUKAS and ALFRED PALAGONIA and others caused the Midland Securities to be sold to investors.

h.   On or about July 29, 1996, the defendant ALFRED PALAGONIA and others caused approximately $1,423,431 to be wired

from the Midland brokerage account at Blair to a bank account maintained in the Isle of Man for the benefit of Midland.

i.   On or about August 20, 1996, one or more coconspirators caused approximately $697,220 to be wired from the Midland brokerage account at Marlowe to a Bankers Trust account for the benefit of Midland.

j.   On or about August 29, 1996, the defendant JOHN CIOFFOLETTI and others caused a check for $817,050 to be drawn on the Midland brokerage account at Barclay for the benefit of Midland.

B.   Securities Fraud

100. The allegations contained in paragraphs 94 through 99 are realleged and incorporated as if fully set forth herein.

101. In or about and between December 1995 and October 1996, both dates being approximate and inclusive, within the Eastern District of New York and elsewhere, the defendants FRANK COPPA, SR., JOHN CIOFFOLETTI, JOHN DOUKAS and ALFRED PALAGONIA, together with others, did knowingly and willfully use and employ manipulative and deceptive devices and contrivances in violation of Rule 10b-5 of the Rules and Regulations of the SEC (Title 17, Code of Federal Regulations, Section 240.10b-5), in that the defendants and others did (a) employ devices, schemes and artifices to defraud; (b) make untrue statements of material facts and omit to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and (c) engage in acts, practices

and courses of business which would and did operate as a fraud
and deceit upon members of the investing public, in connection
with purchases and sales of Cable common stock and warrants, and
by use of means and instrumentalities of interstate commerce and
the mails, in violation of Title 15, United States Code, Sections
78j(b) and 78ff.

### Racketeering Act Nine
### (Cable Money Laundering)

102. The defendants named herein committed the
following racketeering acts, either one of which alone
constitutes the commission of Racketeering Act Nine.

103. The allegations contained in paragraphs 94 through
99 are realleged and incorporated as if fully set forth herein.

A.   Money Laundering Conspiracy

104. In or about and between December 1995 and November
1996, both dates being approximate and inclusive, within the
Eastern District of New York and elsewhere, the defendants JOHN
CIOFFOLETTI, JOHN DOUKAS, ALFRED PALAGONIA and ALEKS PAUL,
together with others, knowing that the property involved in
financial transactions represented the proceeds of some form of
unlawful activity, did knowingly and intentionally conspire to
conduct such financial transactions affecting interstate and
foreign commerce, which transactions in fact involved the
proceeds of a specified unlawful activity, to wit: securities
fraud in connection with purchases and sales of Cable stock and
warrants, in violation of Title 15, United States Code, Sections

78j(b) and 78ff, with the intent to promote the carrying on of
said specified unlawful activity, all in violation of Title 18,
United States Code, Section 1956(h).

105. It was part of the conspiracy that, in order to
conceal the State Street Partners' control over Cable stock and
warrants and the proceeds therefrom, the defendant JOHN DOUKAS
and others caused the issuance of Cable stock stock and warrants
to Hyde Park, which in turn transferred the stock and warrants to
Midland.

106. It was further part of the conspiracy that, in
order to promote the fraudulent sale of Cable stock and warrants
and conceal the proceeds therefrom, the State Street Partners and
others caused proceeds from the sale of their secretly held Cable
stock and warrants to be wired to off-shore accounts designated
by the defendant ALEKS PAUL. In turn, PAUL provided the State
Street Partners with substantial sums of cash, a portion of which
was paid to the defendants JOHN CIOFFOLETTI and ALFRED PALAGONIA,
and others.

B.  Money Laundering

107. The allegations contained in paragraphs 105 and
106 are realleged and incorporated as if fully set forth herein.

108. In or about and between December 1995 and November
1996, both dates being approximate and inclusive, within the
Eastern District of New York and elsewhere, the defendants JOHN
CIOFFOLETTI, JOHN DOUKAS, ALFRED PALAGONIA and ALEKS PAUL, and
others, knowing that the property involved in financial

transactions represented the proceeds of some form of unlawful activity, did knowingly and intentionally conduct and attempt to conduct such financial transactions, in and affecting interstate and foreign commerce, which in fact involved the proceeds of a specified unlawful activity, to wit: securities fraud in connection with purchases and sales of Cable stock and warrants, in violation of Title 15, United States Code, Sections 78j(b) and 78ff, with the intent to promote the carrying on of said specified unlawful activity, in violation of Title 18, United States Code, Sections 1956(a)(1)(A)(i) and 1956(a)(1)(B)(i).

(Title 18, United States Code, Sections 1962(c), 1963 and 3551 et seq.)

