# IN THE UNITED STATES COURT
# OF FEDERAL CLAIMS

ESTATE OF ERNEST GOTTDIENER, ET. AL.,
Plaintiffs,

v.

THE UNITED STATES,
Defendant

No. 15-1245

Judge Wolski

## PLAINTIFFS' OPPOSITION TO DEFENDANT'S
## MOTION TO DISMISS
-----
### ORAL ARGUMENT REQUESTED

Dated: Montauk, New York
October 19, 2016

Respectfully submitted,

**THE LAW OFFICE OF FREDERICK M. OBERLANDER, P.C.**

/s/ Frederick M. Oberlander

Frederick M. Oberlander
Counsel for plaintiffs
28 Sycamore Lane (Box 1870)
Montauk, New York 11954
212.826.0357  Tel.
212.202.7624  Fax

# TABLE OF CONTENTS

## Table of contents       i

Table of Authorities ...................................................................................ii

Introduction ................................................................................................ 1

  Background............................................................................................... 1

    The Underlying Criminal Case .................................................... 2

    The Case Here ................................................................................ 4

Argument .................................................................................................... 7

  A Taking Claim Lies ............................................................................... 7

    As of 1996, Federal Sentencing Law Can Endow Crime Victims with Rights Which Are Property For Takings Purposes ...................................14

      Victims' Rights Prior to 1996 ....................................................14

      Victims' Rights From 1996 to 2004 ..........................................15

      Victims' Rights After 2004 ........................................................19

  An Exaction Claim Lies ....................................................................... 23

    There Is Tucker Act Jurisdiction ............................................... 23

  Nothing in the Facts of This Case as Alleged or as Could Be on Amendment Prevents Presentation of a Well Pled Complaint that Would Satisfy the Requirements to State a Cause of Action ........................................ 26

    Plaintiffs Have Never Sought Restitution There Is and Can Be no Issue Preclusion There Is and Can Be no Fact Preclusion.................................... 26

  CONCLUSION .................................................................................... 32

# TABLE OF AUTHORITIES

**Cases**

*1256 Hertel Ave. Assocs., LLC v. Calloway*, 761 F.3d 252, 262-63 (CA2 2014) ........16

*Adams v. United States*, 391 F.3d 1212 (Fed. Cir. 2004) ......................................... 8

*Amgen, Inc. v. Genetics Inst.*, 98 F.3d 1328, 1331 (Fed.Cir.1996) ........................... 26

*Bouie v. City of Columbia* 378 U.S. 347 (1964) ...................................................... 12

*Clapp v. United States*, 127 Ct. Cl. at 514, 117 F. Supp. at 581 ............................... 12

*Gherman v. Colburn*, 72 Cal. App. 3d 544, 140 Cal. Rptr. 330 (1977) ................... 10

*Horne et al. v. Department of Agriculture*, 378 U.S. 347 (2015) .............................. 18

*Lexmark v. Static Control*, 134 S. Ct. 1377 (2014) ................................................... 8

*McCandless v. Merit Sys. Protection Bd.* .................................................................. 26

*Suwannee S.S. Co. v. United States*, 150 Ct. Cl. 331, 279 F.2d 874 (1960) .............. 11

*U.S. v. Porcelli* 865 F.2d 1352 (CA2 1989) .............................................................. 8

*United States v. Hai Waknine*, 543 F.3d 546 (9th Cir. 2008) ................................. 28

*United States v. Hamburger*, 414 F. Supp. 2d 219 (E.D.N.Y. 2006) ...................... 28

*United States v. Kennedy*, 643 F.3d 1251, 1260 (CA9 2011) ...................................14

*United States v. Puentes*, 803 F.3d 597 (CA11 2015) ..............................................17

**Statutes**

18 U.S.C. § 2259 .......................................................................................................14

18 U.S.C. § 3651-3656 ..............................................................................................14

18 U.S.C. § 3663 .......................................................................................................19

18 U.S.C. § 3663A .................................................................................................... 18

18 U.S.C. § 3664 .......................................................................................................15

18 U.S.C. § 3771 .......................................................................................................19

18 U.S.C. §§ 3663-3664 ............................................................................................14

28 U.S.C. § 1491 ....................................................................................................... 5

Codified at 18 U.S.C. § 3663A .................................................................................15

**Rules**

Rule 12(b)(1) ............................................................................................................. 5

Rule 12(b)(6) ............................................................................................................. 5

# INTRODUCTION

Plaintiffs oppose the motion of Defendant the United States to dismiss their first amended complaint for lack of jurisdiction and failure to state a claim. The complaint alleges a taking or illegal exaction resulting from the failure of a federal district court and United States attorneys prosecuting a criminal case before it to provide Plaintiffs, victims of the crime, with certain rights mandated by Congress.

Because the failure to provide those rights, if lawful, was a Fifth Amendment taking, and if unlawful was in effect an illegal exaction, the motion must be denied. In the alternative, because a well-pled complaint could in the facts of this case properly seek relief on either or both grounds, if their pleading is deemed deficient Plaintiffs must be given leave to amend to cure whatever defects are found to exist.

## BACKGROUND

The question here is whether refusal by United States attorneys and the district court in which they are prosecuting a criminal case to provide the victims certain rights which Congress has mandated they provide constitutes a taking or illegal exaction. More formally, the question(s) is(are):

> Where Congress, in the exercise of its authority pursuant to U.S. Const. Articles I and VI, has enacted laws giving crime victims certain rights, and the Executive, either alone or aided by the Judiciary…
>
> (1) **Legally** takes them from a victim "for the public good," will those rights be conceded as sufficiently derived from and connected to, or themselves to be, protectable property such that the victim may establish a Fifth Amendment **taking** in a suit for compensation; or
>
> (2) **Illegally** confiscates them from a victim, will that confiscation be conceded to have been in effect an **exaction** of money for which the victim will be permitted to recover?

**The Underlying Criminal Case**

Non-party Felix Sater has a long history of defrauding investors in his business ventures.  In 1998, he pled guilty to operating a "pump-and-dump" stock-trading scheme that bilked investors out of more than $40M. That guilty plea should have signaled the end of his business career and the entitlement of his many victims to orders of restitution for the losses they suffered by his crimes.

Not so. Instead of taking steps to help his victims recover for their massive losses as federal statute required them to do, the United States Attorney's Office prosecuting Sater and the district court hearing the case quickly swung into action to squelch any public reference to it. His entire criminal docket was concealed, leaving his victims and third parties unaware of the case or his conviction unless they stumbled across a press release that had been issued by the government at the inception of a related case and which briefly mentioned his plea in a footnote.

