UNITED STATES COURT OF FEDERAL CLAIMS

# 15-CV-1245

E/O GOTTDIENER *ET AL.*

v.

UNITED STATES

SUPPLEMENTAL BRIEF OF ISSUES PRESENTED BY

*PETRO-HUNT v. UNITED STATES*

BY ORDER OF THE COURT

OCTOBER 3, 2017

FREDERICK M. OBERLANDER
*COUNSEL FOR PLAINTIFFS*
**THE LAW OFFICE OF FREDERICK M. OBERLANDER, P.C.**
28 SYCAMORE LANE
POST OFFICE BOX 1870
MONTAUK, NEW YORK 11954

212.826.0357   TEL.
212.202.7624   FAX

FRED55@AOL.COM

### "WHAT ABOUT THE JUDGE?"
### THE GOVERNING DYNAMICS OF DEMOCRACY
### NECESSARILY COLLAPSE WITHOUT
### THE WILL TO DOUBT JUDICIAL INTEGRITY

*I submit this supplemental brief in behalf of my clients, the plaintiffs appearing in their own behalf and, if certification lies, the class representatives acting in behalf of all afflicted victims.*

*The court directed the parties to brief the relevance of* Petro-Hunt v. United States[1] *, which holds, as do others, that this court lacks jurisdiction to adjudicate a takings claim that would require it to find that an act of an Article III court was in error.*

*But then a remarkable thing happened: During my research it became clear how to present not only that, but **all** principles in this and **all** takings cases, judicial or not, but especially judicial.*

*It is elegant. I ask the court's indulgence while I take a few pages to prepare to, and then set forth (in painlessly summary form) what I call the governing dynamics of democracy, and the proper analysis of the judicial sub-dynamics within it as to takings.*

*Hemingway once wrote a novel in six words: "Baby shoes for sale, never worn." The order to brief* Petro-Hunt *has led to the discovery of not six, but four words which similarly may do as much to further understanding: **What about the judge?***

*This is because, like the merchant who while searching for treasure, found one pearl of great price, sold all that he had, and bought it, the revelation came from one case, in some ways more on point than any case has been, and so is the ultimate avatar.*

---

[1] 862 F.3d 1370 (Fed. Cir. 2017).

*Many hands have touched this paper in the forms it has taken on in two months of drafting, many eyes read it, and many ears heard it. And perhaps, maybe, enough minds have understood it, that it may do what is necessary, for when I tell it aloud, one can hear a pin drop throughout, until the question inevitably erupts, always, sometimes sooner, sometimes later, "What about the judge?" Frankly, it's about time.*

## I. INTRODUCTION

All systems are subject to principles, or governing dynamics, which may be intuitively understood as the rules that control the outcomes. This is so even if the nature of those rules, indeed even if their very existence, is unknown to the participants.

For example, fish schooling and birds flying in formation are systems in which behavior is dictated by the rules of fluid dynamics, even though the fish and birds are organizing to minimize drag and maximize efficiency in blissful ignorance of Bernoulli's calculus.

The film *A Beautiful Mind* depicts a similar concept, imagining that instead of all the men going for the blonde, blocking each other, then being rejected by her brunette friends who are angry at being second choice, they should all go for the brunettes. The result, each going home with a brunette, no one with the blonde, is optimal.[2]

---

[2] This does *not* mean the men must cooperate; rather, even if they operate in their own interests, to achieve optimality, if they know the strategies of the others, they *must* consider what those others will do in *their* own interests, anticipating that they will likewise be accounting for what all the others relative to *them* will do. Warren Buffett similarly explains picking stocks by likening it to picking a beauty contest winner: one selects not who he thinks is most attractive, but who he thinks *the judges* think is most attractive.

The math for this can be formidable, so is not stated here. How interesting is it, then, that these ideas were understood intuitively centuries ago by Enlightenment philosophers like Hobbes, Hume, and Rousseau, and can be mathematically shown to underlie the Framers' design for the government of the United States.

Interesting but not surprising, as the first man to consider the governing dynamics of the law in the context of democracy did so 2500 years ago, and was put to death for his trouble.

## II.   THE SOCRATIC METHOD IS THE WILL TO DOUBT

Semble that "the will to doubt" the perceived wisdom of the day is necessary and sufficient for the growth of any society.

Of course, it may be easier said than done. Thousands of years ago, man lived in darkness, believing that natural fires were the result of demonic acts. Then someone discovered how to make fire. He was considered an evildoer and probably burned at the stake by his own discovery. But he had lifted darkness off the earth.

Centuries later, a man invented the wheel, and for his trouble was considered a transgressor who had ventured into forbidden territory. But thereafter men had opened the roads of the world.

Throughout history every new thought that dared doubt the conventional wisdom was opposed, every invention denounced. The motor was thought foolish, the airplane impossible, the power loom vicious, anesthesia sinful, Galileo a heretic.[3]

But the will to doubt can also be sapped by an internal sense that societal conventions *must* have a sound basis, even if we're not sure what it is, as they've been adhered to by many people for a long time. We put ourselves down thinking it is implausible that *both* (1)

---

[3] These examples were adapted from Ayn Rand, *The Fountainhead*.

society can be mistaken in its beliefs, and (2) we are alone in seeing it. We stifle our doubts and follow the flock as we can't conceive of ourselves as pioneers of hitherto unknown, difficult truths.[4]

Well, most of us do. But, not all of us. Because we don't *anymore* return escaped slaves, we don't *anymore* jail women for back-alley abortions, and we don't *anymore* segregate our schools.

Someone must have refused to shut up. Someone must have asked, "Why" and eventually got an answer other than, "Hier ist kein warum." In other words, something must have worked.

Perhaps it was a lawyer. After all, isn't ours the profession that invented inductive questioning?[5]

No, it's not. It was invented when there already were plenty of lawyers, so many that its society was more litigious than ours, by a master of the art of learning; a short, bearded, bald man with a rolling gait, a face like the head of a crab, flat nose, large lips, prominent swollen eyes, and a mind capable of wrestling with God's; who practiced philosophy without writing any of it down, did not charge for his lessons so slid into poverty, wore the same cloak all year and almost always walked barefoot; whose wife, Xanthippe, was of notoriously foul temper (when asked why he'd married her, he said that horse trainers needed to practice on the most spirited animals); and whose most curious trait was his habit of accosting Athenians of every class, age and occupation and bluntly asking them, without worrying whether they would think him eccentric or infuriating, to explain with precision why they held certain common-sense beliefs and what they took to be the meaning of life. As one reported:

---

[4] The following is adopted from de Botton, *The Consolations of Philosophy*.