COUNT TWO
(Racketeering Conspiracy)

109. The allegations contained in paragraphs 1 through 27, 33 through 36, 48 through 55, 67 through 76, 89, and 94 through 99 are realleged and incorporated as if fully set forth herein.

110. In or about and between March 1993 and October 1996, both dates being approximate and inclusive, within the Eastern District of New York and elsewhere, the defendants FRANK COPPA, SR., ERNEST MONTEVECCHI, also known as "Butch," DANIEL PERSICO, JACK BASILE, ROCCO BASILE, LARRY BERMAN, JOHN CIOFFOLETTI, JOHN DOUKAS, WALTER DURCHALTER, also known as "Dutch," DANIEL LEV, EUGENE LOMBARDO, EDMOND NAGEL, ALFRED PALAGONIA, ALEKS PAUL, JOSEPH POLITO, SR., ABRAHAM SALAMAN and

55

GIUSEPPE TEMPERINO, also known as "Joseph Temperino," together with others, being persons employed by and associated with the Enterprise, knowingly and intentionally conspired to violate Title 18, United States Code, Section 1962(c), that is, to conduct and participate, directly and indirectly, in the conduct of the affairs of the Enterprise, which engaged in, and the activities of which affected, interstate and foreign commerce, through a pattern of racketeering activity as defined in Title 18, United States Code, Sections 1961(1) and 1961(5).

111. The pattern of racketeering activity through which the defendants agreed to conduct the affairs of the Enterprise consisted of the acts set forth in paragraphs 32 through 108 of Count One, which are realleged and incorporated as if fully set forth herein. It was part of the racketeering conspiracy that the defendants agreed that at least one coconspirator would commit at least two acts of racketeering in the conduct of the affairs of the Enterprise.

(Title 18, United States Code, Sections 1962(d), 1963 and 3551 et seq.)

## COUNT THREE
(Country World Securities Fraud Conspiracy)

112. The allegations contained in paragraphs 1 through 27 and 33 through 36 are realleged and incorporated as if fully set forth herein.

113. In or about and between July 1993 and October 1995, both dates being approximate and inclusive, within the

56

Eastern District of New York and elsewhere, the defendants FRANK COPPA, SR., LARRY BERMAN, JOHN CIOFFOLETTI, WALTER DURCHALTER, also known as "Dutch," EUGENE LOMBARDO, ALFRED PALAGONIA, ALEKS PAUL and ABRAHAM SALAMAN, together with others, did knowingly and willfully conspire, directly and indirectly, to use and employ manipulative and deceptive devices and contrivances in violation of Rule 10b-5 of the Rules and Regulations of the SEC (Title 17, Code of Federal Regulations, Section 240.10b-5), in that the defendants, together with others, did knowingly and willfully conspire directly and indirectly, to (a) employ devices, schemes and artifices to defraud; (b) make untrue statements of material facts and omit to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and (c) engage in acts, practices and courses of business which would and did operate as a fraud and deceit upon members of the investing public, in connection with purchases and sales of Country World common stock, and by use of means and instrumentalities of interstate commerce and the mails, in violation of Title 15, United States Code, Sections 78j.(b) and 78ff.

(Title 18, United States Code, Sections 371 and 3551 et seq.)

COUNT FOUR
(Country World Securities Fraud)

114. The allegations contained in paragraphs 1 through 27 and 33 through 36 are realleged and incorporated as if fully set forth herein.

115. In or about and between July 1993 and October 1995, both dates being approximate and inclusive, within the Eastern District of New York and elsewhere, the defendants FRANK COPPA, SR., LARRY BERMAN, JOHN CIOFFOLETTI, WALTER DURCHALTER, also known as "Dutch," EUGENE LOMBARDO, ALFRED PALAGONIA, ALEKS PAUL and ABRAHAM SALAMAN, together with others, did knowingly and willfully use and employ manipulative and deceptive devices and contrivances in violation of Rule 10b-5 of the Rules and Regulations of the SEC (Title 17, Code of Federal Regulations, Section 240.10b-5), in that the defendants and others did (a) employ devices, schemes and artifices to defraud; (b) make untrue statements of material facts and omit to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and (c) engage in acts, practices and courses of business which would and did operate as a fraud and deceit upon members of the investing public, in connection with purchases and sales of Country World common stock, and by use of means and instrumentalities of interstate commerce and the mails.

(Title 15, United States Code, Sections 78j(b) and 78ff; Title 18, United States Code, Sections 2 and 3551 et seq.)

COUNT FIVE
(Holly Securities Fraud Conspiracy)

116. The allegations contained in paragraphs 1 through
27 and 48 through 55 are realleged and incorporated as if fully
set forth herein.