Plaintiffs and the members of the class they would represent, are his victims, Plaintiffs themselves lost some $7M to the scheme and the whole class some $40M. Pursuant to statute, they had both (1) the right to receive an order of restitution at his sentencing on October 23, 2009, and (2) if they did not receive it, the right to sue the court by mandamus to get it. *Had they received such an order, it would have been property for takings purposes; so if they did not receive it, their ensuing right to sue the court to get it would have been such property too.*

They never got the order, and never sued the court to get it because they never could. They never could because their right to do so was taken from them. It was taken from them because the statute gave them only a 14-day window starting with the court's entry of the Judgment and Commitment order in which to bring it, fn. 25. By the time years later the secrecy ended and they found out about the

case and the sentencing their right to sue had long been extinguished. Nor could it be revitalized on principles of equity because Sater's Fifth Amendment criminal due process rights would have barred resentencing him to such an order for the first time so long after the fact and any attempt to do so would have been futile.

None of this was by accident. The government and the court strived to keep his case secret and though technically they failed, over the years enough seeping into the public realm to make it public fact, no due diligence on any victim's part would have found it until *The Miami Herald* put it on the front page in 2012, and even then only someone reading that paper could have seen it, or been expected to.

The reason for the secrecy is simple. Sater cut a deal, becoming a cooperator, and to reward him for it the government promised to conceal his case and spare him not only the 20 years in prison he faced under sentencing guidelines and the $80M mandatory forfeiture order he faced under the criminal statute he violated (RICO), but also the $40M mandatory restitution order he was headed for as well.

For what it's worth the government and the court have also maintained that they arranged that secrecy to protect his safety, but it can't be worth much because those seepages rendered it moot; because those against whom he had cooperated had been *told* he was cooperating, even in open court (one of the seepages); and because in March 2011 the government filed a letter in the sentencing court admitting that it had never had any evidence at all of any risk to Sater or his family, the letter signed in behalf of Loretta Lynch, then United States Attorney, Eastern District of New York, now United States Attorney General so presumably credible.

To top it off, the district court in which all this occurred – the secret guilty plea, the secret sentencing, the failure to order restitution, and so on - never actually entered any sealing order. There was no sealing order from the time between

Sater's guilty plea in 1998 and his sentencing in 2009. The court and the government have admitted this, though one might never it, because ever since that admission district courts and the Second Circuit have maintained that even though there was no *real* order, the fact of the secrecy was its own *implied* order. In other words, the First Amendment requires careful analysis and reasoned findings in a written order to justify concealing any part of a criminal case, but that doesn't matter because where, as here, a court conceals a case without any constitutional due process, that act of concealment is not unlawful but is its own implied order automatically making itself lawful even absent compliance with the Bill of Rights in, perhaps, some judicial version of, "If the president does it, it's legal."

This is further complicated by the fact that in 2013 Ms. Lynch had the sentencing judge enter an undocketed, sealed order ruling that Sater had not been sentenced in secret but in open court, which the Solicitor General filed under seal in the Supreme Court to successfully defeat a pending cert petition that threatened to open this up. *They filed papers with the Supreme Court in secret to ensure that the public did not learn that they were claiming that Sater had been sentenced in public.*

**The Case Here**

Plaintiffs filed suit in this court on October 23, 2015, within six years of the date of Sater's secret-but-public October 23, 2009 sentencing. At the time of the filing, Plaintiffs had already sued Sater in 2013 in a civil RICO action predicated on securities fraud which had been dismissed in 2013 for failure to state a claim and so never actually litigated the merits.

In their complaint, which they amended once on June 8, 2016 as of right to add an allegation that a March 2000 press release revealing the existence of Sater's

criminal case was not reasonably discoverable as of his 2009 sentencing, Plaintiffs alleged a taking and, in the alternative, an illegal exaction by the United States.

Their taking claim was predicated on the theory that (1) the restitution order to which they were entitled was, or had they received it would have been, property for taking purposes; (2) their right to sue by mandamus to get it was property for taking purposes; (3) both were taken from them by concealment; (4) the concealments were *legal*; (5) the concealments were for a public purpose (rewarding cooperation, encouraging other potential cooperators, protecting cooperator safety); (6) they had not been paid compensation for the takings; so (6) they demanded it.

Their illegal exaction claim was predicated on the theory that (1) the concealments were *illegal*; (2) the concealments in effect took money from Plaintiffs and put it in the government's pocket, from which it was then paid to Sater as an illegal gratuity, because the government and the court had a legal duty to create and protect enforceable rights and claims against Sater in favor of Plaintiffs and the other victims but instead took what should have been the proceeds of that right and kept it for itself rather than use its own funds to pay Sater for cooperating; and so (3) this was an illegal exaction for which they demanded payment.

The complaint alleges virtually if not literally all of the facts stated above, and could certainly be amended to include any of those it omitted, if necessary.

The government has moved to dismiss under Rule 12(b)(6) of the Rules of the United States Court of Federal Claims (RCFC).[1]  This rule is identical to its counterpart in the Federal Rules of Civil Procedure.  The government argues that

---

[1] The government has also moved to dismiss under Rule 12(b)(1) of the RCFC for identical reasons because this court would not have jurisdiction if Plaintiffs could not plausibly state a claim against the United States.  *See* 28 U.S.C. § 1491.

Plaintiffs failed to plead facts sufficient to support the takings and illegal exaction claims and for various reasons could not both because of legal impossibility and because of some preclusion theory based on the RICO case against Sater.

Plaintiffs are responding not by motion to again amend their complaint under RCFC 15 in response to the motion to dismiss, but by defending the complaint as amended to its present form to establish that (1) in the abstract, a well-pled complaint *can* state a cause of action for takings or exaction based on the deprivation of victims' rights; (2) under the specific facts of this case a well-pled complaint *could* do so; and (3) either their amended complaint *is* sufficiently well-pled or if not they can amend again to make it so and thus respectfully reserve the right to so move should the complaint as it now exists be determined defective but curable.

There is no practical alternative because all a complaint can do is plead facts and all the fact pleading in the world no matter how plausible will not compensate for a legally incognizable theory of recovery, and the novelty and importance of the legal theories underlying their complaint, which will underly any newly amended complaint, and the question(s) whether they may support recovery, must in the interest of justice and judicial economy be resolved now, with all deliberate speed.

# ARGUMENT

## A TAKING CLAIM LIES

The government's primary argument in refutation of the taking theory is that Plaintiffs are complaining that they suffered a taking of a "statutory right to receive money from the government," which is not property for takings purposes.

But this is not so. Plaintiffs are *not* claiming that they had a statutory right to receive *money* from the government. They are claiming that they had a statutory right to receive *property* from the government, viz. *a restitution order*, which by statute is a *lien*, or at least may be made into a lien by the victim by a mere ministerial act as of right, and clearly *that* is property. It is a simple as it sounds. They had a right to receive property; it was taken from them to reward cooperators and help law enforcement; however ill-advised, this was lawful; they are due compensation. That a restitution order would have compelled a third party, Sater, to pay money to Plaintiffs does not make this a "right to receive money from the *government*" case because Sater is not in privity with the government and any money he would have paid Plaintiffs pursuant to it would not have been paid in the government's behalf.