[5] To those Talmudists thinking, "Wait, wasn't it us?" I remind them that no, they invented the idea of answering a question with a question. QED.

> Whenever anyone meets him and has a conversation, what invariably happens is that, although he may have started on a different subject, Socrates will keep heading him off until he has him trapped into giving an account of his life. And once he has him thus trapped, Socrates won't let him go before he has cross-examined him from every angle.

*If we refrain from questioning the status quo, it is primarily because we associate what is popular with what is right.* The philosopher raised questions to determine whether what was popular made any sense.

Many found the questions maddening. Some teased him. A few would kill him. In *The Clouds*, Aristophanes offered a caricature of the philosopher who refused to accept common sense without investigating its logic at length. The actor playing Socrates appeared on stage in a basket hung from a crane, claiming his mind worked better at altitude, immersed in such thoughts that he had no time to perform household tasks, but could consider life's most vital questions, including how many of its own lengths can a flea jump, and do gnats hum through their mouths or their anuses?

Nevertheless, after his conversations with Athenians, popular views on how to lead a good life, views described as normal and so beyond question by the majority, revealed inadequacies of which the confident manner of their proponents had given no indication.

For example, one day he met two generals, Nicias and Laches, who'd fought in the Peloponnesian War and earned the respect of the city. They had one common-sense idea. They believed that to be courageous, a person had to belong to an army, advance in battle and kill. But on meeting them, Socrates asked a few questions:

SOCRATES:   Let's try to say what courage is, Laches.

LACHES:     If a man can stand in the ranks, face the enemy and not run, he's courageous.

But Socrates remembered that at the battle of Plataea a Greek force under the Spartan regent Pausanias had initially retreated, then courageously defeated the Persian army:

SOCRATES:   At Plataea, the Spartans came up against the Persians, but unwilling to stand and fight, fell back. The Persians broke ranks to pursue; but the Spartans turned round like cavalry and won the battle.

Forced to rethink, Laches offered a new common-sense idea: courage was endurance. But endurance could, Socrates pointed out, be directed towards rashness. To distinguish courage from delirium, another element was needed. Laches' companion Nicias, guided by Socrates, proposed that courage would take knowledge, awareness of good and evil, and could not be limited to warfare.

In brief conversation, inadequacies had been discovered in the accepted definition of Athenian virtue. It had been shown not to consider courage off-battlefield or the importance of knowledge combined with endurance. The implications were *immense*. If a general had been taught that ordering his army to retreat was cowardly even when it seemed the best maneuver, the redefinition broadened his options and emboldened him against criticism.

One point to be learned from this is that by merely asking the right questions, one can determine the governing dynamics of a system and perhaps their non-apparent deficiencies.

Another is that by doing so and exposing the lack of valid bases for commonly accepted shibboleths, one will not make friends…

### III.  THE ULTIMATE AVATAR CASE

*Rarely have the governing dynamics of all key principles of law been so well displayed in one case, a precedential decision of the Second Circuit, so I devote much space to it. But take care, as its import lies not so much in what it says as in what it does **not**.*

#### A.  *When the United States Committed Battery and Murder on Its Citizens by Illegal Medical Experiment and Was Haled Before a Federal District Court to Answer for It*

On January 8, 1953, Churchill was preparing to meet Truman; the Orthodox were preparing to celebrate Christmas; and, though he didn't know it, Harold Blauer was preparing to enter history. [6]

Despondent over the failure of his marriage, Harold had been undergoing treatment at Bellevue but, unhappy with his progress, had left a month earlier and admitted himself to the New York State Psychiatric Institute (NYSPI), an affiliate of Columbia University.

Imagine his psychic torment. Only a few years earlier he'd been a top-seeded tennis player, and though at forty-two he was still in shape, he must have felt hopeless, wondering what had happened to his once seemingly sure prospect of living the American dream, a dream which was about to become a nightmare.

A few days before, though he'd been responding well to talk therapy and was to be discharged soon, his supervising physician insisted that he undergo drug treatments or be discharged. He went

---

[6]    I have melded reported authority, *e.g. Barrett v. United States*, 798 F.2d 565 (2d Cir. 1986); *Case Comments,* 62 Notre Dame L. Rev. 255, 287 *et seq.* (1987). To the extent I omit or change language, it is only to save space.

along, though not likely willingly, as the threat of cutting off his therapy must have been terrifying.

He reacted badly to his first injection, a mescaline derivative called EA-1298. He tolerated the next three injections of other drugs, EA-1297 and EA-1316, but refused a fifth injection until he had been coerced again with the threat of involuntary discharge.

On January 8, 1953, Harold Blauer was injected for the fifth time, again with EA-1298, but, incredibly, at *sixteen times* the dose he'd reacted badly to the first time. He began sweating profusely and flailing his arms and had to be restrained. After four minutes, he stiffened, his teeth clenched, and began frothing at the mouth.

On January 8, 1953, after suffering similar reactions for over an hour and a half, Harold Blauer lapsed into a coma and died.

The New York City Medical Examiner said his death was from "coronary arteriosclerosis; sudden death after intravenous injection of a mescaline derivative."

A NYSPI record said that the EA-1298 had been administered "for diagnostic and therapeutic purposes" and had resulted in an "unexpected and totally atypical response."

Neither report was true. Not one of the drugs he'd been given was diagnostic or therapeutic. Each was a psychotropic chemical warfare agent. EA-1298 for example, the drug that killed him, was a weaponized hybrid of mescaline and amphetamine.

The medical examiner had been told to falsify his report.

And the doctors whom Blauer had trusted, professionals who at one time had, all of them, sworn an oath to "First, do no harm," had been injecting him not as medical care, but as part of a covert, illegal CIA-Army project to study the effects of the drugs, in their role in a larger conspiracy born in Dachau by way of Auschwitz.

### B.  The Wrongful Death Suit and the Cover-up

Harold's estate, not knowing the truth and so believing that he had died from "ordinarily" negligent treatment, filed a malpractice action against the State of New York in its Court of Claims, alleging that his death had been caused by the NYSPI's negligence.

The NY Assistant Attorney General defending it uncovered the Army Chemical Corps' role in furnishing the EA-1298 and in arranging its use. At a meeting of federal counsels[7] and the medical personnel, including the supervising NYSPI doctor who'd ignored his patient's pleas to stop, one attorney, concerned the case could cost $75,000 to settle if the truth came out, told the AAG to settle cheaply by hiding the truth. The DOJ lawyer went a bit further, threatening to prosecute for espionage *anyone* who told the truth.