117. In or about and between October 1993 and October
1996, both dates being approximate and inclusive, within the
Eastern District of New York and elsewhere, the defendants JACK
BASILE, ROCCO BASILE, LARRY BERMAN, JOHN CIOFFOLETTI, JOHN
DOUKAS, WALTER DURCHALTER, also known as "Dutch," ALFRED
PALAGONIA, ALEKS PAUL and GIUSEPPE TEMPERINO, also known as
"Joseph Temperino," together with others, did knowingly and
willfully conspire, directly and indirectly, to use and employ
manipulative and deceptive devices and contrivances in violation
of Rule 10b-5 of the Rules and Regulations of the SEC (Title 17,
Code of Federal Regulations, Section 240.10b-5), in that the
defendants, together with others, did knowingly and willfully
conspire directly and indirectly, to (a) employ devices, schemes
and artifices to defraud; (b) make untrue statements of material
facts and omit to state material facts necessary in order to make
the statements made, in light of the circumstances under which
they were made, not misleading; and (c) engage in acts, practices
and courses of business which would and did operate as a fraud
and deceit upon members of the investing public, in connection
with purchases and sales of Holly Preferred Stock, common stock
and warrants, and by use of means and instrumentalities of

`59

interstate commerce and the mails, in violation of Title 15, United States Code, Sections 78j(b) and 78ff.

(Title 18, United States Code, Sections 371 and 3551 et seq.)

## COUNT SIX
### (Holly Securities Fraud)

118. The allegations contained in paragraphs 1 through 27 and 48 through 55 are realleged and incorporated as if fully set forth herein.

119. In or about and between October 1993 and October 1996, both dates being approximate and inclusive, within the Eastern District of New York and elsewhere, the defendants JACK BASILE, ROCCO BASILE, LARRY BERMAN, JOHN CIOFFOLETTI, JOHN DOUKAS, WALTER DURCHALTER, also known as "Dutch," ALFRED PALAGONIA, ALEKS PAUL and GIUSEPPE TEMPERINO, also known as "Joseph Temperino," together with others, did knowingly and willfully use and employ manipulative and deceptive devices and contrivances in violation of Rule 10b-5 of the Rules and Regulations of the SEC (Title 17, Code of Federal Regulations, Section 240.10b-5), in that the defendants and others did (a) employ devices, schemes and artifices to defraud; (b) make untrue statements of material facts and omit to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and (c) engage in acts, practices and courses of business which would and did operate as a fraud and deceit upon members of the investing

public, in connection with purchases and sales of Holly Preferred Stock, common stock and warrants, and by use of means and instrumentalities of interstate commerce and the mails.

(Title 15, United States Code, Sections 78j(b) and 78ff; Title 18, United States Code, Sections 2 and 3551 et seq.)

## COUNT SEVEN
(Holly Money Laundering Conspiracy)

120. The allegations contained in paragraphs 1 through 27, 48 through 55, 61 and 62 are realleged and incorporated as if fully set forth herein.

121. In or about and between May 1994 and October 1995, both dates being approximate and inclusive, within the Eastern District of New York and elsewhere, JACK BASILE, ROCCO BASILE, LARRY BERMAN, JOHN CIOFFOLETTI, JOHN DOUKAS, WALTER DURCHALTER, also known as "Dutch," ALFRED PALAGONIA, ALEKS PAUL and GIUSEPPE TEMPERINO, also known as "Joseph Temperino," together with others, knowing that the property involved in financial transactions represented the proceeds of some form of unlawful activity, did knowingly and intentionally conspire to conduct such financial transactions affecting interstate and foreign commerce, which transactions in fact involved the proceeds of a specified unlawful activity, to wit: securities fraud in connection with purchases and sales of Holly Preferred Stock, common stock and warrants, in violation of Title 15, United States Code, Sections 78j(b) and 78ff, (a) with the intent to promote the carrying on of said specified unlawful activity in

violation of Title 18, United States Code, Section
1956(a)(1)(A)(i), and (b) knowing that the transactions were
designed in whole and in part to conceal and disguise the nature,
location, source, ownership and control of the proceeds of said
specified unlawful activity in violation of Title 18, United
States Code, Section 1956(a)(1)(B)(i).

      (Title 18, United States Code, Sections 1956(h) and
3551 et seq.)

## COUNT EIGHT
### (Holly Money Laundering)

      122. The allegations contained in paragraphs 1 through
27, 48 through 55, 61 and 62 are realleged and incorporated as if
fully set forth herein.