But that is not the end of the matter, for Plaintiffs *also* had a statutory cause of action to sue the district court to *get* that property, the order of restitution, and that, too, was taken from them, and that, too, was a compensable taking.

Indeed, *Adams, passim*, the case on which the government pins its hope for dismissal, instead supports Plaintiffs because it holds that while a cause of action for money may not be property for takings purposes, a cause of action in respect of *property* is, and that's what plaintiffs had, not only the right to a restitution order, which is property, but also the right to sue to get it, which is property too.

In short, Plaintiffs claim that (1) in certain situations, federal sentencing law *can* bestow upon crime victims rights which are, or as of right may be ministerially made into, property for takings purposes; and (2) this is such a case.

To say this presents issues of paramount concern and first impression is to be modest, for if Plaintiffs are correct Congress has constitutionalized victims' rights.

That this is so should be beyond doubt, for while it sounds good to say, as the government says in its motion (and apparently in all takings cases) that "Congress cannot create property," it does not have the added benefit of being true.

Instead, like a bumblebee who, ignoring argument that it is aerodynamically impossible for it to fly, routinely flits from flower to flower, Congress, ignoring that pithy soundbite that it cannot create property, routinely does by creating statutory causes of action which, if there is also Article III injury, thereupon entitle the injured person to invoke the powers of an Article III court, which court thereupon has a virtually unflagging obligation to take up and decide the matter[2].

That is, though there are other ways of course, such as direct Congressional land grant, whenever Congress creates statutory causes of action it creates that which can be property for Fifth Amendment due process purposes[3], for criminal purposes[4], and as is at issue here, at least in certain cases for takings purposes[5].

Plaintiffs present this takings section of this brief in opposition in three parts.

---

[2] In *Lexmark v. Static Control*, 134 S. Ct. 1377 (2014) a 9-0 Supreme Court affirmed that courts have a virtually unflagging obligation to hear cases for which there is Article III jurisdiction regardless of "prudential considerations" and that Congressional creation of a constitutionally valid statutory cause of action creates such jurisdiction.

[3] *Adams.*

[4] *U.S. v. Porcelli* 865 F.2d 1352 (CA2 1989) (Merchant's concealment of state's cause of action for uncollected sales tax *held* property for RICO predicate mail fraud).

[5] *See Adams v. United States*, 391 F.3d 1212 (Fed. Cir. 2004).

First they present an "existence proof" to establish that federal sentencing law *can* "tee up" a taking in certain cases by creating *protectable* property interests which, depending on subsequent events, *can* be taken.

If this court disagrees and holds that this can never be as a matter of law, thus can never be pled, then in the interest of judicial economy there is no reason to proceed further except by appeal of the dismissal that will presumably ensue.

Next, Plaintiffs argue that this case does present one of those situations, that the government and the sentencing court in question years ago *did* do things which were, or led to, such a taking.

Finally, Plaintiffs counter the sundry fact-specific objections of the government, for example that this case is barred by res judicata or collateral estoppel, or this court should exercise some form of "prudential standing" to decline to hear it (notwithstanding that, inconveniently, the doctrine of "prudential standing" was disapproved by the Supreme Court in 2014, fn. 2), showing them to be devoid of merit. This cannot be done without establishing first that there can be such taking based on sentencing law and *then* establishing what is necessary to plead it, as a backdrop against which to show the government's objections are just so many "dogs that won't hunt."

This case raises, or *appears* to raise, issues of judicial takings. The government argues, best as can be understood, that a judicial order which is or works a taking (or exaction) cannot be "reconsidered" as to merit or legality *vel non* by this court so must be left intact. That is strange as, for one thing, in their takings claim Plaintiffs are not asking this court to "reconsider" any order of any judge and would be delighted if this court assumes all such orders, if and to the extent they were takings, were lawful because lawfulness is a condition precedent to a taking.

It's also strange for another, related reason. When there is a regulatory taking, for example, the resulting suit for compensation does not ask this court to decide that the agency order creating the taking was wrong or "abuse of discretion." No Susette Kelo is here seeking to invalidate any taking or order, nor could one be, as this would be the wrong court. Plaintiffs are seeking only to be compensated.

Like a repudiation of a partnership, where the aggrieved plaintiff has a choice of (1) refusing to submit to the repudiation and suing to enforce the partnership agreement; or (2) submitting to the revocation and suing for damages as a result of it (and, as here with the exaction alternative, both partnership actions can be pled in a single complaint in the alternative[6]), here, as in any takings case, Plaintiffs are saying, "Fine, the judge (or the government, or both, see *infra*) did this and that and as a result there was a taking; we submit to it, the government can keep what it took, just make them pay us for it."

Of course, as far as Plaintiffs are concerned, this court is free to rule that what the government and the sentencing court did in taking Plaintiffs' property was *illegal* and so there is no taking, and proceed to find an illegal exaction, but if this court believes it has no authority to decide whether what they did was illegal then it has to accept it as legal and simply recognize that it was Plaintiffs whose ox was gored by those acts and then decide how much they should get paid for the ox.

Otherwise, and this is quite literally so, this court will be holding that when a district court judge effectuates what would be a compensable taking if done by the executive or legislative branch, it isn't a taking if done by the judiciary, or it might as well not be because the Court of Claims will not hear the takings case because to

---

[6] *Gherman v. Colburn*, 72 Cal. App. 3d 544, 140 Cal. Rptr. 330 (1977).

do so it would have to determine if the judicial act was legal (or not) or at the least presume it was legal (or not) and it refuses to weigh in on the issue whatsoever.

This would be a disaster because, as noted, the grant of exclusive jurisdiction to this court to hear a takings case in excess of $10,000 and the existence of the Fifth Amendment right to compensation gives this court a "virtually unflagging" obligation to resolve the case, period, full stop. There is no lawful basis for exercise of prudential standing, so this would be an abdication of judicial responsibility.

The only alternative would be an express or implied holding that a federal court has the inherent authority to do by decree what, if the executive or legislative branch did, would be a constitutional tort, even a constitutional crime, *viz.* to take or exact property without compensation or liability. To call that a disaster would be understatement, as it would signal every executive official to get court orders decreeing that which if they did it by executive or agency action would have to be paid for. While admittedly of benefit to the national fisc, this cannot be the law.

At the risk of getting ahead of the argument by digressing into exaction, in *Suwannee*[7], for example, the Government, through the Maritime Administrator, required a citizen to surrender $20,000 it was not authorized to demand as a condition for receiving the Government's approval to sell two of its ships to a foreign purchaser.  Under the Shipping Act, the plaintiff could not sell the ships without the Administrator's permission. The Administrator agreed to the sale on the condition that the plaintiff pay $20,000 to the Government.  The plaintiff accepted the terms proposed by the Administrator, paid the $20,000, and later sued the United States claiming that the "Maritime had no legal authority to condition its approval of the requested transfer upon the payment of $20,000."