A cover-up ensued. NYSPI documents which showed the truth were taken out-of-state, beyond the estate's subpoena power. The AAG delayed the estate's pretrial examination of NYSPI doctors. And the conspirators agreed to concede liability for ordinary negligence in the hope that that would keep the estate from becoming inquisitive, so the estate wasn't told of the Chemical Corps' role, or that Harold had reacted so badly to the injections. The DOJ lawyer agreed to, and did, get his superior, the head of the Civil Division of the DOJ, to sign off not only on the coverup but also on a scheme to secretly reimburse NY State for half the settlement cost.

If his estate had pursued its right to examine the relevant NYSPI files and witnesses it might have uncovered all or most of these facts or have been alerted by refusals to answer or disclose on

---

[7]    The federal attorneys included an attorney with the Army JAG; a Legal Advisor to the Chief Chemical Officer, Army Chemical Corps; and the first assistant to the Assistant Attorney General, DOJ Civil Division.

grounds of executive privilege. However, in the belief that it had all the relevant records and that it faced the risk of not proving its negligence claim against the state since "plain" mescaline (but not, of course, the weaponized experimental compound) was becoming recognized as fit for diagnostic or therapeutic purposes, the estate agreed with the AAG to settle its wrongful death claim for $15,000.

The state could not settle without putting evidence of prima facie liability into the Court of Claims in a hearing where the judge could find liability and award damages in the amount agreed, so a hearing was held. Before it began, at a secret *ex parte* conference, the AAG told the judge the truth and asked him to keep it from the estate. The judge agreed, but told him to raise the sum to $18,000.

Thus, at the hearing the AAG could and did put into the record documents which revealed the truth, but without the estate finding out, by handing them to the judge, but not the estate, which did not object because, the judge said, the hearing was a mere formality.

Carrying out his role in the conspiracy, the NYSPI supervising physician who'd forced the drugs on Harold testified that his death had been caused by injection of a "mescaline compound" not in accord with accepted medical practice, conceding mere negligence.

The estate signed a settlement which for $18,000 released the State and all others, and on July 7, 1955, the Court of Claims entered judgment for the estate, ending the case with the secret intact.

## C. After 20 Years, the United States Admitted the Truth

Though CIA director Helms in 1973 ordered records of what would be known as MKUltra destroyed, in 1975 the Secretary of the Army revealed the Army's role in that chemical warfare test.

### D. The Federal District Court Civil Rights Lawsuits

The estate, failing to reopen the case in the Court of Claims, sued in the Southern District of New York the United States, under the Federal Tort Claims Act, and current and former federal and state officials, including attorneys involved in the cover-up, under § 1983 and *Bivens v. Six Unknown Named Federal Agents*[8], for damages for wrongful death and concealment of the Army's role.

After the Second Circuit's reversal of the district court's dismissal of the actions as time-barred, the defendants moved to dismiss or for summary judgment on grounds including immunity.

As to the NY AAG, the district court held that though the interest of a government attorney in defending a civil suit for damages is not as great as that of a prosecutor in enforcing criminal laws, the (former) AAG was entitled to the same absolute immunity given judges, witnesses, prosecutors and quasi-judicial officers, as the conduct complained of was undertaken on behalf of the State of New York during, and in connection with, ongoing litigation.

The federal attorneys were held *not* to have absolute immunity as they had not been acting as counsel in any prospective or pending suit, the would-be plaintiff wholly unaware of a potential case against the United States. They were held not to have qualified immunity as they *"should have been aware that they were depriving plaintiffs of their property right by their alleged actions"* in concealing a possible FTCA action by the plaintiff against the United States.

The federal attorneys appealed the denial of all immunity. The estate cross-appealed the dismissal of the NY AAG for absolute immunity.

---

[8]    403 U.S. 403 (1971).

### E.   The Result on Appeal

The Second Circuit applied a functional analysis to affirm that the AAG had absolute immunity. That he may have engaged in bad conduct in his representation of the State in litigation is irrelevant. The immunity attached to his function, not how he performed it.

However, though a decade earlier the Supreme Court had made clear it would be untenable to distinguish between federal and state officials for purposes of determining immunity[9], the Second Circuit declined to find any immunity for the federal attorneys.

There was no absolute immunity because they failed functional analysis. They hadn't been counsel for any of the parties in litigation relating to the death, but to the contrary were devoted to avoiding involvement of the government or its officials in such proceedings by keeping the estate ignorant of the government's role.

Their conduct wasn't public, but unknown to those it affected, the conflict of a suit, which can create a need for absolute immunity to let the government attorney perform fearlessly, was absent. And giving such protection would mean all government lawyers acting in any way to prevent exposure of government liability would also be absolutely immune, which the court found too wide-ranging.

The *ratio decidendi* behind affirmance of no qualified immunity is key. The court reviewed the law: officials who don't qualify for absolute may have qualified immunity, shielding them "from liability for civil damages insofar as they didn't violate clearly established statutory or constitutional rights which a reasonable person

---

[9] The Supreme Court said separating state from federal officials for immunity had the Bill of Rights guarded state officials more than federal, standing the constitution on its head. *Butz v. Economou*, 438 U.S. 478, 504 (1978).

would have known," if recovery is based on a claimed violation of such norms. What was the "clearly established" right? The court:

> The estate claims the federal attorneys unconstitutionally deprived it of a *property interest* in its *causes of action* against the United States and various officials. Qualified immunity turns on whether (1) the estate had a cognizable claim for damages against the government and/or officials that constituted a property interest under the Constitution, and (2) whether the actions of the federal attorneys interfered with the vindication of any claim to the extent they infringed upon this property right in violation of the Constitution.

Knowing the government's role in the death would have been critical to the estate's assessment of its rights. The Army's instigation of and participation in the administration of the drugs without consent (indeed, over objection) would have provided the basis for a claim of violation of Harold's right to be free from unjustified and unconsented-to invasion of his person, a battery.

The conduct would have been a tort and a violation of Harold's constitutional rights. *Though damages against the government under the Federal Tort Claims Act, may, by sovereign immunity, have been uncertain*, his right to be free from battery at the instigation of Army officials could hardly be questioned. Sovereign immunity could not then be availed of for participation in such wrongful conduct. In sanctioning an unconsented-to invasion of his body by use of a deadly drug, they would not be exercising powers delegated by the government, as they were not authorized to violate the Constitution by arbitrarily depriving him of life and liberty. The governing principle was that *a government official could not escape personal liability for tortious action when his conduct exceeded his authority by violating statutory or constitutional requirements*.