      123. In or about and between May 1994 and October 1995,
both dates being approximate and inclusive, within the Eastern
District of New York and elsewhere, JACK BASILE, ROCCO BASILE,
LARRY BERMAN, JOHN CIOFFOLETTI, JOHN DOUKAS, WALTER DURCHALTER,
also known as "Dutch," ALFRED PALAGONIA, ALEKS PAUL and GIUSEPPE
TEMPERINO, also known as "Joseph Temperino," together with
others, knowing that the property involved in financial
transactions represented the proceeds of some form of unlawful
activity, did knowingly and intentionally conduct and attempt to
conduct such financial transactions, in and affecting interstate
and foreign commerce, which in fact involved the proceeds of a
specified unlawful activity, to wit: securities fraud in
connection with purchases and sales of Holly Preferred Stock,

common stock and warrants, in violation of Title 15, United States Code, Sections 78j(b) and 78ff, (a) with the intent to promote the carrying on of said specified unlawful activity, and (b) knowing that the transactions were designed in whole or in part to conceal and disguise the nature, location, source, ownership and control of the proceeds of said specified unlawful activity.

(Title 18, United States Code, Sections 1956(a)(1)(A)(i), 1956(a)(1)(B)(i), 2 and 3551 et seq.)

COUNT NINE
(USBNY Securities Fraud Conspiracy)

124. The allegations contained in paragraphs 1 through 27 and 67 through 76 are realleged and incorporated as if fully set forth herein.

125. In or about and between December 1994 and October 1996, both dates being approximate and inclusive, within the Eastern District of New York and elsewhere, the defendants JOHN CIOFFOLETTI, JOHN DOUKAS, WALTER DURCHALTER, also known as "Dutch," DANIEL LEV, EUGENE LOMBARDO, EDMOND NAGEL, ALFRED PALAGONIA, ALEKS PAUL, JOSEPH POLITO, SR., and LAWRENCE RAY, together with others, did knowingly and willfully conspire, directly and indirectly, to use and employ manipulative and deceptive devices and contrivances in violation of Rule 10b-5 of the Rules and Regulations of the SEC (Title 17, Code of Federal Regulations, Section 240.10b-5), in that the defendants, together with others, did knowingly and willfully conspire directly and

63

indirectly, to (a) employ devices, schemes and artifices to defraud; (b) make untrue statements of material facts and omit to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and (c) engage in acts, practices and courses of business which would and did operate as a fraud and deceit upon members of the investing public, in connection with purchases and sales of USBNY common stock and warrants, and by use of means and instrumentalities of interstate commerce and the mails, in violation of Title 15, United States Code, Sections 78j(b) and 78ff.

(Title 18, United States Code, Sections 371 and 3551 et seq.)

### COUNT TEN
#### (USBNY Securities Fraud)

126. The allegations contained in paragraphs 1 through 27 and 67 through 76 are realleged and incorporated as if fully set forth herein.

127. In or about and between December 1994 and October 1996, both dates being approximate and inclusive, within the Eastern District of New York and elsewhere, the defendants JOHN CIOFFOLETTI, JOHN DOUKAS, WALTER DURCHALTER, also known as "Dutch," DANIEL LEV, EUGENE LOMBARDO, EDMOND NAGEL, ALFRED PALAGONIA, ALEKS PAUL, JOSEPH POLITO, SR., and LAWRENCE RAY, together with others, did knowingly and willfully use and employ manipulative and deceptive devices and contrivances in violation

of Rule 10b-5 of the Rules and Regulations of the SEC (Title 17, Code of Federal Regulations, Section 240.10b-5), in that the defendants and others did (a) employ devices, schemes and artifices to defraud; (b) make untrue statements of material facts and omit to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and (c) engage in acts, practices and courses of business which would and did operate as a fraud and deceit upon members of the investing public, in connection with purchases and sales of USBNY common stock and warrants, and by use of means and instrumentalities of interstate commerce and the mails.

(Title 15, United States Code, Sections 78j(b) and 78ff; Title 18, United States Code, Sections 2 and 3551 et seq.)

COUNT ELEVEN
(USBNY Money Laundering Conspiracy)

128. The allegations contained in paragraphs 1 through 27, 67 through 76, 82 and 83 are realleged and incorporated as if fully set forth herein.