---

[7] *Suwannee S.S. Co. v. United States*, 150 Ct. Cl. 331, 279 F.2d 874 (1960).

In response to the plaintiff's claim in *Suwannee*, the Government argued that it "had the power to deny the plaintiff permission to make the desired transfer" and that under the statute, it had "complete freedom to impose conditions upon any permission granted."  This court rejected the Government's argument:

> We suggest that no statute should be read as subjecting citizens to the uncontrolled caprice of officials, unless the statute has to do with the powers of the President in dealing with foreign relations, the powers of a military commander in the field, or some comparable situation… [8]

It seems unlikely that the Framers intended that this goes out the window when the government official doing the taking or exaction happens to be wearing a robe at the time while holding lifetime tenure so immunized from accountability.

For example, in *Bouie*[9] , the South Carolina Supreme Court had applied an entirely new construction of a criminal trespass statute to uphold convictions of two alleged trespassers. This interpretation was such departure from settled law that the United States Supreme Court held it amounted to the imposition of an *ex post facto* law in violation of petitioners' due process rights. In the *Bouie* Court's view, *a state may not avoid constitutional restrictions on its power merely by delegating the restriction to the courts instead of having them instituted by elected branches:*

> If a state legislature is barred by the *Ex Post Facto* Clause from passing such a law, it must follow that a State Supreme Court is barred by the Due Process Clause from achieving precisely the same result by judicial construction.

---

[8] *Also see Clapp v. United States*, 127 Ct. Cl. at 514, 117 F. Supp. at 581 (Shipping Act did not authorize government to condition sale on payment of fee as "[t]aken literally that section would permit the Administration to impose any condition whatever").

[9] *Bouie v. City of Columbia* 378 U.S. 347 (1964).

The point is that if a result is constitutionally proscribed if brought about by the act of executive or legislative function, it must be equally proscribed if brought about by judicial function, whether by construction or by equitable decree.

Besides, there may be no such thing as a judicial taking in a criminal case, as who's to say who (which part of the government) "took?" In her autobiography *Heartburn*, Nora Ephron told this story, though the court is respectfully advised it is best imagined as read aloud in a Yiddish accent:

> Once upon a time there was a little boy who hated kreplach. Every time he saw a kreplach in the soup he screamed, "Aaah, kreplach!" So his mother decided to teach him not to be afraid of kreplach. She took him to the kitchen and rolled out some dough. "Just like a pancake," she said. "Just like a pancake," said the little boy. Then she took a piece of meat and rolled it into a ball. "Just like a meatball," she said. "Just like a meatball," said the little boy. Then she rolled up the meat in the dough and held it up. "Just like a dumpling," she said. "Just like a dumpling, said the little boy." Then she dropped it into the soup and put it in front of the little boy, and he screamed, "Aaah, kreplach!"

Why does it matter, by what authority *can* it matter, who brings what to the party? In any criminal case the government is present in two capacities, as judge and as prosecutor. Two branches of government are involved, always. With respect for the *constitutional property rights* of the victims, their Fifth Amendment rights to be free of uncompensated takings (and illegal exactions), why does it matter which of them brought the dough, the court or the prosecutor, and which brought the meat; all that matters is that together they made kreplach, and like the little boy knew kreplach when he saw it, and Potter Stewart knew obscenity when he saw it, we all know that it's a taking (or exaction) when we see it floating there in the soup, even if we don't, and need not, know or care what chef played what role in putting it together and dropping it in there.

**As of 1996, Federal Sentencing Law Can Endow Crime Victims with Rights Which Are Property For Takings Purposes**

VICTIMS' RIGHTS PRIOR TO 1996

That crime victims have rights has long been clear. In 1450, for example, the Rolls of Parliament record an impeachment of William de la Pole, Duke of Suffolk, on charges including failure to afford victims rights to which they were entitled.

This case concerns the constitutional dimension of one such right, the right of a victim to a sentencing order of restitution, and other rights derivative thereof.

Federal courts do not inherently possess the power to award restitution; they may do so only to the extent authorized by statute.[10] Congress first gave courts the authority to award restitution in 1925 with enactment of the Federal Probation Act (FPA)[11], which allowed – but did not require –imposition of restitution, but not as a separate component of a sentence, only as a condition of a sentence probation.

In 1982, Congress enacted the Victim and Witness Protection Act (VWPA)[12] which allowed – but again did not require – a court to impose a sentencing order of restitution as a separate component in, *inter alia*, Title 18 criminal cases and any other criminal case in which a defendant agrees to it as a part of a plea agreement.

In 1994, Congress significantly expanded victims' rights with regard to restitution awards with passage of the Violence Against Women Act, the first statute to *require* sentencing courts to impose mandatory restitution, though the requirement was limited to convictions for sexual offenses against children[13].

---

[10] *United States v. Kennedy*, 643 F.3d 1251, 1260 (CA9 2011)

[11] Codified at 18 U.S.C. § 3651-3656, repealed November 1, 1987.

[12] Codified in 18 U.S.C. *passim*, restitution provisions at 18 U.S.C. §§ 3663-3664.

[13] Codified at 18 U.S.C. § 2259.

Victims' Rights From 1996 to 2004

In 1996, Congress enacted the Mandatory Victim Restitution Act (MVRA)[14], which with exceptions *required* a court to issue a sentencing order compelling a defendant to make *full* restitution to *all* victims in *all* Title 18 criminal cases. And it rewrote the then-existing VWPA restitution statute, adding these provisions:

It allowed courts to order a defendant to make restitution in kind in the form of a return of property or a provision of services.[15]  And it allowed a victim named in a restitution order for payment of money, possibly even an order for payment in kind, to *as of right* record the order in the state court or county clerk's office whereupon it becomes a *judgment lien* on the property of the defendant.[16]

*The MVRA obligates courts to impose orders of restitution which, with the possible exception of in-kind services orders,* **are always protectable property for takings purposes** because (1) if they *are in kind* as to specific property, requiring turnover of that property to a victim, that is an interest in such property; or, (2) if they are recordable, which is as of right if they specify an amount, which would always be the case if they are not in kind and may also be the case if they are, they automatically,

---

[14] Codified at 18 U.S.C. § 3663A.

[15] 18 U.S.C. § 3664(f)(3),(4), providing, in part, "A restitution order may direct the defendant to make…in-kind payments…in the form of return of property."