Thus, it was apparent that the conduct of Army officials in joining with the State of New York in undertaking the unconsented to experimental injections was an actionable wrong. *The estate's right to sue for damages was governed by the law of New York.* Under New York law one participating in the administration of a dangerous drug to human subjects without adequate warning of the risk could be responsible in damages for the consequences.

And *it was settled law that the estate's underlying right to sue the Army wrongdoers for damages for causing the death was a property right protected by the Constitution from arbitrary governmental interference.* The Supreme Court as far back as 1882 had held, "a vested right of action is property in the same sense in which tangible things are property, and is equally protected from arbitrary interference." *Pritchard v. Norton.*[10]

*Whether the cover-up of the federal-attorneys violated the estate's foregoing property right presents a closer question.* The federal-attorneys were not parties to the litigation between the estate and the State of New York nor subject to discovery in that action. *They therefore were not under any duty to volunteer to the estate information that would alert it to the existence of a claim against the federal government and certain of its officials for his wrongful death.* On the other hand, the government officials were not free to arbitrarily interfere with the estate's vindication of its claims.[11]

*Unconstitutional deprivation of a cause of action occurs when government officials thwart vindication of a claim by violating basic principles that enable civil claimants to assert their rights effectively.*

Although in 1953 courts may not have explicitly stated it, they had enunciated that the Constitution protects causes of action from

---

[10]    106 U.S. 104 (1882).

[11]    *Id.* at 132.

arbitrary interference, and state law proscribed particular forms of meddling. The federal attorneys had a duty not to suborn perjury in the ongoing litigation and not to induce the NY AAG to evade disclosure to the estate, in the Court of Claims discovery, of the Army 's complicity in the death:

> *Violation of these duties was also a crime and could have been prosecuted under provisions of the New York Penal Law* as it stood in 1953. See N.Y. Penal L. § 580(6) (repealed 1967) (conspiracy to obstruct); id., at § 814 (suppression of evidence); id., at § 1620, et seq. (subornation of perjury).

> The estate would have had a damage remedy against perpetration of these wrongs. [N.Y. Jud. L. § 487] authorized an injured person to recover treble damages from an attorney "guilty of any deceit or collusion with intent to deceive the court or any party." Nothing in [§ 487] limits the action to one by a party against an attorney for another party in a case. But even if it did, *since the NY AAG was an attorney for the state in the Court of Claims the federal attorneys could be held jointly liable for conspiring with him to deceive the estate* there through use of perjury and suppression of evidence.

> Regardless [of § 487], a fraudulent scheme that is greater in scope than the issues in the action in which perjurious testimony was given could under New York law be the subject of an action for damages on the part of the party aggrieved. Continued viability of this principle is recognized.

The estate claims the federal attorneys crossed a line from silence to active interference with their rights in its Court of Claims case. The NYSPI supervising physician is alleged to have been

counseled by the federal attorneys not to tell the Army's involve-ment in supplying the mescaline derivative or the purpose of the injections. The NY AAG is alleged to have been forced to engage in corrupt tactics under threat of espionage prosecution. A federal attorney is alleged to have transferred medical records to the Army Chemical Center in Maryland so, according to his memorandum, "they would be beyond the subpoena power of the plaintiff."

Proof of the foregoing by the federal attorneys would preclude their resort to qualified immunity. Their conduct would be not only active participation in a conspiracy to deceive the estate by conceal-ing material evidence in its pending action in the New York Court of Claims, for which they could be held liable under currently ef-fective law, but a violation of the estate's constitutional rights to be able to bring a potential action against the Army and the federal of-ficials participating in the unconsented-to lethal injections, which was currently recognized as a property right entitled to protection.

The federal attorneys contend that, if the estate had a cogniza-ble property right in a claim against the Army and federal officials for causing the death, their alleged conduct was only an interfer-ence with its remedy rather than with the property right itself, as the estate received $18,000 in compensation for Blauer's death.

*But they are alleged to have entirely concealed the fact that Harold's rights were violated by the federal government and officials.* Thus, the alleged conduct wholly deprived the estate of its causes of action against *them qua* federal defendants. This deprivation cannot be a mere alteration of remedies or forms of recovery, but rather rose to the level of infringement of the estate's underlying rights.

Similarly, we reject the argument that the "cover-up" did not harm the estate. Although the settlement in the estate's Court of Claims suit was raised from $15,000 to $18,000 by the court after it had been told *ex parte* by the NY AAG of the federal involvement,

the estate would not have accepted $18,000 if it had known of that involvement, but would have demanded a higher figure, as one of the federal attorneys recognized in stating that if all of the circumstances were revealed the case would be worth $75,000." The difference between the true value of the claim and the settlement figure was a property right, the secret denial or suppression of which by the federal attorneys conspiring with the NY AAG was a denial of the estate's constitutional right without due process of law.

### F.   Criminal Acts

The Second Circuit had no trouble correctly musing that the federal attorneys had committed crimes (the statements, however correct as hypothetical conclusions, are not legally operative findings of fact or conclusions of law; for one thing, the case was on threshold interlocutory appeal absent any real factfinding below; for another, the proceedings below had been civil, not criminal, and did not sound in RICO, or anything else where criminal liability would be determined, even if at a lesser evidentiary standard).

Also significant is the Second Circuit's correct musing that the federal attorneys could have been prosecuted for *state* crimes, which by "federal officer" Supremacy Clause immunity would not be possible unless their actions had been *corruptly ultra vires*.[12]

---

[12] Stone and Warren, *Supremacy Clause Immunity for Federal Supremacy Clause Immunity for Federal Officers and Agents in State Criminal Prosecutions*:

In defining the contours to the federal immunity defense, the courts have established a two-part rule: "a state court has no jurisdiction if (1) the federal agent was performing an act he was authorized to do by the laws of the United States and in (2) performing that act, the federal agent did no more than was necessary and proper." *Comm. of Ky. v. Long*, 837 F.2d 727 (6th Cir. 1988).