129. In or about and between December 1994 and February 1996, both dates being approximate and inclusive, within the Eastern District of New York and elsewhere, the defendants JOHN CIOFFOLETTI, JOHN DOUKAS, WALTER DURCHALTER, also known as "Dutch," DANIEL LEV, EUGENE LOMBARDO, EDMOND NAGEL, ALFRED PALAGONIA, ALEKS PAUL and JOSEPH POLITO, SR., together with others, knowing that the property involved in financial

transactions represented the proceeds of some form of unlawful activity, did knowingly and intentionally conspire to conduct such financial transactions affecting interstate and foreign commerce, which transactions in fact involved the proceeds of a specified unlawful activity, to wit: securities fraud in connection with purchases and sales of USBNY common stock and warrants, in violation of Title 15, United States Code, Sections 78j(b) and 78ff, (a) with the intent to promote the carrying on of said specified unlawful activity in violation of Title 18, United States Code, Section 1956(a)(1)(A)(i), and (b) knowing that the transactions were designed in whole and in part to conceal and disguise the nature, location, source, ownership and control of the proceeds of said specified unlawful activity in violation of Title 18, United States Code, Section 1956(a)(1)(B)(i).

(Title 18, United States Code, Sections 1956(h) and 3551 et seq.)

## COUNT TWELVE
(USBNY Money Laundering)

130. The allegations contained in paragraphs 1 through 27, 67 through 76, 82 and 83 are realleged and incorporated as if fully set forth herein.

131. In or about and between December 1994 and February 1996, both dates being approximate and inclusive, within the Eastern District of New York and elsewhere, the defendants JOHN CIOFFOLETTI, JOHN DOUKAS, WALTER DURCHALTER, also known as

"Dutch," DANIEL LEV, EUGENE LOMBARDO, EDMOND NAGEL, ALFRED PALAGONIA, ALEKS PAUL and JOSEPH POLITO, SR., together with others, knowing that the property involved in financial transactions represented the proceeds of some form of unlawful activity, did knowingly and intentionally conduct and attempt to conduct such financial transactions, in and affecting interstate and foreign commerce, which in fact involved the proceeds of a specified unlawful activity, to wit: securities fraud in connection with purchases and sales of USBNY common stock and warrants, in violation of Title 15, United States Code, Sections 78j(b) and 78ff, (a) with the intent to promote the carrying on of said specified unlawful activity, and (b) knowing that the transactions were designed in whole or in part to conceal and disguise the nature, location, source, ownership and control of the proceeds of said specified unlawful activity.

(Title 18, United States Code, Sections 1956(a)(1)(A)(i), 1956(a)(1)(B)(i), 2 and 3551 et seq.)

## COUNT THIRTEEN
### (Money Laundering Conspiracy)

132. The allegations contained in paragraphs 1 through 27, 67 through 76, and 89 are realleged and incorporated as if fully set forth herein.

133. On or about and between August 10, 1995 and August 31, 1995, both dates being approximate and inclusive, within the Eastern District of New York and elsewhere, the defendants FRANK COPPA, SR., ERNEST MONTEVECCHI, also known as "Butch," and DANIEL

PERSICO, together with others, knowing that the property involved
in financial transactions represented the proceeds of some form
of unlawful activity, did knowingly and intentionally conspire to
conduct such financial transactions affecting interstate and
foreign commerce, which transactions in fact involved the
proceeds of a specified unlawful activity, to wit: securities
fraud, in violation of Title 15, United States Code, Sections
78j(b) and 78ff, with the intent to promote the carrying on of
said specified unlawful activity by the Enterprise in violation
of Title 18, United States Code, Section 1956(a)(1)(A)(i).

134. It was part of the conspiracy that, beginning on
or about August 10, 1995, the White Rock Partners and the
defendants FRANK COPPA, SR., ERNEST MONTEVECCHI and DANIEL
PERSICO and others arranged for USBNY warrants to be purchased
and deposited in White Rock brokerage accounts for the benefit of
COPPA, MONTEVECCHI and PERSICO and shortly thereafter sold for a
substantial profit.

(Title 18, United States Code, Sections 1956(h) and
3551 et seq.)

## COUNT FOURTEEN
### (Money Laundering)

135. The allegations contained in paragraphs 1 through
27, 67 through 76, 89 and 134 are realleged and incorporated as
if fully set forth herein.

136. On or about and between August 10, 1995 and August
31, 1995, both dates being approximate and inclusive, within the

Eastern District of New York and elsewhere, the defendants FRANK
COPPA SR., ERNEST MONTEVECCHI, also known as "Butch," and DANIEL
PERSICO, together with others, knowing that the property involved
in a financial transaction represented the proceeds of some form
of unlawful activity, did knowingly and intentionally conduct and
attempt to conduct financial transactions, in and affecting
interstate and foreign commerce, which in fact involved the
proceeds of a specified unlawful activity, to wit: securities
fraud, in violation of Title 15, United States Code, Sections
78j(b) and 78ff, with the intent to promote the carrying on of
said specified unlawful activity by the Enterprise.

      (Title 18, United States Code, Sections
1956(a)(1)(A)(i), 2 and 3551 et seq.)