[16] 18 U.S.C. § 3664(m), which provides:

> At the request of a victim named in a restitution order, the clerk of the court shall issue an abstract of judgment certifying that a judgment has been entered in favor of such victim in the amount specified in the restitution order. Upon registering, recording, docketing, or indexing such abstract in accordance with the rules and requirements relating to judgments of the court of the State where the district court is located, the abstract of judgment shall be a lien on the property of the defendant located in such State in the same manner and to the same extent and under the same conditions as a judgment of a court of general jurisdiction in that State.

upon the merely ministerial act of recordation, become a *judgment lien*, which is protectable property for takings purposes as well.[17]

---

[17]   The metes and bounds of the rights conveyed by a judgment lien are matters of state law. However, the federal constitutional ramifications of such rights are matters of federal law. In this case, because the sentencing court was the Eastern District of New York, a restitution order would have been recordable in the Kings County clerk's office as a New York judgment lien, fn. 16, and the federal constitutional ramifications of that recordation would be a question of federal law specific to New York judgment liens. Fortunately, that has already been decided and such a judgment lien has been persuasively held to be protectable property for takings purposes. S*ee 1256 Hertel Ave. Assocs., LLC v. Calloway*, 761 F.3d 252, 262-63 (CA2 2014):

> Under New York law, after a plaintiff has won a judgment against a defendant, obtaining a judgment lien against his real property is simple. The judgment creditor need only file the judgment with the county clerk of the county where the property is located. N.Y. C.P.L.R. § 5018(a). The lien secures the judgment creditor's ability to collect the judgment, by forced sale of the property if need be, N.Y. C.P.L.R. § 5236, by ensuring that, apart from a few statutory exceptions, no transfer by the judgment debtor of any interest in the liened property is effective against the judgment creditor.…
>
> In *Ford Motor Credit Co. v. NYC Police Department* this Court held that a lienholder with a security interest in a motor vehicle seized by the New York City Police Department possesses a constitutionally protected property interest in the seized vehicle and may not be excluded from participation in the civil forfeiture process. 503 F.3d 186, 190-92 (CA2 2007). The Court relied in part on *Armstrong v. United States*, in which the Supreme Court similarly concluded that a mechanic's lien obtained pursuant to Maine law constituted a constitutionally protected property interest. 364 U.S. 40, 44-45, (1960). Like the mechanic's lien at issue in *Armstrong*, a judgment lien entitles the lienholder to force a sale of the liened property and to obtain payment in priority over other creditors. *See* C.P.L.R. § 5236(a); *see also* C.P.L.R. § 5235 prac. cmt. C5235:1 (McKinney 2014) (explaining that C.P.L.R. § 5236(a) "ordinarily bars sale of the realty on execution if the judgment is not…a lien"). And like other common property interests, a judgment lien can be freely bought, sold, and assigned. There is no reason that a judgment lien should not be entitled to similar protection. The legal rights of a judgment lienholder are obviously far fewer than those of an owner in fee simple, but a judgment lien, like other security interests, "is indisputably a property interest protected by the Fourteenth Amendment." *Ford Motor Credit Co.,* 503 F.3d at 191.

*then see* fn. 16 (Victim named in restitution order has right to record abstract of same in state court in same manner, extent and conditions as judgment of such court).

*The Puentes[18] Hypothetical*

For his role in a fraud scheme defendant Puentes was imprisoned and ordered to pay restitution jointly and severally with his co-conspirators., While in prison he became a cooperator and in return as a reward the government moved by Rule 35 to reduce his prison time. The court not only did, allowing his early release, it *sua sponte* terminated his restitution despite the fact that the MVRA made restitution mandatory for fraud.

The Eleventh Circuit reversed the termination, explaining that (1) the MVRA required the defendant compensate victims; (2) it contemplated joint and several liability, not exempting one defendant thus improperly shifting risk of absorbing the remaining defendants' collective inability to pay from him (Puentes) to innocent victims. The court held that the MVRA did not give a court authority to terminate, even to encourage cooperation, as *the purpose of the MVRA was to eliminate district court discretion for restitution* and that a termination would frustrate this,and the MVRA says it applies "notwithstanding any other provisions of law."

If *Puentes* had been decided in 2000, it could present these questions:

(1) If a victim had recorded the restitution order, which was apparently for the mere payment of money, in a state with lien rights similar to those of New York, thus making it a judgment lien on Puentes' property and so itself thereafter protectable for takings purposes, and prior to the appeal Puentes took the termination order to state court and had the lien removed or ruled null and void on account of it, would the termination have been a taking of the lien?

(2) If so, would it have been a taking if the sentencing court had entered the order before the victim got into court to record it?

(3) Suppose Puentes had defrauded a victim into giving him property, was possessed of it when convicted, and the restitution order required him to return it *in kind* but he had not while in prison. If it would be recordable as a judgment lien, then it too would be protectable property. But suppose it was not recordable. Would the termination have been a taking of that restitution order, or of the underlying property, or of the right to its return? Does this depend on whether the property was:

---

[18] *United States v. Puentes*, 803 F.3d 597 (CA11 2015).

(a)  Blackacre, a farmland in fee simple?

(b)  Interests in common-law partnership holding Blackacre in fee?

(c)  Membership interests in an LLC holding Blackacre in fee?

(d)  A license to use Blackacre, as opposed to a possessory estate in Blackacre, whereby the licensee can enter upon Blackacre to look for and extract (legally) certain mineral deposits?

(e)  Assuming the state in question be Louisiana, a usufruct, a *civil law*, not common law, right to harvest certain low-hanging fruit?

(f)  An inseparable, fungible portion of grain in a silo?

(g)  A trade secret known only to the entity owner, a method of enhancing nitrogen fixation that enables superior crop production?

(h)  A patent giving the entity owner the exclusive right to practice that method of nitrogen fixation?

(i)  A license giving the right to practice that method, where it is otherwise precluded by a third-party's trade secret or patent?

All restitution orders recordable as judgment liens, which includes all orders stating an amount so all orders for payment of money, are property for takings purposes in states with creditors rights like those of New York not only upon recordation but upon issue as recordation is as of right so the victim has a reasonable "investment-backed" expectation based on the language of the MVRA[19] that he will make it to the recording office with the docketed restitution order still intact.[20]

All other (non-recordable) restitution orders which require the turnover of specific property to the victim must also be protected property for takings purposes if the property in question would itself be protected property, which, whatever else may be true, includes real property and personal property, tangible or not.[21]

---

[19] 18 U.S.C. § 3663A(a)(1) ("Notwithstanding any other provision of law, when sentencing a defendant…the court shall order that the defendant make restitution to the victim of the offense").

[20] *Ruckelshaus v. Monsanto*, 467 U.S. 986 (1984), *Palazzolo v. R,I,*, 533 U.S. 606 (2001).

[21] *Horne et al. v. Department of Agriculture*, 378 U.S. 347 (2015).

Victims' Rights After 2004

These questions were intentionally omitted from the *Puentes Hypothetical*:

What, if any, rights would the victims have had to object to the court's order terminating restitution? In what forum by what procedure would they have standing to do so? Did they have a right to have been told of it, or of the government's Rule 35 motion? If so what would have been the consequences had they not been told?