18                    *SUPPLEMENTAL BRIEF*                    [15-CV-1245]

It should be clear the federal crimes for which they could have been prosecuted include wire fraud, mail fraud, and racketeering even though single-scheme, if protracted enough (though at that time of course there was no such statute).[13]

---

In analyzing "necessary and proper," *particularly in the context of an agent acting under exigencies*, courts apply a broad view of reasonableness of conduct, *focusing "on the intent of the officer and not the actual legality of his action." Colorado v. Nord*, 377 F. Supp. 2d 945, 951 (D. Col. 2005) (federal officer entitled to immunity *when he acts in good faith within the general scope of his duties as he understands them;*" id. at 950); *Clifton v. Cox*, 549 F.2d 722, 728 (9th Cir. 1977) (federal officer need not show his action "was in fact necessary or in retrospect justifiable, only that he reasonably though it to be"). *The only consideration is the intent of the officer in enforcing his federal responsibilities*. As Justice Holmes said, "even the most unquestionable and most universally applicable of state laws, such as those concerning murder [cannot] control the conduct of a marshal of the United States acting under and in pursuance of the laws of the United States." *Johnson v. Maryland*, 254 U.S. 51, 56-57 (1920).

Great leeway is given a federal agent, *so long as he is not acting with an evil intent*: "when the federal agent is acting reasonably within the broad contours of official duty, and without malice, the courts have employed the Supremacy Clause to protect the agent from prosecution." *Idaho v. Horiuchi, 253 F.3d 359* (9th Cir.) (en banc), vacated as moot, 266 F.3d 979 (9th Cir. 2001).

In *Clifton v. Cox*, 549 F.2d 722 (9th Cir. 1977), for example, a federal task force executed a search warrant and arrest warrant at a ranch near Garberville, California. An Army helicopter shuttled the task force to the site. As the agents disembarked, one tripped and fell. Another agent, Clifton, thought the fellow had been shot. He ran to a nearby cabin, kicked in the door, and saw a man jump over a bannister in the yard and begin running towards a nearby wooded area. Clifton yelled "halt" twice, and when the man kept running, shot him in the back, killing him. The man was unarmed and had not offered any resistance. A grand jury indicted Clifton for murder and manslaughter, and a federal judge granted his habeas petition on federal immunity grounds.

[13] The Second Circuit has upheld a conviction for sixty-one counts of mail fraud and one count of RICO predicated on mail fraud where the fraud was concealing from New York State the existence of a civil cause of action against defendant for tax fraud. *U.S. v. Porcelli*, 865 F.2d 1352 (2d Cir. 1989).

### G. Barrett *Considered as a Taking*

*Barrett* was pled in constitutional tort, the plaintiff's causes of action implied (*Bivens*, property seizure or deprivation without due process) or statutory (§ 1983, same, but 14th Amendment).[14]

Suppose it had been pled as a Fifth Amendment taking of the cause of action *qua* compensable property?

Clearly, if the plaintiff had pled that these acts of federal and state attorneys had been criminally corrupt, as the Second Circuit thought well might be the case, then she would likley have pled herself out of a takings claim as a threshold dismissal, as (presumably) such corruption would have precluded her from establishing the requisite element of authority (whether it would be actionable in s as a due process violation is outside the scope of this brief).

But suppose she had pled (or repled) as plaintiffs here have, acquiescing to the deprivation by saying, "OK, I see the point, I see the need to have covered this up so that the Army and the CIA could go on secretly dosing citizens with chemical weapons for the greater good of the country; I just don't think they should have been able to make me bear the cost, they should have paid me compensation for what they – and I admit it – lawfully and legally and with absolute authority took from me, *per se* mind you, when they negated my right to sue for the public good."

---

[14] In current theory, once they lost immunity the federal attorneys could be liable in § 1983 as co-conspirators with the NY AAG, notwithstanding his immunity, if they were subject to sufficient control and direction by him. "We can see no reason why a…conspiracy between federal and state officials should not carry the same consequences under § 1983 as does joint action by state officials and private persons." *Kletschka v. Driver*, 411 F.2d 436 (2d Cir. 1969) see also *Beechwood Restorative Care Ctr. v. Leeds*, 436 F.3d 147, 154 (2006) (Jacobs, B.D. Parker, and Hurd JJ.) (Federal actor may be subject to § 1983 liability where he was in conspiracy with state defendants").

Why wouldn't that work? Yes, the government would have to consider throwing the defendants under the bus and defending that they were all criminals acting devoid of any conceivable authority, but they could do it, probably citing Nuremberg protocols. Or the court could do it for them sua sponte. Either way there would be a nice little trial here on whether the taking of the cause of action had been with authority. But no one ever said that this court lacked the subject matter jurisdiction to determine whether what would otherwise be a taking was not for lack of authority…or did they?

Before addressing that, the court may note the elegance of thought which *Barrett* affords, to the present case and all others.

### H.  This Is a Perfect Avatar, Especially for the Present Case, as Both Cases Share a Common Gravamen, viz. the Concealment of a Cause of Action Belonging to the Victim of a Crime

Recall, Barrett was a suit for a constitutional violation by the deprivation of a crime victim's property, *viz.* a cause of action for wrongful death. It was not a wrongful death action itself. True, as it played out, the plaintiff estate recovered $900.000 at trial, and the metric of the damages was the victim's lost income, but that doesn't make it a wrongful death action itself.

Essentially, it's a concept in synthetic or derivative ownership. I contract with you to pay me in one year the gain, if any, on 10,000 shares of some stock. I agree in return to pay you interest on some notional amount equal to the present price of the stock. If you don't pay me, and I sue, the damages are computed with reference to the stock price, but it doesn't mean either of us ever owned any stock.

And so, the government's claim that this court cannot hear this case as a taking because a claim for restitution is inherently criminal (a point plaintiffs don't concede, incidentally) is simply irrelevant;

this court would not be conducting a criminal proceeding any more than the Southern District court in the eventual *Barrett* trial was conducting a wrongful death proceeding – which it would never have had jurisdiction to hear directly for lack of diversity – rather than a constitutional tort proceeding which happened to have as a damages referent a hypothetical past wrongful death action.

Similarly, the court's concern, expressed at oral argument, about the form of action, is, respectfully, also simply irrelevant. The court, accepting at least *arguendo* that a plenary action for money damages or, for that matter, for a judgment lien (in New York State, actions for such liens are in equity, if that matters), as a restitution judgment would have provided ministerially, noted that the form of action the plaintiffs here were deprived of was one that would be initiated by motion, not a pleading, and that, alternatively, the other property the plaintiffs here were deprived of, the right to bring a writ of mandamus in an appellate forum to compel the district court to award restitution, was not of "traditional" form.