COUNT FIFTEEN
(Cable Securities Fraud Conspiracy)

      137. The allegations contained in paragraphs 1 through
27 and 94 through 99 are realleged and incorporated as if fully
set forth herein.

      138. In or about and between December 1995 and October
1996, both dates being approximate and inclusive, within the
Eastern District of New York and elsewhere, the defendants FRANK
COPPA, SR., JOHN CIOFFOLETTI, JOHN DOUKAS and ALFRED PALAGONIA,
together with others, did knowingly and willfully conspire,
directly and indirectly, to use and employ manipulative and
deceptive devices and contrivances in violation of Rule 10b-5 of
the Rules and Regulations of the SEC (Title 17, Code of Federal

69

Regulations, Section 240.10b-5), in that the defendants, together
with others, did knowingly and willfully conspire directly and
indirectly, to (a) employ devices, schemes and artifices to
defraud; (b) make untrue statements of material facts and omit to
state material facts necessary in order to make the statements
made, in light of the circumstances under which they were made,
not misleading; and (c) engage in acts, practices and courses of
business which would and did operate as a fraud and deceit upon
members of the investing public, in connection with purchases and
sales of Cable common stock and warrants, and by use of means and
instrumentalities of interstate commerce and the mails, in
violation of Title 15, United States Code, Sections 78j(b) and
78ff.

    (Title 18, United States Code, Sections 371 and 3551 et
seq.)

### COUNT SIXTEEN
(Cable Securities Fraud)

    139. The allegations contained in paragraphs 1 through
27 and 94 through 99 are realleged and incorporated as if fully
set forth herein.

    140. In or about and between December 1995 and October
1996, both dates being approximate and inclusive, within the
Eastern District of New York and elsewhere, the defendants Frank
COPPA, SR., JOHN CIOFFOLETTI, JOHN DOUKAS and ALFRED PALAGONIA,
together with others, did knowingly and willfully use and employ
manipulative and deceptive devices and contrivances in violation

70

of Rule 10b-5 of the Rules and Regulations of the SEC (Title 17,
Code of Federal Regulations, Section 240.10b-5), in that the
defendants and others did (a) employ devices, schemes and
artifices to defraud; (b) make untrue statements of material
facts and omit to state material facts necessary in order to make
the statements made, in light of the circumstances under which
they were made, not misleading; and (c) engage in acts, practices
and courses of business which would and did operate as a fraud
and deceit upon members of the investing public, in connection
with purchases and sales of Cable common stock and warrants, and
by use of means and instrumentalities of interstate commerce and
the mails.

(Title 15, United States Code, Sections 78j(b) and
78ff; Title 18, United States Code, Sections 2 and 3551 et seq.)

### COUNT SEVENTEEN
(Cable Money Laundering Conspiracy)

141. The allegations contained in paragraphs 1 through
27, 94 through 99, 105 and 106 are realleged and incorporated as
if fully set forth herein.

142. In or about and between December 1995 and November
1996, both dates being approximate and inclusive, within the
Eastern District of New York and elsewhere, the defendants JOHN
CIOFFOLETTI, JOHN DOUKAS and ALFRED PALAGONIA, together with
others, knowing that the property involved in financial
transactions represented the proceeds of some form of unlawful
activity, did knowingly and intentionally conspire to conduct

71

such financial transactions affecting interstate and foreign commerce, which transactions in fact involved the proceeds of a specified unlawful activity, to wit: securities fraud in connection with purchases and sales of Cable common stock and warrants, in violation of Title 15, United States Code, Sections 78j(b) and 78ff, (a) with the intent to promote the carrying on of said specified unlawful activity in violation of Title 18, United States Code, Section 1956(a)(1)(A)(i), and (b) knowing that the transactions were designed in whole and in part to conceal and disguise the nature, location, source, ownership and control of the proceeds of said specified unlawful activity in violation of Title 18, United States Code, Section 1956(a)(1)(B)(i).

(Title 18, United States Code, Sections 1956(h) and 3551 et seq.)

## COUNT EIGHTEEN
(Cable Money Laundering)

143. The allegations contained in paragraphs 1 through 27, 94 through 99, 105 and 106 are realleged and incorporated as if fully set forth herein.

144. In or about and between December 1995 and November 1996, both dates being approximate and inclusive, within the Eastern District of New York and elsewhere, the defendants JOHN CIOFFOLETTI, JOHN DOUKAS and ALFRED PALAGONIA, together with others, knowing that the property involved in a financial transaction represented the proceeds of some form of unlawful

activity, did knowingly and intentionally conduct and attempt to conduct financial transactions, in and affecting interstate and foreign commerce, which in fact involved the proceeds of a specified unlawful activity, to wit: securities fraud in connection with purchases and sales of Cable stock and warrants, in violation of Title 15, United States Code, Sections 78j(b) and 78ff, (a) with the intent to promote the carrying on of said specified unlawful activity, and (b) knowing that the transactions were designed in whole or in part to conceal and disguise the nature, location, source, ownership and control of the proceeds of said specified unlawful activity.