What if the court had determined that an exception applied and so did not order restitution pursuant to the exceptions embedded in the MVRA[22], what if any rights would the victims have to object?

In 2004, Congress enacted the Crime Victims' Rights Act (CVRA), which gives victims enumerated rights[23], importantly including rights (2) to notice of any

---

[22] 18 U.S.C. § 3663(c)(3), which provides

This section shall not apply in the case of an offense described in paragraph (1)(A)(ii) if the court finds, from facts on the record, that—

(A) the number of identifiable victims is so large as to make restitution impracticable; or

(B) determining complex issues of fact related to the cause or amount of the victim's losses would complicate or prolong the sentencing process to a degree that the need to provide restitution to any victim is outweighed by the burden on the sentencing process.

[23] Codified at 18 U.S.C. § 3771. The enumerated rights are listed in § 3771(a):

(1) The right to be reasonably protected from the accused.

(2) The right to reasonable, accurate, and timely notice of any public court proceeding, or any parole proceeding, involving the crime or of any release or escape of the accused.

(3) The right not to be excluded from any such public court proceeding, unless the court, after receiving clear and convincing evidence, determines that testimony by the victim would be materially altered if the victim heard other testimony at that proceeding.

public court proceeding involving the crime; (3) not to be excluded from any such public proceeding; (4) the right to be heard at any public proceeding involving sentencing; (5) the right to confer with the government; (6) the right to full and timely restitution as provided in law; and (10) the right to be informed of these rights.

This was a sea change in victims' rights because, while the MVRA required a court to order restitution, and thus to the extent a court did so the MVRA often did constitutionalize victims' rights since, as Plaintiffs have proved every recordable order of restitution, at least in New York, is a federally constitutionally protected property interest, as are non-recordable in-kind turnover orders nationwide where the underlying property would be so protected, there was no method for a victim aggrieved by a court's failure to grant a restitution order to do anything about it by formal legal process, relegating her to a takings or exaction claim.

---

(4)   The right to be reasonably heard at any public proceeding in the district court involving release, plea, sentencing, or any parole proceeding.

(5)   The reasonable right to confer with the attorney for the Government in the case.

(6)   The right to full and timely restitution as provided in law.

(7)   The right to proceedings free from unreasonable delay.

(8)   The right to be treated with fairness and with respect for the victim's dignity and privacy.

(9)   The right to be informed in a timely manner of any plea bargain or deferred prosecution agreement.

(10)  The right to be informed of the rights under this section and the services described in section 503(c) of the Victims' Rights and Restitution Act of 1990 (42 U.S.C. 10607(c)) and provided contact information for the Office of the Victims' Rights Ombudsman of the Department of Justice.

But the CVRA added two things to the mix. First, it gave victims statutory standing to intervene in the criminal case to assert their rights by suit if necessary[24] (by definition this would give them Article III injury standing as well) and importantly to assert their rights to an order of restitution, by suit if necessary[25]. And second, it made clear that the burden is on the government[26] *and* the court[27]

---

[24]  18 U.S.C. § 3771(d)(3), which provides

> The rights described in subsection (a) shall be asserted in the district court in which a defendant is being prosecuted for the crime or, if no prosecution is underway, in the district court in the district in which the crime occurred. The district court shall take up and decide any motion asserting a victim's right forthwith. If the district court denies the relief sought, the movant may petition the court of appeals for a writ of mandamus. The court of appeals may issue the writ on the order of a single judge pursuant to circuit rule or the Federal Rules of Appellate Procedure. The court of appeals shall take up and decide such application forthwith within 72 hours after the petition has been filed, unless the litigants, with the approval of the court, have stipulated to a different time period for consideration. In deciding such application, the court of appeals shall apply ordinary standards of appellate review. In no event shall proceedings be stayed or subject to a continuance of more than five days for purposes of enforcing this chapter. If the court of appeals denies the relief sought, the reasons for the denial shall be clearly stated on the record in a written opinion.

[25]  *Id.* Note that the statute has a special short limitations period that limits the time to petition for a writ of mandamus to reopen a sentence to 14 days from entry of the sentencing order and imposes a condition precedent that the victim have first asserted a right to be heard. Since an order of restitution is a sentencing order, these requirements apply to a suit for a restitution order, as well as those of § (d)(3).

The short limitation period is in 18 U.S.C. § 3771(d)(5), which provides

> In no case shall a failure to afford a right under this chapter provide grounds for a new trial. A victim may make a motion to re-open a plea or sentence only if—
>
> (A) the victim has asserted the right to be heard before or during the proceeding at issue and such right was denied;
>
> (B) the victim petitions the court of appeals for a writ of mandamus within 14 days; and

[26]  18 U.S.C. §3771(a), (c)(1), *passim.*

to affirmatively inform all victims of their rights. For one thing, whatever else that meant, it set a behavioral standard for the government and the courts which will be addressed in the exaction section of this memorandum. But more important, to the extent there is a meaningful metric of importance, it eliminated any ability of the government or the court to "blame the victim" for failure to perfect their rights to the extent they didn't, and worst case couldn't have with reasonable diligence, learned of them. In essence, if one borrows the analogy from other fields, if one cannot sit on their rights when one sees storm clouds gathering, the notice provisions made clear that federally protected crime victims don't have to keep looking out the window to see if it might rain but can wait for the government to call and tell them, "Better carry an umbrella."

And it did quite something else. By giving victims a cause of action to sue, it gave them some kind of property, and by giving them a cause of action to sue for a restitution order, at least as in the case here where the sentencing court is sitting in New York and the victim is entitled to a recordable order for the payment of money, it gave them a cause of action to obtain that which itself is protected property.[28]

Which of course also means it gave them a second piece of property that could be taken, and so gave them a second basis for a takings (or exaction) action.

That is, while the MVRA requires the court to order restitution, the subsequently-enacted CVRA gives a victim the right to try to force the court do so, and that is no empty right, for it gives the victim the standing to enforce that right by giving her the standing to intervene in the sentencing in the criminal case to move

---

[27] 18 U.S.C. § 3771(b)(1), which provides, "In any court proceeding involving an offense against a crime victim, the court shall ensure that the crime victim is afforded the rights described in subsection (a)."

[28] *Adams.*

the court to order restitution, whereupon the court must consider the request and then, if the court still will not order restitution, the victim has the right to sue the district court by petitioning the appellate court for a writ of mandamus to order the district court to do so.

## AN EXACTION CLAIM LIES

### There Is Tucker Act Jurisdiction

In 2015 Judge Wheller authored a most thoughtful Opinion and Order of in the AIG case. *See Starr International Company v. United States*, 11-779C, ECF 443 ( June 15, 2015).

In his opinion he found an illegal exaction despite the absence of money-mandating language in the applicable legal source (FRB regulations).

He made a lengthy analysis, and Plaintiffs respectfully see no reason to cut and paste it here or rewrite it at length.