Suppose on admission to the NYSPI, Blauer had signed a form that required him to submit any claim for wrongful death to AAA or JAMS arbitration, and to substitute a second arbitration for any right of appeal or similar writ to an appellate court.

Could the result in Barrett have plausibly been any different?

And, though counsel will have to supplement because the citation eludes him, some years ago the FDIC commenced a plenary action in the Southern District of New York by Order to Show Cause, not by motion, but the court found no problem with that. Should that action have been any less property because of the type of Blumberg form used to commence it?

Sadly, but with reason, no one who reads the above will react with surprise. The government performs atrocities on its citizens, allows enlisted men to die of syphilis intentionally untreated for

decades, secretly injects patients with chemical warfare drugs, lets
out nerve gas in subways. Tell the public something it *doesn't* know.

Still, most will react with nausea and rage. Indeed, reaction is
universal: What kind of lawyers were those who would violate their
oaths to uphold the constitution by perpetrating fraud, suborning
perjury, obstructing justice, and covering up a second-degree mur-
der? What kind of physicians were those who would violate their
Hippocratic oaths? Everyone with any sense of justice asks those
questions, or ones like them. Everyone should.

There is, however, a question no one asks, not in the texts and
law reviews condemning the lawyers' roles in the case, or the jour-
nal articles criticizing the doctors' actions.

But everyone asks when I read them this document:
*What about the judge?*

## I.   What About the Judge?

Buried in those 3000 words discussing Bartlett above are the
clear statements that (1) the NY AAG had told the judge the truth
and asked him to keep it from the plaintiffs; (2) the judge agreed,
and did so, indeed actively, by discouraging the estate's counsel
from asking to see the documents being filed at settlement.

Was the judge equally guilty, even more guilty, not only by dint
of mediate causation, that is vicariously, through aid and abettance
and conspiracy (and thus, quite seriously, second-degree murder,
to the extent that would be includible), but directly for his own acts
of obstruction and fraud?

At least as a matter of policy, can one argue that if anything he
was *guiltier*? Judges wear judicial robes of dignity, not papal robes
of antinomian self-dispensation. No authority provides that a judge

who commits what is otherwise a crime does not simply because in his own mind he does it to further the ends of justice.

Motive doesn't displace intent; it runs to mitigation, or it is an element of the crime, for example in obstruction, but it is not an expiation of guilt, let alone of the very same judge himself.

Nor could there be; to the extent a criminal statute in question (but for common-law contempt, federal crimes are statutory) is constitutional, the Supremacy Clause would prohibit such, nor could it be said that a judge violating the criminal law by his actions taken insofar as those would be taken by a judge, except corruptly as to motive, is impliedly making some kind of ruling that some implied provision of the law it doesn't apply to him, as he is not a party to any case or controversy involving that question, so he would lack subject matter jurisdiction to hold that he is absolved, and were he to do so would  violate the Canons as an inherently conflicted).[15]

Fortunately, those questions need not be considered in this case. Except that is no longer true, because of the court's directive to consider the issues in *Petro-Hunt*.

But first, it's necessary to review the facts underlying this case.

## IV.   FELIX SATER'S HISTORY AS A CAREER CRIMINAL

### A.   *Sater's Beginnings as a Career Criminal Injure Plaintiffs*

Felix Sater has a long history of violent crime: In 1990 he was convicted of assault with a deadly weapon; in 1995 he tortured a co-

---

[15] Much has been written about the desirability *vel non* of the judge-made rule, today at least to a degree uniquely forceful in the United States, that provides judges absolute civil immunity for acts taken in the apparent scope of their authority unless they were taken in the clear absence of all jurisdiction. The issue is not presented in this case and so is not discussed further.

conspirator for days to get him to admit skimming; in 1996 he was implicated in the mob killing of a rival; and in the next decade he threatened to kill three of his business associates if they "talked" and revealed his ongoing crimes.

His history of defrauding investors in business is almost as long. For example, in November 1998, he and confederates Gene Klotsman and Sal Lauria pled guilty in the Eastern District of New York to racketeering for controlling an organized crime pump-and-dump stock scheme that bilked many investors, even the elderly, even Holocaust survivors, out of $40 million.

The plaintiffs have well pled that they were among the victims of this scheme as defined by the MVRA and CVRA and suffered damages compensable under those statutes.

When this case was filed, there was no other case pending by plaintiffs or their privies which concerned the underlying facts.

No other case could have ever operated as res judicata against plaintiffs; it is apodictic that res judicata, that is, claim preclusion, cannot operate without an identity of parties and cannot operate when the putatively preclusive case was in a forum which could never have heard the case *instanter*.

Not could there have been collateral estoppel; no court ever ruled on the merits of any of the issues herein nor were any litigated and as they are all by definition federal questions then per *Semtek Int'l Inc. v. Lockheed Martin Corp.*[16] even a Rule 41(b) involuntary dismissal cannot be deemed on the merits.

Nor is the Gottdiener's loss at the threshold pleading stage in a RICO case against Sater[17] relevant, for the above reasons plus the

---

[16] 531 U.S. 497, 503, 506 (2001).

[17] *Gottdiener v. Sater*, 13-cv-2905 (2003 SDNY)(Schofield, J.).

fact that the basis for dismissal, failure to plead with particularity, is not on the merits either.

### B.   Sater's Conviction in 2000 Is Public, But Only If One Knows Where to Look, for All Practical Purposes Hidden.

Because all had made deals and "flipped," their charging instruments and pleas would typically have been secret, sealed pursuant to lawful court orders, while they helped federal prosecutors build cases against their stock fraud co-conspirators.

They were kept secret, but not pursuant to any formal court orders; Judge Glasser, presiding in all the cases, admitted on the record that he never issued a formal sealing order in Sater's case, a fact confirmed by Sater's now-public docket, and for that matter neither Lauria's nor Klotsman's now-public dockets appear to show that any sealing orders were entered at the time.

Almost immediately, the secrecy began to crumble when someone leaked a copy of the supposedly sealed criminal complaint which had been filed against Sater and Klotsman to *BusinessWeek*, which, though admitting that it thought the document was sealed, revealed the criminal investigation in November 1998 by printing excerpts from it[18], as it had the right to do.[19]

---

[18]   See "The Case of the Gym Bag That Squaled," *BusinessWeek*, November 9, 1998 (available at https://www.bloomberg.com/news/articles/1998-11-08/the-case-of-the-gym-bag-that-squealed ).