(Title 18, United States Code, Sections 1956(a)(1)(A)(i), 1956(a)(1)(B)(i), 2 and 3551 et seq.)

## COUNT NINETEEN
(Extortion Conspiracy)

145. The allegations contained in paragraphs 1 through 27 and 67 through 76 are realleged and incorporated as if fully set forth herein.

146. In or about and between August 1995 and September 1995, both dates being approximate and inclusive, within the Eastern District of New York and elsewhere, the defendants EDWARD GARAFOLA and JOSEPH POLITO, SR., together with others, knowingly and intentionally conspired to obstruct, delay and affect commerce, and the movement of articles and commodities in commerce, by extortion, as that term is defined in Title 18, United States Code, Section 1951(b)(2), in that the defendants

73

and others conspired to obtain, through extortionate demands, $100,000 as compensation for money that had been secretly paid to obtain bonding for USBNY.

(Title 18, United States Code, Sections 1951 and 3551 et seq.)

COUNT TWENTY
(Extortion)

147. The allegations contained in paragraphs 1 through 27 and 67 through 76 are realleged and incorporated as if fully set forth herein.

148. In or about and between August 1995 and September 1995, both dates being approximate and inclusive, within the Eastern District of New York and elsewhere, the defendants EDWARD GARAFOLA and JOSEPH POLITO, SR., and others, did knowingly and intentionally obstruct, delay and affect, and attempt to obstruct, delay and affect, commerce, and the movement of articles and commodities in commerce, by extortion, as that term is defined in Title 18, United States Code, Section 1951(b)(2), in that the defendants and others sought to obtain, through extortionate demands, $100,000 as compensation for money that had been secretly paid to obtain bonding for USBNY.

(Title 18, United States Code, Sections 1951, 2 and 3551 et seq.)

## FORFEITURE ALLEGATIONS

### FORFEITURE FOR COUNTS ONE AND TWO

149. The allegations contained in Counts One and Two are hereby realleged and incorporated by reference for the purpose of alleging forfeiture pursuant to the provisions of Title 18, United States Code, Section 1963.

150. Pursuant to Title 18, United States Code, Section 1963(a), each defendant convicted of Counts One and Two shall forfeit to the United States:

(a)   any interest which they acquired and maintained in violation of Title 18, United States Code, Section 1962, which interest is subject to forfeiture to the United States of America pursuant to Title 18, United States Code, Sections 1963(a)(1);

(b)   any interest in, security of, claim against, or property or contractual right of any kind affording them a source of influence over the Enterprise which said defendants have established, operated, controlled, conducted or participated in the conduct of, in violation of Title 18, United States Code, Section 1962, which are subject to forfeiture to the United States of America pursuant to Title 18, United States Code, Section 1963(a)(2); and

(c)   any property constituting, or derived from, any proceeds which they obtained directly and

indirectly from racketeering activity in violation
of Title 18, United States Code, Section 1962,
which property is subject to forfeiture to the
United States of America pursuant to Title 18,
United States Code, Section 1963(a)(3).

151. The property subject to forfeiture includes, but is not limited to, an amount not less than $41,400,000.

152. If more than one defendant is convicted of the offenses, the defendants so convicted are jointly and severally liable for the value of all property involved in such offense.

153. If, as a result of any act or omission of any defendant, any of the property forfeitable pursuant to Title 18, United States Code, Section 1963(a) --

  a. cannot be located upon the exercise of due diligence;

  b. has been transferred or sold to, or deposited with, a third party;

  c. has been placed beyond the jurisdiction of the Court;

  d. has been substantially diminished in value; or

  e. has been commingled with other property which cannot be divided without difficulty,

it is the intention of the United States, pursuant to Title 18, United States Code, Section 1963(m), to seek forfeiture of any other property of said defendants up to the value of such property described in subparagraphs (a) through (e) above.  Such substitute property includes, but is not limited to the following:

705 NE 26th Avenue, Hallendale, FL
(ERNEST MONTEVECCHI)

450 Merion Road, Merion Station, PA  10966-1324
1917 Lafayette Road, Gladwyne, PA 19035-1236
(LARRY BERMAN)

27 Seagull Avenue, Lincroft, NJ 07738
(JOHN CIOFFOLETTI)

3021 Beach 40th Street, Brooklyn, NY 11224
(EUGENE LOMBARDO)

18 East Gate Road, Port Washington, NY
86-10 Shore Parkway, Howard Beach, NY
(ALFRED PALAGONIA)   ---

4 Ridgeway Drive, Great Neck, NY 11020
(ALEKS PAUL)

1314 Partridge Close, Pompano Beach, FL 33064
2519 State Route 55, White Lake, NY
(JOSEPH POLITO, SR.)

9728 Wynmill Road, Philadelphia, PA  19115-1804
(ABRAHAM SALAMAN)

(Title 18, United States Code, Section 1963)

FORFEITURE FOR COUNTS SEVEN,
EIGHT, ELEVEN, TWELVE, THIRTEEN,
FOURTEEN, SEVENTEEN AND EIGHTEEN

154. The allegations contained in Counts Seven, Eight, Eleven, Twelve, Thirteen, Fourteen, Seventeen and Eighteen are hereby realleged and incorporated by reference for the purpose of alleging forfeiture pursuant to the provisions of Title 18, United States Code, Section 982.

155. Pursuant to Title 18, United States Code, Section 982(a)(1), each defendant who is convicted of the offenses set forth in Counts Seven, Eight, Eleven, Twelve, Thirteen, Fourteen, Seventeen and Eighteen of this Indictment shall forfeit to the

United States the following property: All right, title, and interest in any and all property, real and personal, involved in the money laundering and money laundering conspiracy offenses described in each of the counts for which the defendant is convicted, in violation of Title 18, United States Code, Section 1956, and all property traceable to such property, including, but not limited to, the following: 1) all money and other property that was the subject of each financial transaction that the defendants conducted in violation of Title 18, United States Code, Section 1956; 2) all commissions, fees and other property obtained as a result of those violations; and 3) all property used in any manner or part to commit or to facilitate the commission of those violations. The property subject to forfeiture includes, but is not limited to, an amount not less than $41,400,000.

     156. If more than one defendant is convicted of the offenses, the defendants so convicted are jointly and severally liable for the value of all property involved in such offense.

     157. If, by any act or omission of the defendant, the property described in paragraph 155 or any portion thereof:

     a.    cannot be located upon the exercise of due diligence;

     b.    has been transferred, sold to or deposited with a third party;

     c.    has been placed beyond the jurisdiction of the Court;

     d.    has been substantially diminished in value; or

     e.    has been commingled with other property which cannot be divided without difficulty;

the defendant shall forfeit substitute property, up to the value
of the property described in subparagraphs (a) through (e) above,
pursuant to Title 21, United States Code, Section 853(p), as
incorporated by Title 18, United States Code, Section 982(b).
Such substitute property includes, but is not limited to:

450 Merion Road, Merion Station, PA 10966-1324
1917 Lafayette Road, Gladwyne, PA 19035-1236
(LARRY BERMAN)

27 Seagull Avenue, Lincroft, NJ 07738
(JOHN CIOFFOLETTI)

3021 Beach 40th Street, Brooklyn, NY 11224
(EUGENE LOMBARDO)

18 East Gate Road, Port Washington, NY
86-10 Shore Parkway, Howard Beach, NY
(ALFRED PALAGONIA)

4 Ridgeway Drive, Great Neck, NY 11020
(ALEKS PAUL)

1314 Partridge Close, Pompano Beach, FL 33064
2519 State Route 55, White Lake, NY
(JOSEPH POLITO, SR.)

(Title 18, United States Code, Section 982)

A TRUE BILL

_____
FOREPERSON

LORETTA E. LYNCH
UNITED STATES ATTORNEY
EASTERN DISTRICT OF NEW YORK

FORM DBD-34
JUN. 85

*No.   CR*

# UNITED STATES    DISTRICT COURT

## EASTERN *District of* NEW YORK

## CRIMINAL *Division*

## THE UNITED STATES OF AMERICA

*vs.*

### FRANK COPPA, SR., et al.

**Defendants.**

# INDICTMENT

(T. 15, U.S.C., §§ 78j (b) and 78ff;  T. 18, U.S.C.,   §§ 371, 1951,
1956 (a) (1) (A) (1), 1956 (a) (1) (B) (1), 1956 (h), 1962 (c),
1962 (d), 1963, 982, 2 and 3551 et seq.)

*A true bill.*

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - -
                                                          *Foreman*

*Filed in open court this* _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ *day,*

*of* _ _ _ _ _ _ _ _ _ _ _ *A.D. 19* _ _ _ _ _

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - -
                                                          *Clerk*

*Bail, $* _ _ _ _ _ _ _ _ _ _ _

*AUSA Jonathan Sack (718) 254-6238*