The government correctly raises the argument that where a statute, such as the MVRA and CVRA, denies that it creates a cause of action, that may be seen as a complete refutation of any implied money-mandating obligation.

Plaintiffs do not agree, but do not feel the need to spend many pages on the point as all persons involved agree that the issue is expressly that, whether jurisdiction is here for an exaction (assuming it is well-pled, which it must be as it basically only requires restating the takings complaint but alleging illegality of the taking).

Therefore plaintiffs respectfully disagree that the MVRA and CVRA language preclude an exaction claim and instead is merely language precluding Federal Tort Claims liability.

Assuming that argument prevails, then the only other issue is whether the government may be said to have "Plaintiff's money in its pocket." It does, or rather it did, until it paid it out to Sater, constructively.

In Starr, this court held that it was an exaction when there was dilution even though the actual number of shares owned did not change.

Respectfully then it should be an exaction where an obligation to order the turnover of property or provision of a lien is diluted or extinguished in favor of a third party for the benefit of the government, as happened here.

Fifth Amendment taking claims and illegal exaction claims are two sides of the same coin: taking claims are based upon authorized actions by government officials, whereas illegal exaction claims are based upon unauthorized actions of government officials. See *Aerolineas Argentinas*, 77 F.3d at 1579 (Nies, J., concurring):

> As recognized in *United States v. Testan*, 424 U.S. 392 (1976), a Tucker Act claim for damages against the United States based upon a [law] may take one of two forms: a claim under a money-mandating [law] or a claim for money improperly exacted or retained. A claimant must rely either on a [source of law] that mandates payment of money from the government to the claimant or on an illegal exaction, that is, a payment to the government by the claimant that is obtained without [legal] authority. See *Clapp v. United States*, 127 Ct. Cl. 505 (1954). The first is founded on [legal] authorization; the second on the absence of legal authorization. One is the flip side of the other. [Bracketed text edited]

For Plaintiff's taking claim(s), the money-mandating source of law is the takings clause of the Fifth Amendment, which has express language ("just compensation") to that end. Tucker Act jurisdiction was clear.

For Plaintiff's exaction claim(s), the situation is less clear. Unlike the takings clause, the due process clause of the Fifth Amendment does not contain money-

mandating language, and so an exaction claim to some degree requires reference to another law to create jurisdiction in this court.[29]

In addressing this jurisdictional problem for exaction claims, some decisions have dispensed with the requirement for a money-mandating statute, seemingly embracing the concept that the Government should not escape responsibility for its unauthorized actions based on a jurisdictional loophole.[30]

Other decisions have espoused a slightly tighter standard, but one that is still broader than simply requiring a "money-mandating" source of law.[31]

---

[29] *See Hamlet v. United States*, 873 F.2d 1414, 1416-17 (Fed. Cir. 1989) (this Court can adjudicate constitutional claims if made in conjunction with money-mandating source of law)

[30] *See Figueroa v. United States*, 57 Fed. Cl. 488, 495-96 (2003) ("In the context of an … exaction, the court has jurisdiction regardless of whether the provision relied upon can be reasonably construed to contain money-mandating language."); *Bowman v. United States*, 35 Fed. Cl. 397, 401 (1996) ("In … exaction cases, in contrast to other actions for money damages, jurisdiction exists even when the provision allegedly violated does not contain compensation mandating language."); *Aerolineas Argentinas*, 77 F.3d at 1573 ("[A]n … exaction has occurred when 'the Government has the citizen's money in its pocket.' Suit can then be maintained under the Tucker Act to recover the money exacted.") (quoting *Clapp*, 127 Ct. Cl. at 513, *Auto. Club Ins. Ass'n v. United States*, 103 Fed. Cl. 268, 273 (2012) (Where an…exaction is alleged, the Tucker Act "enables suit even in the absence of a money-mandating statute.").

[31] *See Norman v. United States*, 429 F.3d 1081 (Fed. Cir. 2005):

> An…exaction involves a deprivation of property…in violation of the Due Process Clause….*See*, e.g., *Casa de Cambio Comdiv*, 291 F.3d at 1363…To invoke Tucker Act jurisdiction over an exaction claim, a claimant must demonstrate that the law causing the exaction provides, either expressly or by "necessary implication," that "the remedy for its violation entails a return of money…exacted." *Cyprus Amax Coal Co. v. United States*, 205 F.3d 1369, 1373 (Fed. Cir. 2000) (Tucker Act jurisdiction over exaction claim based on Export Clause as language of that clause "leads to the ineluctable conclusion that the clause provides a cause of action with a monetary remedy").

## NOTHING IN THE FACTS OF THIS CASE AS ALLEGED OR AS COULD BE ON AMENDMENT PREVENTS PRESENTATION OF A WELL PLED COMPLAINT THAT WOULD SATISFY THE REQUIREMENTS TO STATE A CAUSE OF ACTION

Plaintiffs address the remaining arguments of the government, which are without merit.

**Plaintiffs Have Never Sought Restitution**
**There Is and Can Be no Issue Preclusion**
**There Is and Can Be no Fact Preclusion**

There have been many prior actions directly or peripherally related to Sater's criminal case. Plaintiffs (nominally, not as a class representative) have been parties to some, but not all. Sater has been a defendant in some, but not all.

To begin with, each and every one of those actions was filed in a court other than the Court of Claims and to the extent that they sought money damages from any defendant they sought vastly more than $10,000 under any theory.

As a result, in none of those cases could Plaintiffs have presented a takings claim because Tucker Act jurisdiction for such a claim is exclusive in this court when the damages requested exceed $10,000.

As a result of *that*, res judicata, or claim preclusion, cannot apply, as it bars relitigating only claims that were *or could have been* brought in the prior action.[32]

---

[32] Application of res judicata requires a prior final judgment on the merits by a court or of competent jurisdiction; identity of parties or those in privity; and a subsequent action based on the same claims that were raised, or could have been raised, in the prior action. *See Amgen, Inc. v. Genetics Inst.*, 98 F.3d 1328, 1331 (Fed.Cir.1996); *McCandless v. Merit Sys. Protection Bd.*, 996 F.2d 1193, 1197-98 (Fed.Cir.1993).

Even more inconvenient for the government is the fact that such preclusion requires an identity of parties. This is an action for damages from the government for the taking away, lawful or otherwise, of Plaintiff's right to an order of restitution and their right to sue to get it. It is not a suit against Sater for anyting and it would be rather ludicrous to argue that a criminal defendant is in privity with the government whose lawys he violated and who then prosecuted him for it. And the claim is not remotely the same because what Sater did to create liability is to steal money from Plaintiffs by stock fraud and what the government did to create liability is to prevent them from forcing the government to order Sater to return it.