[19]   Coincidentally, this occurred not long after BusinessWeek had obtained and published a copy of a sealed complaint which had been filed in a Sixth Circuit district court. While at first enjoined by the district court ex parte from publishing it, because it had been sealed, the Sixth Circuit said no, period, they cannot be enjoined from publishing a sealed complaint. *Procter & Gamble Co. v. Bankers Trust Co.*, 78 F. 3d 219 (6th Cir. 1996).

Whatever damage that leak did, if any, was soon moot when in little over a year their convictions by those pleas were made public in a global press release put out by Loretta Lynch, then United States Attorney, EDNY; the head of the NY FBI office; and Howard Safir, then NYPD Commissioner, on March 2, 2000, when the 19 co-conspirators were indicted for their roles in the fraud.

Six months later, on September 2, 2000, that press release was placed in the Congressional Record by an NASD official testifying, along with the head of SEC Enforcement, about the presence of organized crime on Wall Street in general and Sater's racketeering scheme in particular.

However, as plaintiffs have pled, it was not available online, whether at Thomas or anywhere else, for another decade, until late 2010, and what press coverage there was omitted mention of Sater.

In the next years, the 19 defendants, preparing for trial on *U.S. v. Coppa et al.*[20], were told that Sater and others were cooperating and given Brady, Jencks, and Giglio material on them. Many moved for more. Many of these motions, responses, and transcripts, all confirming that Sater and others were cooperators, were publicly filed and thereafter, to this day, publicly available, first at the EDNY clerk's office, then the Lee Archives. As one example only, in November 2001 the government publicly filed on the *Coppa* docket a 3500 letter, on the letterhead of the United States Attorney for the Eastern District of New York, telling *pro se* defendant Lawrence Ray that Sater and Lauria were cooperating witnesses who would testify against him, which has been public ever since then.

And his cooperator status was discussed in a *Coppa* hearing in open court in February 2001, attended by defendants and counsels.

---

[20]   00-CR-0169 (EDNY) (Glasser, J.) (2000).

A transcript of that hearing has been publicly available on PACER for over a decade.

(Apparently, as a cooperator Sater was of little use, despite what he and others say; for example, Jeffrey Licthman, counsel for *Coppa* defendant Daniel Lev, has for years said on his web site that he had "RICO charges dismissed … after [his] investigation of government's linchpin witness revealed his repeated perjury and fraud while cooperating with the government,"[21] and confirmed years ago that he was referring to Sater[22].)

The plaintiffs have well pled that without actual or at least a hint of constructive knowledge that Sater had been charged, let alone convicted, they could not, despite any degree of diligence, have known of his conviction through all this time and beyond.

Moreover, even if they had found in PACER, if it was even online anywhere at the time, the 2000 indictment in Coppa, it listed Sater as an "unindicted co-conspirator" which to any layman would mean anything but that he'd been convicted.

In any event, by 2002 all 19 *Coppa* defendants had pled guilty and been sentenced, most to several years' incarceration and multi-million-dollar restitution orders, leaving only Sater and other cooperators to deal with.

Klotsman was sentenced in 2002, Lauria in 2004. Sater wasn't sentenced until 2009; perhaps his deal took that long to finish, or he sought to avoid a final conviction as he knew it could mean civil liability to his victims.

---

[21]   https://www.jeffreylichtman.com/results.html

[22]   Telephone conversation with respondent, in or about late 2010 to early 2011.

#### C.   *The Details of His Cooperation Become Public Record in 2009, Along With His Sentencing*

Sentencing pronouncements must be made in open court. If Loretta Lynch, U.S. Attorney, EDNY; Donald Verrilli, U.S. Solicitor General; and Leo Glasser, the judge in Sater's case, are to be believed, Sater *was* sentenced in open court, as the now-public transcript shows, in his real name, with details of his cooperation read.

Why shouldn't they be believed? After all, in 2013 they agreed to, and did, tell the iIgh Court in papers opposing cert that he was sentenced in open court.[23] A secret sentencing would be bad; for a federal judge, U.S. Attorney, and Solicitor General to tell the Court it had been open court when it hadn't would be unthinkable. Right?

*But it doesn't matter*, because again the only known calendar for the event listed Sater as "John Doe," his criminal docket simply didn't exist to anyone looking for it if they didn't already know where to find it, and even then all they would find was the name, not the charge. All this has been well pled and of course an amendment if necessary can make such even more so.

According to the sentencing transcript, the finality of Sater's conviction by entry of judgment and conviction at the end of his sentencing hearing, and the hearing itself, were all conducted under Sater's real name, and according to that transcript details of his cooperation were read aloud, and again assuming that it is unthinkable for a United States Attorney, Solicitor General, and a sitting federal district court judge to conspire to defraud, and then act to defraud, the United States Supreme Court by asking it to deny cert

---

[23]   See 2013.03.14 Glasser order, indicating Sater was sentenced in open court.

in reliance on a fabrication, saying the sentencing was in open court if it was not, is of a historic import beyond words.

### D.  The Relevance of Petro-Hunt

Is simply this: None of this matters (unless it does). I explain.

The preceding paragraphs serve to establish that whether the plaintiffs were truly deprived of property by its concealment is at best a factual question, as they have well pled that no amount of diligence, due or otherwise, could have revealed the truth.

At this stage (that is, at the motion to dismiss under § 12(b)(6), unless palpably ridiculous, those allegations must be taken as true.

(And I presume the court is aware of the enormous publicity of the last years in which the government and Sater have screamed to anyone who would listen that counsels "blew" Sater's secrecy.)

And, if necessary on repleading, plaintiffs can add that they duly litigated against many persons for over a decade because of their loss, including brokers and clearing agents, and so can readily demonstrate, though they themselves are deceased, diligence.

But again, this doesn't matter. It doesn't even matter whether the government can or should be estopped from arguing that there was a sealed case, and for good cause.

*Petro-Hunt* and its related cases say so.

That's because whether the government sealed his case or didn't seal his case or should have or shouldn't have cannot matter because plaintiffs have acquiesced. Had plaintiffs pled here that they were defrauded by the secrecy and that it was wrongful, even criminal, and that they stood in the shoes, so to speak, of Harold Blauer, then we would have an altogether different story, for we would be asking the court to find a taking in the face of criminal misconduct, which should rationally be clearly without authority.