Next, not one of those actions sought restitution from Sater, nor could it have, because restitution in this context does not mean some kind of private civil remedy in the nature of replevin or constructive trust, it means exactly and precisely one thing, which is an order issued as part of a criminal sentence and so can only be issued in a sentencing. Sater was sentenced on October 23, 2009. He was not sentenced to restitution. The only possibility for Plaintiffs to have sought restitution from him would have been to have moved the sentencing court to impose such an order and if that failed to seek mandamus. That would have to have been done by November 6, 2009. Plaintiffs did not do so and could not as they never knew of the sentencing proceeding. That is the whole point of this case.

Plaintiffs unsuccessfully sought civil damages from Sater in a RICO case but it was dismissed for failure to plead with sufficient particularity that Sater was liable and because Plaintiffs were not mentioned in Sater's criminal information.

Because that case sounded in fraud, FRCP 9(b) applied as a heightened pleading standard, and although Plaintiffs believe it was incorrect to do so the re-

viewing courts imported the even higher pleading standard of the PSLRA (Private Securities Litigation Reform Act) into the case.

In contrast there is no pleading standard in a demand for restitution because it is part of a sentencing proceeding. Typically, the court holds a Fatigo hearing to resolve any factual issues for sentencing and of course the government and Probation Services obtain loss records from victims. But in the end to the extent a restitution decision is based on formal evidence a preponderance standard applies.[33] So when the government asks, "Why would there be a lower standard of proof in a criminal case than in a civil securities fraud case," the answer is, "Because restitution is part of the sentencing phase of a criminal case and the sentencing phase is not even bound by rules of evidence at all, but again where and to the extent it is in a restitution proceeding it is a preponderance standard.

Moreover, restitution is a penal sanction. While it has compensatory aspects, the Second Circuit has consistently held that its purpose is penal, it is to be deterrent, and it is not to be conflated with civil damages and in fact the settlement of a civil case brought by the victims against the criminal defendant cannot lawfully influence or reduce any obligation to impose restitution, though it may reduce the amount awarded by the amount of any settlement.[34]

---

[33] *United States v. Hai Waknine*, 543 F.3d 546 (9th Cir. 2008).

[34] *United States v. Hamburger*, 414 F. Supp. 2d 219 (E.D.N.Y. 2006)

> [T]he Court of Appeals for this Circuit has held, although not in this context, that "restitution undoubtedly serves traditional purposes of punishment. The prospect of having to make restitution adds to the deterrent effect of imprisonment and fines." *United States v. Brown*, 744 F.2d 905, 909 (CA2 1984). This court is constrained to follow the cited appellate authority that a pre-existing civil settlement does not limit a court's obligation to order restitution in accordance with 18 U.S.C. §3663A.
>
> *In fashioning a restitution order, a pre-existing civil settlement is properly considered by the*

Therefore Plaintiffs cannot understand, nor should this court, why the government keeps trying to conflate the civil case against Sater with the right to restitution against Sater.

Indeed, Plaintiffs respectfully point out that neither they nor any other victim can relinquish the obligation of a court to award restitution. When a victim renounces it, it must go to a victim fund. The court's obligation to order it remains. It must follow then that the other members of the class cannot be asked to forfeit their rights and thus even were Plaintiffs themselves able to recover nothing in restitution as class representatives they are uniquely capable of doing so for all the other victims.

Moreover, the fact that Plaintiffs here claim they were entitled to restitution in the amount of $7M plus loss of use is in no way precluded by or inconsistent with any prior civil action or claim in restitution against Palagonia. It is axiomatic that a plaintiff may settle in part or whole with one or more co-conspirators who have direct or vicarious liability with them without limiting their rights to proceed against others for more. Unless Plaintiffs have misunderstood what is a 450-page record of the Palagonia restitution issue, which is conceivable, Plaintiffs there never stipulated or agreed that their total losses to the crime were $1.5M, which is what they were awarded from him, rather they stipulated and agreed that they would limit their recovery from him to the losses they suffered on 2 of the roughly 12 stocks that were manipulated to the point of causing them losses.

No case in which Plaintiffs were a party ever reached the merits for purposes of collateral estoppel. By definition collateral estoppel, or issue preclusion, can on-

---

*Court, but only as an offset against the calculation of total loss to the victim.*

ly apply when there has been a full and fair opportunity to litigate the issue and it has actually been litigated.

While Plaintiffs and others counsel have represented have, variously, filed papers in other courts, such as that RICO case, alleging that the government's actions and the court's actions were fraudulent, even criminally so to the point of sedition, no court has ever adjudicated any of those claims or anything related to or dependent on them, and so Plaintiffs are perfectly free, and counsel ethically compelled therefore in the interests of zealousness, to plead as they have here in the alternate that what was done in concealment was either lawful and a taking or not lawful and an exaction (or not, insofar and to the extent that some kind of money-mandating express or implied obligation is required but not present).

For example, the government makes much of the fact that the Southern District and the Second Circuit noted (said, held, opined, it doesn't matter, there is nothing evasive here) that Sater was not convicted of aiding and abetting Palagonia's securities fraud. That is true. For one thing it is true because aiding and abetting is not a stand-alone crime it is a method of transferred liability, that is, becoming liable for the primary offense by helping another.

The public record of United States v. Sater, 98-CR-1101, shows that Sater was convicted of racketeering based on five predicate acts of securities fraud and one of money laundering.

By definition, RICO is a scheme crime and the MVRA provides that restitution liability in a scheme crime is joint and several to all victims everywhere, especially as to the ringleaders of the scheme, like Sater. *See Puentes, infra*. In civil terms this would be called vicarious liability by the doctrine of mediate causation but the label does not matter, what matters is this:

Sater pled guilty to being one of three control persons in a criminal enterprise that perpetrated a fraud on the market by, inter alia, bribing brokers to push stocks on customers without disclosing the manipulation. He pled guilty to charges that the RICO enterprise paid bribes to brokers at various firms. He pled guilty to charges that one of his two confederates was Salvatore Lauria.

Salvatore Lauria pled guilty to identical charges.

Palagonia pled guilty to securities fraud and in his allocution expressly admitted that he had committied those frauds while participating in a scheme run by Sater and did so even in the presence of his counsel and a warning from Judge Glasser that by admitting to this he was exposing himself to extreme liability.

Palagonia then years later testified under oath that Sal Lauria had bribed him as part of his (Lauria's) role in the scheme to pump the stocks.

All this was alleged here and if any was inadvertently not it can be amended to be so alleged.

The idea that this is not sufficiently plausible to support the claims here is laughable. What is not laughable is the government's insistence on ever having to admit that Sater had any victims.

## CONCLUSION

Wherefore the above, Plaintiffs ask this court to deny the government's motion to dismiss the complaint and, if the court should otherwise be inclined to dismiss but agree that repleading would not be futile, that it will accept a motion for leave to amend at that time.

Plaintiffs also ask such other relief as may be just and proper.


/s/ Frederick M. Oberlander