Thus, to the extent *Petro-Hunt* is relevant here at all, it can only stand for the proposition that a failure to acquiesce to the actions of the court which then, for plaintiffs to prevail, would require this court to review, essentially as an appellate court under § 1291 or § 1292, the actions of an Article III district court, fails for lack of subject matter jurisdiction:

Plaintiffs are not claiming that the district court made an error in concealing the case and the sentencing and the cause of action to set aside the sentencing component which Congress gave them.

They acquiesce to all of it.

But in doing so, with respect, there must be great care. In the cases cited in *Petro-Hunt* at Part D, *q.v.,* because there is a great subtlety here that must be paid attention.

For example, pursuant to those case this court cannot decide whether Judge Glasser should have or should not have ordered restitution, if that should be outcome-determinative (note that the government is legally in error; Judge Glasser simply never ruled on the issue, rather than ruled against restitution, as such a ruling would have required a full statement of reasons, which is absent, though again even that doesn't matter.)

But it isn't what plaintiffs are asking this court to do…

### E.  Pursuant to Petro-Hunt, the Property Issue Here Is One of Embedded Optionality, or Real Option Theory

No one claimed in *Barrett* that the estate had been deprived of money; they claimed that the estate had been deprived of the right to try to recover it. Another way of analyzing a right of action is as an option vested in the holder entitling him to petition a court for relief. It is an option; he need not exercise it.

All options have value.

A right of appeal is such an option, as too is the CVRA right to petition the court to reverse its decision.

*We may dispute how to value them, but we cannot dispute that they have aleatory value.*

*That's what is taken when a cause of action which would allow the wronged person to sue to overturn a decision is taken.*

Apparently, the court may be concerned that allowing a trial to measure the value of the right to have challenged Judge Glasser's decision by petition before him or writ of mandamus to the Second Circuit is implicitly allowing the court to decide whether Judge Glasser was wrong in the first place, either by avoiding the issue or by deciding no restitution was due. That is a fail. because *plaintiffs are not asking this court to decide whether Judge Glasser was wrong, but to decide whether, for example, the Second Circuit might have decided that, **even if incorrectly**, in a mandamus preceding.*

That is why I took the time to set forth concepts of governing dynamics, and the examples from *A Beautiful Mind* and Warren Buffet's stock picking as a beauty contest, because *this court is not being asked whether it agrees with Judge Glasser as to who he held was the prettiest girl in the room, but rather is being asked to decide whether the Second Circuit would have agreed with him in a mandamus.*

## V.  THE GOVERNING DYNAMICS OF DEMOCRACY

There is something worth noting in closing. *Petro-Hunt* again stands for the jurisdictional inability of this court to sit in judgment of the correctness of another court's actions.

But it does not define correctness.

As one example, if a judge acts collusively with the government to hide a cause of action, or utterly corruptly by reason of bribe,

does the jurisdictional bar preclude this court from detrmining that insofar as that would presumably run to authority?

Assuming garden variety "authority" issues are precluded from review (if outcome determinative) as the equivalent of merits reviews, in other words this court cannot sit in judgment of another court's claim to jurisdiction, how far does that extend?

Because if it extends all the way to infinity, then all acts of such a judge must be respected as authorized as well as correct, and that means there will always be a taking, ceteris paribus, if the only issue is whether the judge acted with authority.

Or, in the alternative, it might mean that this court believes it can throw up its hands and hold non-justiciable as a taking anything having to do with any aspect of anything a judge did.

In that case, there will never be takings again.

For example, in Barrett, the New York Court of Claims judge did have to enter judgment for the state, and he did knowing that there was a fraud on plaintiffs. Is his entry of judgment enough of a "confirmatory" judicial act as to bring that case, if pled as a taking, under review as a "judicial" taking triggering the above concern?

What if, at the request of an *ex parte* request, the *Barrett* judge had *ordered* the state and federal governments not to inform the victims of the crime. Would this court then be precluded from reviewing the correctness of that decision and thus have to hold that no matter how collusive it might be, it was correct, thus the judge authorized the cover-up, thus everyone acted with authority, thus there was, again a taing.

If that seems perverse, consider the alternative, where the court (presumably upheld by the Circuit and the Supreme Court) simply cannot determine takings (or exactions, for that matter) anytime an Article III judge left a thumbprint on anything material.

Is there any doubt that such will soon produce the executive branch running into court for orders purporting to authorize anything it did so it vitiates the entirety of Tucker Act jurisdiction?

In *Edison the Man*, the inventor suffers a setback when two of the dynamos he'd built to light up lower Manhattan were operating out of synchronization, one pulling on the other as a motor, running away with it. He only averted disaster by installing a governor between them, a control rod guaranteeing one could not pull against or lag behind the other and so throw the system into imbalance.

The next scene is a half-century in the future, at the celebration honoring the then-elderly inventor for giving "50 Years of Light." Recalling that episode all those years before, he gives this speech:

> This evening I talked with two schoolchildren. Tomorrow the world will be theirs. It's a troubled world, full of doubt and uncertainty. You say we men of science have been helping it. Are these children and their children going to approve of what we've done? Or are they going to discover too late that science was trusted too much, turning into a monster whose final triumph was man's own destruction?

> Some of us are beginning to feel that danger. But we have a chance to avoid it. I once had two dynamos. They needed regulating. It was a problem of balance and adjustment. I believe the confusion in the world today presents the same problem. The dynamo of man's God-given ingenuity is running away with the dynamo of his equally God-given humanity. I am too old now to do much more than to say, put those dynamos in balance. Make them work in harmony as the great designer intended they should. It can be done. What man's mind can conceive his character can control. Man must learn that, and then we need not be afraid of tomorrow, but can go forward toward more light.

The Framers, whether they explicitly thought of it or not, de-signed our system of government as a grand experiment in the gov-erning dynamics of, well, governing, by intentionally incorporating into it just such a governor, what Professors Tarkington and Chemerinsky call the *checking power*, to protect it from one branch running away with the power of the other two.

We lawyers are a necessary part of that checking power, as much as your honors are, for you may hold the gavel, but we hold the client's hand.

The case at bar presents a study in the governing dynamics of the judiciary vis-à-vis democracy, at least in theory, at least in the preceding two pages, which the court may not reach.

Nevertheless, the issue will have to be dealt with at some point.

There is right, there is wrong, and there is the gray in between. As professionals, we are expected to know what to do when some-thing is wrong, to strive to make things right, and, as to the gray, to use judgment, as the difference between a profession and a trade is that the profession is meant to teach the methods and means, the skill and abilities, to, as they say, boldly go where no one has gone before and still have a good idea what to do when you get there.

Even if we have to exercise the will to doubt a federal judge.